**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CASE NUMBER 1:23-CR-10 |
| | § | |
| | § | |
| AHMED ABDALLA ALLAM | § | |

## MOTION TO DISMISS THE INDICTMENT

Comes Now Ahmed Abdalla Allam, the Citizen Accused herein, and files this Motion to Dismiss the Indictment, and would show unto the Court the following:

Allam was indicted by a Grand Jury on February 1, 2023. The Indictment contains one count of possession of a firearm in a school zone under 18 USC § 922(q)(2)(A). Based upon the Fifth Circuit Court of Appeals opinion in *U.S. v. Rahimi* on February 2, 2023, the United States Supreme Court's recent opinion in *Bruen*, and the Second Amendment to the U.S. Constitution, Allam moves to dismiss this action pursuant to the Federal Rules of Criminal Procedure. This prohibition is unconstitutionally broad in scope, creates an unconstitutional imposition on otherwise lawful possessors of firearms, and is unconstitutional as applied to Allam.

### I.   STATEMENT OF FACTS

On January 29, 2023, Allam was arrested by Beaumont Police. Ostensibly, the basis for the arrest was a violation of Texas Transportation Code Section 504.945. This Title 7, Subtitle A, non-moving violation carries up to a $200 fine and is not punishable by jail time under the Code. The basis for the arrest will, however, be the subject of a separate motion.

As part of the inventory conducted by officers pursuant to the arrest, a rifle was discovered and is the sole subject of the indictment. The firearm was a Diamondback Firearms DB15 multicaliber rifle. The indictment alleges that Allam possessed this weapon within 1,000 feet of

St. Anthony Basilica Cathedral School in violation of 18 USC § 922(q)(2)(A). Allam is not a prohibited person and has no felony or violent criminal history. He is a citizen of the United States and a resident of New York State.

The relevant statue, § 922(q)(2) reads:

**(A)** It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone.

**(B)** Subparagraph (A) does not apply to the possession of a firearm:

    **(i)** on private property not part of school grounds;

    **(ii)** if the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license;

    **(iii)** that is:

        **(I)** not loaded; and

        **(II)** in a locked container, or a locked firearms rack that is on a motor vehicle;

    **(iv)** by an individual for use in a program approved by a school in the school zone;

    **(v)** by an individual in accordance with a contract entered into between a school in the school zone and the individual or an employer of the individual;

    **(vi)** by a law enforcement officer acting in his or her official capacity; or

    **(vii)** that is unloaded and is possessed by an individual while traversing school premises for the purpose of gaining access to public or private lands open to hunting, if the entry on school premises is authorized by school authorities.

The definition for "school zone" is found in 18 USC § 921(a)(26): "(A) in, or on the grounds of, a public, parochial or private school; or (B) within a distance of 1,000 feet from the grounds of a public, parochial or private school."

## II.  ARGUMENT AND AUTHORITIES

### A.  The Second Amendment Guarantees a Right to Possess Firearms

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II.  In *D.C. v. Heller*, 554 U.S. 570 (2008), the U.S. Supreme Court struck down a city ordinance in the Nation's capital and affirmed that the Second Amendment protects an individual's right to possess a firearm and to use that firearm for traditionally lawful purposes, such as self-defense. More recently, the Court decided another civil matter involving gun regulations in New York, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), and reaffirmed this position. Prior to these opinions, the Second Amendment had enjoyed second-class status amongst the Bill of Rights. On February 2, 2023, though, the Fifth Circuit Court of Appeals struck down a federal criminal statute, 18 USC § 922(g)(8), and reaffirmed this Circuit's position that the Second Amendment protects the rights of individuals to possess firearms. *U.S. v. Rahimi*, No. 21-11001, 5th Cir. (2023), *see attached* Exhibit A.

### B.  *Rahimi* Shed the Circuit's Previous Test for Constitutionality of Criminal Laws in Relation to the Second Amendment

Zackey Rahimi was charged under federal law with a violation of 18 USC § 922(g)(8), which prohibits persons who are the subject of a restraining or protective order to possess a firearm. Rahimi, evidently, had committed a number of violent crimes involving firearms while he was the subject of a state civil protective order that, among other things, prohibited him from possessing firearms. Rahimi averred that § 922(g)(8) violated his Second Amendment rights. *Rahimi*, No. 21-

11001, 1-2. The trial court, and initially a panel of the Fifth Circuit disagreed, and sustained a conviction against him. While Rahimi's *en banc* petition was pending, though, the Supreme Court issued its opinion in *Bruen* and the Fifth Circuit withdrew its previous opinion and issued a new one on February 2, 2023.

In *Rahimi* opinion, the Fifth Circuit discarded prior precedent on the Second Amendment (*McGinnis* and *Emerson*), and its analysis, as obsolete. *Rahimi*, No. 21-11001, 5. In its place, the Fifth Circuit adopted a two-part test consistent with the Court's analysis in *Bruen*. The first step is establishing whether the Second Amendment covers the individual and their conduct. *Rahimi*, No. 21-11001, 5, citing *Bruen*, 142 S.Ct. at 2129-30. The second step requires a showing by the Government that the regulation or prohibition is consistent with historical firearm regulations in the United States. *Id*.

### C.     Allam Clearly Enjoys the Protections of the Second Amendment

In *Heller*, the Supreme Court described what people or conduct was covered by the Second Amendment. Primarily, *Heller* concluded the Second Amendment confers on an individual the right to keep and bear arms, specifically for the purposes of self-defense. *Heller,* 554 U.S. at 628. Following *Heller*, the Court in *Bruen* concluded that when the plain text of the Second Amendment covers an individual's conduct – keeping and bearing arms – "the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2126. The Court went on to write: "[t]o justify its regulation, the government may not simply posit that the regulation promotes an important interest," but rather must demonstrate consistency with historical firearm regulation. *Id*.

In *Rahimi*, the person and the conduct created a debatable question because the accused was not a normal, law-abiding citizen. Rather, he was, by all accounts, a dangerous and violent

person. Nonetheless, the Court concluded he was protected from federal criminal liability under the Second Amendment as one of "the people."

Here, though, Allam has no real criminal history and was not engaged in any criminal activity at the time of his arrest. He merely possessed a firearm in his vehicle on a public roadway and was not violating any state firearms laws. As such, the Constitution must presumptively cover Allam and his conduct. Put differently, *Heller*'s reference to "the people" means that Allam is included in "the people" and thus within the Second Amendment's scope. *See Rahimi*, at 8.

### D. Recent Cases Place the Burden Upon the Government to Justify the Law as Consistent with the Nation's Historical Tradition of Firearm Regulation

The focus then turns to the second prong of the analysis. Here, the Government bears the burden of "justify[ing] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.*

### E. Section 922 (q) and Historical Firearms Regulation

In considering whether 18 USC § 922(q)(2)(A) is consistent with historical firearms regulations, it is worth considering the Government's own analysis. The Justice Department has created a document entitled History of Federal Firearms Laws in the United States.[1] There, the government laid out the timing, basis, and scope of major firearms regulations passed by Congress and signed into law. The statute in question was part of the Gun-Free School Zones Act of 1990, whereby Congress endeavored to make it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a

---

[1] https://www.justice.gov/archive/opd/AppendixC.htm; *See attached* Exhibit B.

-5-

school zone." 18 U. S. C. § 922(q)(1)(A) (1988 ed., Supp. V). Based upon the Justice Department's overview, the historical firearms regulations relating to "school zones" are relatively new in comparison to the Second Amendment. And, during hearings prior to its passage, Richard Cook, Chairman of the Bureau of Alcohol, Tobacco, and Firearms, acknowledged that the bill was a significant expansion of federal jurisdiction in relation to schools and firearms. *See attached* Exhibit C, testimony of Chairman Cook, pg. 19.

Absent from the Gun Free School Zone Act's legislative history is any detailed reasoning behind the 1,000 foot demarcation. *See generally* Exhibit C (testimony from the mark up hearing on the Act). In fact, it is difficult to find in the record any calculation, explanation, or intent as to how Congress arrived at such a number. Members of the Committee, in their questioning, even seem perplexed as to how the authors of the bill arrived at the 1,000 foot mark. For example, one member, Mr. Gekas of Pennsylvania, asked ATF Chairman Cook about the statistical basis for the 1,000 foot "magical zone" and Cook acknowledged he did not have any. *See* Exhibit C, pg. 21. Additionally, testimony from various experts was presented to the subcommittee that provided anecdotal evidence of gun violence in schools that the bill endeavored to address. But, the examples almost all involved actions on campus by students who were too young to face prosecution for violating federal law. *See* Exhibit C, pg. 52, 72. In essence, there was very little record or statistics regarding shootings by adults happening adjacent to campus grounds that would justify the additional 1,000 foot restriction. It seems, therefore, that the distance was arbitrary and capricious and has significant constitutional infirmity even before the new *Bruen* and *Rahimi* analysis was developed.

The record indicates that Members of Congress, at the time of initial passage, found it arbitrary and that there existed no obvious reason why the perimeter created by the bill was not

eighty-three or one-thousand and three feet. *See* Exhibit C, pg. 21. Most of the testimony provided by the ATF and other witnesses make it clear that the bill was drafted to make it easier for the federal government to combat major narcotics and gun trafficking enterprises, not unlawfully restrict the Second Amendment rights of citizens. *See generally* Exhibit C.

There is ample commentary in the testimony demonstrating that Members and witnesses recognized and were concerned about the unconstitutional restrictions the bill placed on citizens. But, the result ultimately was to fall back on the exemptions for state gun owner registration laws and the provisions for private property possession and unloaded/locked weapons in vehicles. It is worth considering, though, that Texas, for example, has open carry laws, no restrictions on long rifle possession in vehicles, and that having a locked away and unloaded weapon is not terribly useful for self-defense against a car jacker or armed robber.

In its original form, the statute did not regulate commercial activity and did not contain any requirement that the possession be connected to interstate commerce. This too was noted by witnesses and Members of Congress at the time of the final markup hearing. *See e.g.* Exhibit C, pg. 18, the prepared remarks of Chairman Cook. In *U.S. v. Lopez,* the Supreme Court struck down the statute for those reasons and held that the act exceeded congressional authority "[t]o regulate Commerce . . . among the several States . . . ." U. S. Const., Art. I, § 8, cl. 3. The previous version of the statute, and the debate in *Lopez*, centered around the power of Congress to regulate guns in and around schools as part of its interstate commerce power. The question of whether the Second Amendment was implicated by the statute was not mentioned.

Subsequently, § 922(q) was amended to reference the interstate commerce nature of firearms. In the wake of *Lopez*, most litigation about § 922(q) has centered around issues relating to the commerce clause and whether a particular weapon was sold or possessed as part of interstate

commerce. As an aside, the Legislative changes did not address the question of whether schools impacted interstate commerce and the Tenth Amendment implications of the right of states to regulate education – an area traditionally reserved for them. *See U.S. v. Lopez*, 2 F.3d. 1342, 1346-1347 (5th Cir. 1993) (discussion by the Court regarding the conflict between the Tenth Amendment and the Commerce Clause prior to the Supreme Court decision in 1995 on that case).

Of particular importance for this Motion to Dismiss, though, § 922(q) still relies on the definition of a "school zone" as "(A) in, or on the grounds of, a public, parochial or private school; or (B) within a distance of 1,000 feet from the grounds of a public, parochial or private school." 18 USC § 921(a)(26). Subsection (B) of this definition provides the basis for the alleged violation here and should be struck down by this Court under *Bruen* and, now, *Rahimi*.

### F. Expansion of "School Zones" to Include Public Places and Roadways Violates the Second Amendment

Texas law makes it a crime to intentionally, knowingly, or recklessly possess a firearm "on the physical premises of a school or educational institution, any grounds or building on which an activity sponsored by a school is being conducted…" Tex. Pen. Code § 46.03. And, as noted above, the first definition provided for "school zone" under § 922(q)(2)(A) and § 921(a)(26) duplicates this prohibition under federal law. In *Heller,* the Court explained that its holding should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms *in* sensitive places such as schools and government buildings . . . ." *Heller* 554 U.S. at 626–27 (emphasis added). Here, though, the conduct that our society seeks to criminalize – using firearms in school – is not what Allam was doing, or even accused of doing. He was not on the grounds or premises of a school and certainly was not "in" a school building with a firearm.

Allam, therefore challenges the language in 18 USC § 921(a)(26)(B) expanding the "school zone" to include public places and roadways that are not on school grounds. A 1,000 foot radius of the grounds of every public, parochial, or private school is a substantial imposition on his rights, and the right of all citizens, to possess a firearm. This prohibition impedes on the rights of firearm owners to drive in their vehicles with their firearms over a significant amount of geography. In order to survive constitutional scrutiny, the Government must demonstrate that coverage of this excess area has its roots in historical firearms regulation.

### 1. The Radius of St. Anthony Basilica School Property Demonstrates the Scope of the Imposition

The property that encompasses the grounds of St. Anthony Basilica School and Cathedral takes up four city blocks in downtown Beaumont. Using Google maps and the 1,000 foot scale provided therein, one can create a radius of 1,000 feet in each direction from the boundaries of the campus complex and property. For this particular property, a citizen in otherwise lawful possession of a firearm commits an offense when driving in and out of downtown Beaumont on State Highway 90/College Avenue, driving on Martin Luther King, Jr. Parkway, and parking at the Beaumont Event Center. Moreover, the entire diameter, when properly calculated, covers more than 45 blocks.

Below is a map of the 1,000 foot diameter from the St. Anthony property. The property boundaries are highlighted in yellow. To measure the distance, the scale in the bottom right was used to establish 1,000 feet radius in each direction on this map. Then a circle is overlayed to demonstrate the complete diameter that the 1,000 foot prohibition would encompass.



A zoomed in view demonstrates the significant swath encompassed by the 1,000 foot diameter:



**2. Similar Analysis of Other Schools in the Eastern District Renders the Same Result**

Performing a similar analysis throughout Beaumont demonstrates the significant impairment to the Second Amendment by the unnecessarily expansive 1,000 foot radius. For example, St. Anne School's 1,000 foot radius would prohibit carrying a firearm on Calder Avenue, Liberty and Laurel Avenues, the Maury Myers Bridge, a significant portion of 11th Street, and parts of Interstate 10 and its access road.



Another example includes Marshall Middle School and its neighboring Sallie Curtis Elementary School in Beaumont. The public schools would prohibit transport by firearm owners on a two major streets in Beaumont, Gladys Avenue and Dowlen Road, and, again, would take up dozens of city blocks.



A larger map of other schools in Beaumont show the impact this prohibition has for people legally possessing firearms on city streets. Highway 69, Delaware Street, and another portion of 11th Street are implicated.



Other locations outside of Beaumont demonstrate further imposition on otherwise law-abiding citizens in their vehicles elsewhere in the Eastern District of Texas. In Lumberton, Texas, for example, one cannot travel through or in town on Highway 69 or Highway 96 without coming within 1,000 feet of the high school, middle school, or primary school.



Likewise, throughout East Texas, schools are located near major thoroughfares. Port-Neches, Nederland, Silsbee, Vidor, Bridge City, Orange, Little Cypress-Mauriceville, Nome (Hardin-Jefferson), Winnie, High Island, Barbers Hill, Kountze, Buna, Kirbyville, Jasper, Woodville, Livingston, Cleveland, Corrigan, Groveton, Huntington, Lufkin, Jacksonville, Tyler, Longview, Marshall, Mt. Pleasant, Plano, and Texarkana all have public school grounds within a 1,000 feet of major highways. Certainly, there are many others throughout the District and the State of Texas. Under this law, as the Government is applying it to Allam, tens of thousands of Texans are violating the law on a daily basis.

### G. The 1,000 Foot Radius Furthers No Legitimate Purpose Not Already Served by State and Federal Law and is Overly Broad and Encompassing

In the wake of the *Lopez* decision, Congress instituted the current version of § 922(q)(2)(A). Again, the focus of the revisions was on shoring up the Interstate Commerce Clause Power for Congress to regulate the conduct in the first place. Little focus was placed on the 1,000 foot diameter prohibition and the Second Amendment implications were not addressed.

The federal definition of "school zone" is also overly broad because, unlike speed limit reductions around a school during specified hours, the imposition here is operable even when the school is not operating and children are not present. Normal law- abiding citizens understand a "school zone" in the context of speed reductions around schools during times when students may be coming or going from the school. This is the same as temporary speed limit reductions in a construction zone "when workers are present." As an example, here are the "school zone" signs regarding St. Anthony School.



-14-



There are specifically delineated times on school days that the law for the school zone is applicable. And, to make matters more confusing for the public, the church, across from the school has signs about prohibited items, but the signs are inside the easement and do not appear to impact someone parking on the street or be applicable to the school across the street.



Importantly, Allam was arrested on a Sunday evening. No children were in school or present. He did not brandish a firearm or threaten anyone. And, he did not enter the grounds of the school or the church with a weapon.

Again, § 922(q)(2)(A) is aimed at protecting children from gun violence. It cannot be used to make everyone who drives or parks within a thousand feet of a school with a firearm in their vehicle a criminal. There can be no historical legislative purpose for the scope of that intrusion on citizens' Second Amendment rights. There also is no rational, legal reason for applying the law to Allam the way that the Beaumont Police and the federal agents have done in this matter.

### III.   CONCLUSION

The Second Amendment to the U.S. Constitution protects the right of Ahmed Allam to possess a firearm in his vehicle for his own protection. Allam was arrested and indicted for possessing a firearm within 1,000 feet of the St. Anthony Basilica School. He did not enter the school or the property of the school with a firearm. He is not a prohibited person and he has no violent criminal history. Nonetheless, 18 USC § 922(q)(2)(A) prohibits citizens from possessing a firearm within 1,000 feet of school boundaries. In the wake of the *Bruen* and *Rahimi* decisions, this prohibition should be struck down and the indictment should be dismissed. Allam hereby asks this Court to do so.

### IV.   PRAYER

WHEREFORE, Ahmed Allam, prays the Court dismiss the Indictment.

        Respectfully submitted,

        THE GERTZ KELLEY LAW FIRM
        Attorneys at Law
        2630 Liberty
        Beaumont, Texas 77702
        Ph.: (409) 833-6400
        Fax: (409) 833-6401
        Email: rgertz@gertzlawyers.com


        _/s/ *Ryan W. Gertz*_____
        RYAN W. GERTZ
        STATE BAR NUMBER: 24048489
        THOMAS W. KELLEY
        STATE BAR NUMBER: 24072891

        ATTORNEYS FOR AHMED ALLAM

## **CERTIFICATE OF SERVICE**

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this the 6th Day of February, 2023.


        /s/  *Ryan W. Gertz*
        _____
        Ryan W. Gertz

-18-

**CERTIFICATE OF CONFERENCE**

Counsel for Defendant spoke with Assistant United States Attorney John Ross regarding this motion and the Government of the United States is opposed to this Motion.

/s/ *Ryan W. Gertz*_____
Ryan W. Gertz