2/5/23, 8:18 PM
Case 1:23-cr-00010-MAC-ZJH   Document 32-2   Filed 02/07/23   Page 1 of 7 PageID #: 234
OCR 100 | United States Department of Justice Archive - Appendix
skip to content

# APPENDIX C

# HISTORY OF FEDERAL FIREARMS LAWS IN THE UNITED STATES

Recognizing that no single law or initiative will end gun violence in America, this Administration has supported a comprehensive approach to address the problem. The following brief description of the federal firearms laws provides a context for the Administration's current gun violence reduction efforts.

**I.    Controlling the Firearms Market: The Gun Control Act of 1968**

Following the assassinations of President John F. Kennedy, Senator Robert Kennedy, and Dr. Martin Luther King, Jr., Congress passed the Gun Control Act of 1968 (GCA). The GCA, as amended over the years, continues to be the primary vehicle for the federal regulation of firearms. The GCA's stated goals are to "keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background or incompetency, and to assist law enforcement authorities in the states and their subdivisions in combating the increasing prevalence of crime in the United States."[(1)] To achieve these goals, the GCA created the first comprehensive federal framework to investigate and prosecute firearms crimes. In particular, the GCA required individuals engaged in the business of dealing in firearms to obtain a federal license, prohibited transfers of firearms to certain persons, restricted the interstate transportation of firearms, and regulated the importation of certain firearms not suitable for sporting purposes.

### A.    *Requiring Federal Licenses for Transferring Firearms Under the GCA*

One of the GCA's key provisions creates a licensing scheme that regulates the interstate movement of firearms. Persons engaged in the business of manufacturing, importing, or dealing in firearms-referred to as "federal firearms licensees" (FFLs)-must obtain a license from the Secretary of the Treasury. The license entitles the holder to ship, transport, and receive firearms in interstate or foreign commerce. The FFL must maintain records of all acquisitions and dispositions of firearms and comply with applicable state and local laws in transferring firearms. The recordkeeping requirements help allow some crime guns to be traced. Combined with other obligations and restrictions imposed on firearms dealers, manufacturers, and importers, these requirements help provide a basis for investigating illegal firearms trafficking.[(2)]

### B.    *Prohibiting Certain Transfers and Possession*

The GCA made it unlawful for certain persons to receive firearms, and made it a felony for an FFL to transfer a firearm knowing, or having reasonable cause to believe, that the transferee is prohibited from receiving the firearm. Subsequent amendments made it unlawful for any person to knowingly transfer a firearm to a prohibited person, and made it unlawful for the following categories of prohibited persons to possess a firearm:

- Felons;
- Fugitives;
- Drug addicts or unlawful drug users;
- Persons committed to mental institutions or adjudicated as "mentally defective";
- Persons dishonorably discharged from the armed forces;
- Persons who have renounced their United States citizenship;
- Illegal or nonimmigrant aliens;
- Persons subject to certain domestic violence restraining orders; and
- Persons convicted of misdemeanor crimes of domestic violence.

The GCA also prohibits anyone under a felony indictment from receiving or transporting a firearm. In addition, with certain limited exceptions, juveniles under 18 years of age may not possess handguns. Finally, the GCA makes it unlawful for an FFL to transfer a handgun to anyone under the age of 21, or a long gun to anyone under the age of 18. Young people between the ages of 18 and 21 may still buy handguns from non-licensed

**EXHIBIT B**

sellers in the secondary market, and there are no age restrictions on the transfer of rifles and shotguns by non-licensed sellers.

### C.  Controlling the Interstate Flow of Firearms Under the GCA

The GCA helps individual states enforce their own laws regulating firearms possession and transfers by generally prohibiting the transport and shipment of firearms across state lines, except among FFLs. Before the GCA, differences among state controls over firearms commerce impaired the ability of states to enforce their own laws. The GCA's interstate prohibitions were intended to minimize the impact of different state laws, which had led to illicit commerce in guns between states with little firearms regulation and jurisdictions with strict controls.

### D.  Regulating Imported Firearms

When Congress passed the GCA, it was well known that the rifle used to assassinate President John F. Kennedy was a surplus Italian military rifle imported into the United States. In addition, so-called "Saturday night specials"-inexpensive and often imported handguns-were associated with rising street crime. Accordingly, the GCA established a framework for "curbing the flow of surplus military weapons and other firearms being brought into the United States which are not particularly suitable for target shooting and hunting."[(3)] Under the Act, all imported firearms must be "generally recognized as particularly suitable for sporting purposes" before being approved for importation. Handguns are judged against "factoring criteria," which include overall length, frame construction, weight, caliber and safety features. The factoring criteria have not been reexamined since they were established in 1968.

Domestically produced handguns do not have to satisfy the factoring criteria applied to imported handguns. If the same test were required for domestically produced handguns as for imported handguns, eight of the top ten traced handguns in the United States in 1998 would have been barred.

## II.  The Early 1980s: Drugs and Guns

In the early 1980s, very high levels of gun violence were associated with the burgeoning crack epidemic. In 1984, Congress enacted the Comprehensive Crime Control Act and the Armed Career Criminal Act, which enhanced the sentences of those convicted of using firearms in crimes of violence. In 1986, Congress extended these enhanced penalties to criminals who use or carry firearms during serious drug offenses.[(4)] These amendments to the GCA imposed:

- A mandatory five-year prison term for using or carrying a firearm during a crime of violence or drug trafficking crime;

- A mandatory fifteen-year prison term for felons in possession of a firearm who had three prior convictions for violent felonies or serious drug offenses;

- A ten-year sentence enhancement for using a short-barreled rifle or shotgun, or a semiautomatic assault weapon, in a crime of violence or drug trafficking crime;

- A thirty-year sentence enhancement for using a machine gun, destructive device, or firearm equipped with a silencer during a crime of violence or drug trafficking crime; and

- A twenty-year prison term or life imprisonment for second or subsequent GCA offenses.

To take advantage of these stiffer penalties, in 1986 ATF developed the "Achilles Program" to concentrate on enforcing these new laws. The Achilles Program made firearms possession by violent criminals their "Achilles heel" by exposing them to lengthy prison sentences under the new firearms laws. ATF worked closely

with U.S. Attorneys and state and local law enf6orcement officials to ensure that drug dealers and violent criminals were prosecuted in the forum where they would receive the greatest punishment for their crimes. These enforcement activities continue today.

### III.     A Step Backward: The Firearms Owners' Protection Act of 1986

In 1986, Congress loosened several controls it had established in the GCA. The stated purpose of the Firearms Owners' Protection Act of 1986 (FOPA) was to ensure that the GCA did not "place any undue or unnecessary Federal restrictions or burdens on law abiding citizens,"[(5)] but it opened many loopholes through which illegal gun traffickers can slip. In FOPA, Congress:

- Allowed FFLs to temporarily conduct business away from their normal place of business, such as at organized gun shows;

- Narrowed the scope of those who "engage in the business" of dealing in firearms (and are therefore required to have a license) to include only those who devote "time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." Significantly, FOPA excluded those who buy and sell firearms to "enhance a personal collection" or for a "hobby," or who "sell all or part of a personal collection." The complex definition made it difficult to identify illegal dealers who claim that they are merely "hobbyists" or trading firearms from their personal collection;

- Reduced the criminal penalties for certain recordkeeping offenses committed by FFLs, from felonies to misdemeanors;

- Prohibited ATF from centralizing or computerizing firearms purchase records;

- Permitted sales of ammunition without a license;

- Allowed a convicted felon to obtain firearms where the convicting jurisdiction automatically restored the felons' civil rights upon release from prison or completion of sentence;

- Prohibited ATF from conducting more than one warrantless compliance inspection of a licensee in any 12-month period;

- Required the government to prove either a "knowing" or "willful" state of mind for all GCA violations; and

- Required any forfeiture proceeding of any firearm or ammunition involved in any violation of the GCA to be commenced within 120 days of seizure.

On the positive side, FOPA finally banned the manufacture of machine guns for civilian use and made it unlawful for anyone, not just licensees, to sell firearms to prohibited persons.

A notable effect of FOPA was to direct ATF's enforcement efforts away from the legal and illegal firearms markets, and toward creating programs that sought primarily to identify, prosecute and punish violent criminals who used firearms in crime. For example, in the late 1980s, the Justice Department and ATF developed an intensive prosecution initiative known as "Project Triggerlock," which identified and prosecuted recidivist criminals under firearms laws that mandated long prison terms for repeat offenders.

### IV.     Reducing the Illegal Supply of Guns

Firearms violence continued to escalate throughout the 1980s and early 1990s, with increasing public concern that criminals were becoming even more heavily armed. Firearms enforcement efforts remained focused on the criminal users of firearms, not the markets in which criminals acquired their guns.

Following President Clinton's election in 1992, the Administration and Congress again focused on the need to keep guns out of the hands of criminals and juveniles not eligible to possess firearms. In 1993, after a legislative battle that spanned seven years, Congress finally passed, and President Clinton signed, the Brady Handgun Violence Prevention Act. The Brady Law for the first time empowered FFLs and law enforcement to combat the practice of "lying and buying." Although the GCA made it illegal for felons and other prohibited persons to possess or acquire firearms, FFLs had no way to know whether a customer was lying about his background in order to get a gun. The Brady Law changed this by requiring that FFLs check with law enforcement officials before selling a firearm. In this way, the Brady Law eliminated the "honor system" in firearms purchases, requiring verification of statements made by prospective purchasers that they are legally entitled to obtain a firearm.

From its effective date in early 1994 through November 30, 1998, the Brady Law required background checks for handgun purchases only. These background checks were done by individual state or local law enforcement officials, usually the local sheriff's office or police department. As of November 30, 1998, with the creation of the FBI's National Instant Criminal Background Check System (NICS), a computerized background check is now conducted to determine if a would-be gun buyer is legally permitted to acquire a gun. Depending on the individual state, an FFL may contact NICS directly or through their state point-of-contact. In its first year of operation, NICS denied firearms to more than 160,000 felons, fugitives, and other prohibited persons. Overall, since 1993, the Brady Law has prevented more than 500,000 prohibited persons from acquiring firearms from licensed dealers.

V.        **Reforming the Federal Firearms Licensing System**

In a further effort to keep firearms out of the hands of criminals and regulate the illegal flow of guns, President Clinton directed a review of gun dealer licensing in August 1993. Recognizing that acquiring a gun dealer license was often easier than getting a driver's license, the directive sought to ensure that only those engaged in a legitimate firearms business be licensed. At the time, it was estimated that over 40 percent of the licensees conducted no business at all, but used their licenses to buy and sell firearms across state lines at wholesale prices, often in violation of state and local zoning or tax laws.

The Brady Law also changed the licensing procedures for FFLs by increasing the dealer licensing fee from $10 per year to $200 for three years. Subsequently, under the Violent Crime Control and Law Enforcement Act of 1994, licensees were required to submit photographs and fingerprints as part of their application, and to certify that their firearms business complied with all state and local laws, including zoning regulations. As a consequence of these reform efforts, the number of FFLs dropped from over 282,000 in 1993 to fewer than 104,000 in 1999.

VI.        **The Youth Handgun Safety Act and the Youth Crime Gun Interdiction Initiative**

Armed juveniles and school violence increasingly drew Congress' attention in the late 1980s. In response to several multiple school shootings, in 1990 Congress enacted the Gun Free School Zones Act, which made it unlawful for anyone to possess a firearm in close proximity to a school.[(6)] In addition, that same year, the Gun Free Schools Act conditioned state receipt of federal education grant money on agreement to expel any student found to be in possession of a firearm on school property. This law also requires grant recipients to refer any student who brings a gun to school to juvenile justice authorities.

Youth gun homicides escalated in the early 1990s, tripling between 1985 and 1993. In 1994, President Clinton signed into law the Youth Handgun Safety Act, which generally bans possession of handguns by people under age 18, and prohibits adults from transferring handguns to juveniles. Before this amendment, FFLs were

prohibited from selling handguns to anyone under age 21, but there were no federal restrictions on the possession of handguns by juveniles or the transfer of handguns to juveniles by non-licensees.

The Youth Handgun Safety Act does not apply to long guns. Since enactment of the Gun Control Act in 1968, FFLs have been prohibited from selling long guns to persons under age 18. However, no federal law prohibits possession of long guns, including "grandfathered" semiautomatic assault rifles, by juveniles. Nor is it unlawful for an unlicensed individual to transfer a long gun to a juvenile.

In 1996, ATF created the Youth Crime Gun Interdiction Initiative (YCGII) to develop better information about how youthful offenders obtain firearms and to use that information to arrest illegal gun traffickers and reduce youth gun violence. YCGII provides for comprehensive crime gun tracing. The program is based in cities plagued by youth firearms violence problems. YCGII began in 17 cities and now operates in 37 cities.

## VII. The Assault Weapons Ban and Related Import Restrictions

In September 1994, Congress passed the Violent Crime Control and Law Enforcement Act which made it unlawful, with certain exceptions, to manufacture, transfer, or possess semiautomatic assault weapons. Congress had been presented with significant evidence demonstrating that these weapons were "the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder,"[7] and concluded these guns were so dangerous they had no place in the civilian marketplace. The 1994 Act also made it unlawful to possess or transfer large capacity ammunition feeding devices, generally defined as a magazine, belt, drum, feed strip, or similar device that can hold more than 10 rounds of ammunition.

In 1997, members of Congress and others expressed concern that certain rifles modified to evade the assault rifle ban continued to be imported into the country. Based on this concern and the fact that nearly ten years had elapsed since the last comprehensive review of the importation of rifles, the Department of the Treasury conducted a study to determine if certain modified semiautomatic assault rifles met the GCA's sporting purposes test. In an April 1998 report, the Department issued a determination that modified semiautomatic assault rifles that had the ability to accept a large capacity military magazine were not for sporting purposes under the GCA and could not be imported.

The 1994 ban on semiautomatic assault weapons and large capacity feeding devices continues to have significant deficiencies in meeting its stated objectives. For example, the ban only applies to assault weapons and magazines manufactured after September 13, 1994, thereby "grandfathering" thousands of weapons and magazines. Moreover, the ban's definition of assault weapons is so narrow and that it does not prohibit the manufacture, transfer and possession of many weapons that have the ability to fire many rounds of ammunition quickly, without being reloaded.

## VIII. State and Local Firearms Laws

Through their independent efforts and in collaboration with the federal government, state and local governments play a crucial role in the effort to reduce firearms crimes and accidents. Some state laws place more stringent controls on the use and possession of firearms than federal law. For example:

- In 1993, Virginia limited handgun sales to one per month per person, resulting in a significant drop in the percentage of guns that had been purchased in Virginia and used in crimes in New England.

- Maryland's ban on the production and sale of unreliable, inexpensive handguns has reduced the frequency with which the banned handguns are used in crime in that state.

- In 1995, Nevada took a significant step toward preventing felons from possessing firearms by passing legislation that allows a private person who wishes to transfer a firearm to another person to request a background check on the transferee from the Nevada criminal history records repository.

- Connecticut recently amended its laws to provide that individuals adjudicated delinquent for committing serious juvenile offenses are not eligible to possess firearms or receive permits to carry firearms as adults.

- In 1992, Hawaii made it a misdemeanor to store or leave a firearm, loaded or unloaded, within reach or easy access of anyone younger than 16 years of age.

- California generally requires all firearms transfers to be processed through an FFL. It also recently passed other strong gun control measures, including provisions that limit handgun purchases to one per month, require all assault weapons to be registered and prohibit the sale or manufacture of unsafe handguns.

## IX.     The Youth Crime Gun Enforcement Act

In November 1998, the President directed the Secretary of the Treasury and the Attorney General to make recommendations responding to the fact that criminals and other prohibited persons can obtain firearms at gun shows without Brady Law background checks. Under current law, large numbers of firearms are sold anonymously at the more than 4,000 gun shows held each year. Most sellers at gun shows do not seek background checks on purchasers to find out if the buyer is a felon or otherwise prohibited from possessing a firearm. In January 1999, the Departments of the Treasury and Justice responded with a report describing the gaps in current law and recommending by extending the Brady Law to "close the gun show loophole."[8]

In recognition of the need to strengthen our federal firearms laws as part of a comprehensive effort to reduce gun violence, the Administration developed a gun safety bill that was submitted to Congress in April 1999. The Youth Gun Crime Enforcement Act of 1999 (YGCEA) is intended to strengthen federal firearms laws and make it more difficult for juveniles and criminals to gain access to guns. Among the provisions contained in the bill are those to close the gun show loophole, strengthen penalties against gun traffickers and reduce youth access to firearms. These legislative proposals are discussed in greater detail in Appendix C. If enacted, these provisions will help close a number of significant loopholes in our system of regulating firearms.

[Back to Report](#)

---

1.     S. Rep. No. 90-1097 (1968).   *back to main text*

2.     The Enforcement Branch of the Alcohol and Tobacco Tax Division of the Internal Revenue Service initially enforced the GCA.  On July 1, 1972, the Bureau of Alcohol, Tobacco and Firearms (ATF) was created as an independent Bureau within the Treasury Department.   *back to main text*

3.     S. Rep. No. 90-1097, at 24 (1968).   *back to main text*

4.     In 1998, Congress amended the GCA to provide for a mandatory seven-year enhancement for brandishing a firearm and a ten-year enhancement for discharging a firearm in the commission of a crime of violence or drug trafficking crime.   *back to main text*

5.     See Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986), <u>as amended</u>.   *back to main text*

6.     The Gun Free School Zones Act was held unconstitutional by the Supreme Court in Lopez v. United States, 514 U.S. 549 (1995), because the law lacked a sufficient connection to interstate commerce. Congress thereafter amended the law to require that the firearm move in, or otherwise affect, interstate commerce.  *back to main text*

7.     H.R. Rep. No. 103-489, at13 (1994).  *back to main text*

8.     Department of the Treasury & Department of Justice, Gun Shows: Brady Checks and Crime Gun Tracing (1999).  *back to main text*

*Back to Report*