DOCUMENT RESUME

ED 333 597                                              EA 023 164

TITLE            Gun-Free School Zones Act of 1990. Hearing on H.R.
                 3757 before the Subcommittee on Crime of the
                 Committee on the Judiciary. House of Representatives,
                 One Hundred First Congress, Second Session.
INSTITUTION      Congress of the U.S., Washington, D.C. House
                 Committee on the Judiciary.
PUB DATE         6 Sep 90
NOTE             93p.; Serial No. 144. Some print may not reproduce
                 adequately in paper copy.
PUB TYPE         Legal/Legislative/Regulatory Materials (090) --
                 Guides - Non-Classroom Use (055)

EDRS PRICE       MF01/PC04 Plus Postage.
DESCRIPTORS      Elementary Secondary Education; *Federal Legislation;
                 Hearings; *School Security; *Violence
IDENTIFIERS      Congress 101st; *Firearms; Proposed Legislation

ABSTRACT
                 This document presents federal legislation (H.R.
3757) outlawing possession and use of firearms on school premises.
Testimony for the "Gun-free School Zones Act of 1990" is offered in
the form of discussion and prepared statements by panel members
Edward P. Kovacic, Chief of Police, Cleveland, Ohio; Barbara Lautman,
Director of the Center to Prevent Handgun Violence (Washington,
D.C.); Joel Packer, Legislative Specialist with the National
Education Association and National PTA; and Mark D. Widome, Associate
Professor of Pediatrics at Pennsylvania State University College of
Medicine. Based on the panel's evidence concerning gun violence on
school campuses across the U.S. and the traumatic effects on
schoolchildren, discussion was weighted overwhelmingly in favor of
the proposed legislation, with few suggested modifications.
Appendices contain a statement from the National PTA, a "Time"
magazine article entitled "Shootouts in the Schools," a statement
from the National Rifle Association Institute for Legislative Action,
and the Center to Prevent Handgun Violence's 1990 report on gun
violence in American schools. (MLH)

***********************************************************************
*      Reproductions supplied by EDRS are the best that can be made    *
*                     from the original document.                      *
***********************************************************************



**EXHIBIT C**

# GUN—FREE SCHOOL ZONES ACT OF 1990

ED333597

# HEARING

**BEFORE THE**

## SUBCOMMITTEE ON CRIME

**OF THE**

## COMMITTEE ON THE JUDICIARY

## HOUSE OF REPRESENTATIVES

### ONE HUNDRED FIRST CONGRESS

**SECOND SESSION**

ON

## H.R. 3757

GUN-FREE SCHOOL ZONES ACT OF 1990

SEPTEMBER 6, 1990

## Serial No. 144

U.S. DEPARTMENT OF EDUCATION
Office of Educational Research and Improvement
EDUCATIONAL RESOURCES INFORMATION
CENTER (ERIC)
☑ This document has been reproduced as
received from the person or organization
originating it.
☐ Minor changes have been made to improve
reproduction quality

• Points of view or opinions stated in this docu-
ment do not necessarily represent official
OERI position or policy



**BEST COPY AVAILABLE**

Printed for the use of the Committee on the Judiciary

**U.S. GOVERNMENT PRINTING OFFICE**

35-526 ≈    **WASHINGTON : 1991**

For sale by the Superintendent of Documents, Congressional Sales Office
U.S. Government Printing Office, Washington, DC 20402



2

## COMMITTEE ON THE JUDICIARY

JACK BROOKS. Texas, *Chairman*

ROBERT W. KASTENMEIER. Wisconsin
DON EDWARDS. California
JOHN CONYERS. JR., Michigan
ROMANO L. MAZZOLI. Kentucky
WILLIAM J. HUGHES. New Jersey
MIKE SYNAR. Oklahoma
PATRICIA SCHROEDER, Colorado
DAN GLICKMAN. Kansas
BARNEY FRANK, Massachusetts
GEO. W. CROCKETT, JR., Michigan
CHARLES E. SCHUMER, New York
BRUCE A. MORRISON, Connecticut
EDWARD F. FEIGHAN, Ohio
LAWRENCE J. SMITH, Florida
HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
HARLEY O. STAGGERS. JR., West Virginia
JOHN BRYANT. Texas
MEL LEVINE. California
GEORGE E. SANGMEISTER. Illinois
CRAIG A. WASHINGTON. Texas

HAMILTON FISH. JR., New York
CARLOS J. MOORHEAD. California
HENRY J. HYDE, Illinois
F. JAMES SENSENBRENNER. JR.,
   Wisconsin
BILL McCOLLUM. Florida
GEORGE W. GEKAS. Pennsylvania
MICHAEL DeWINE, Ohio
WILLIAM E. DANNEMEYER, California
HOWARD COBLE, North Carolina
D. FRENCH SLAUGHTER. JR., Virginia
LAMAR S. SMITH, Texas
CHUCK DOUGLAS. New Hampshire
CRAIG T. JAMES. Florida
TOM CAMPBELL. California

WILLIAM M. JONES, *General Counsel*
ROBERT H. BRINK, *Deputy General Counsel*
ALAN F. COFFEY. JR., *Minority Chief Counsel*

### SUBCOMMITTEE ON CRIME

WILLIAM J. HUGHES, New Jersey, *Chairman*

ROMANO L. MAZZOLI. Kentucky
EDWARD F. FEIGHAN. Ohio
LAWRENCE J. SMITH. Florida
RICK BOUCHER. Virginia
JOHN CONYERS. JR.. Michigan

BILL McCOLLUM. Florida
GEORGE W. GEKAS. Pennsylvania
MICHAEL DeWINE. Ohio
CHUCK DOUGLAS. New Hampshire

HAYDEN W. GREGORY. *Chief Counsel*
DEBRA N. DIENER. *Assistant Counsel*
LINDA C. HALL. *Editor*
MARK BRINTON. *Minority Counsel*

(II)

3



# CONTENTS

## HEARING DATE

Page

September 6, 1990 ........................................................................................................... 1

## TEXT OF BILL

H.R. 3757 ....................................................................................................................... 3

## OPENING STATEMENT

Hughes, Hon. William J., a Representative in Congress from the State of New Jersey, and chairman, Subcommittee on Crime ............................................. 1

## WITNESSES

Cook, Richard, Chief, Firearms Division, Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, accompanied by Bradley A. Buckles, Deputy Chief Counsel ...................................................................... 8
Kovacic, Edward P., chief of police, city of Cleveland, OH ................................... 24
Lautman, Barbara, executive director, Center to Prevent Handgun Violence, Washington, DC ......................................................................................................... 37
Packer, Joel, legislative specialist, National Education Association and National PTA, Washington, DC ............................................................................ 44
Widome, Mark D., M.D., associate professor of pediatrics, Pennsylvania State University College of Medicine, Hershey, PA, on behalf of the American Academy of Pediatrics, Washington, DC ............................................................ 50

## LETTERS, STATEMENTS, ETC., SUBMITTED FOR THE HEARING

Cook, Richard, Chief, Firearms Division, Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury: Prepared statement ...................... 11
Kovacic, Edward P., chief of police, city of Cleveland, OH: Prepared statement 28
Lautman, Barbara, executive director, Center to Prevent Handgun Violence, Washington, DC: Prepared statement ................................................................. 40
Packer, Joel, legislative specialist, National Education Association and National PTA, Washington, DC:
    Article from the Education Week Newsletter entitled, "Survey of Teen Health and Safety Finds Crime Prevalent at Schools," September 7, 1988 .................................................................................................................. 75
    Data concerning percentage of boys who carried knives to school ............... 74
    Data concerning violence in our Nation's schools ........................................... 73
    Prepared statement ............................................................................................. 46
    Statement on BATF's Outreach Program ........................................................ 64
Widome, Mark D., M.D., associate professor of pediatrics, Pennsylvania State University College of Medicine, Hershey, PA, on behalf of the American Academy of Pediatrics, Washington, DC: Prepared statement ........................... 53

## APPENDIXES

Appendix 1.—Statement of the National PTA ........................................................ 77
Appendix 2.—Article from Time Magazine entitled "Shootouts in the Schools," November 20, 1989 ........................................................................... 78

4



IV

                                                                                    Page
Appendix 3.—Statement of James Jay Baker, director, National Rifle Associa-
    tion Institute for Legislative Action ........................................................................   79
Appendix 4.—Caught in the Crossfire: A Report on Gun Violence in Our
    Nation's Schools, September 1990, submitted by the Center to Prevent
    Handgun Violence........................................................................  ....................   81



# GUN–FREE SCHOOL ZONES ACT OF 1990

---

## THURSDAY, SEPTEMBER 6, 1990

House of Representatives,
Subcommittee on Crime,
Committee on the Judiciary,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 10:10 a.m., in room 2237, Rayburn House Office Building, Hon. William J. Hughes (chairman of the subcommittee) presiding.

Present: Representatives William J. Hughes, Romano L. Mazzoli, Edward F. Feighan, George W. Gekas, and Chuck Douglas.

Also present: Hayden W. Gregory, chief counsel; Debra N. Diener, assistant counsel; Phyllis Henderson, secretary; and Mark Brinton, minority counsel.

### OPENING STATEMENT OF CHAIRMAN HUGHES

Mr. Hughes. The Subcommittee on Crime will come to order.

The Chair has received a request to cover this hearing in whole or in part by television broadcast, radio broadcast, still photography, or by other similar methods. In accordance with committee rule 5(a) permission will be granted unless there is objection. Is there objection?

[No response.]

Mr. Hughes. Hearing none, permission is granted.

Good morning. Welcome to the hearing of the Subcommittee on Crime on H.R. 3757, the Gun-Free School Zones Act of 1990. This bill, sponsored by our esteemed colleague Ed Feighan, addresses the increasing problems and tragedies which occur all too regularly when guns are brought onto school property. We are bombarded by news reports of yet another student or teacher killing at the hands of either an armed and deranged person, or by an angry and armed fellow student.

Equally tragic, the shooting is sometimes accidental, but with the same fatal and tragic result. The horror of the killings by Patrick Purdy in Stockton, CA, and Laurie Dann in Winnetka, IL, are tragically not isolated instances. Although recent shootings might not, fortunately, be of the same magnitude as in Stockton or Winnetka, that does not lessen our outrage and sadness upon learning of the loss of a life of any young person or teacher.

We will hear today from witnesses who are confronted with the stark reality of children as shooting victims. A school shooting has a devastating impact upon everybody in the school system: Teachers, surviving children, and parents. Unfortunately, one of the most repeated themes in all of their statements is the fact that the

(1)



2

volume of shootings within school facilities does not appear to be decreasing at all.

Our witnesses from the Center to Prevent Handgun Violence and the National Education Association have provided us with chilling statistics in their written submissions. Barbara Lautman, on behalf of the Center to Prevent Handgun Violence notes in her testimony that a 1987 survey by the National School Safety Center estimated that 135,000 boys carried guns to schools daily during 1987.

Joel Packer, for the NEA, states that schools around the country report dramatic increases in gun incidents, but notes that this phenomenon is not limited or isolated to only our city school systems or to one area of the country. These disturbing trends are national in character.

We correctly emphasize the importance of education in this country—the safety of our students and teachers must be insured.

[The bill, H.R. 3757, follows:]

7



3

101st CONGRESS
1st Session

# H. R. 3757

To amend title 18, United States Code, to prohibit the possession or discharge of
a firearm in a public school zone.

---

## IN THE HOUSE OF REPRESENTATIVES

NOVEMBER 20, 1989

Mr. FEIGHAN (for himself, Mr. STARK, Mr. HOYER, Mr. GRAY, Mr. FAWELL,
Mr. SMITH of Florida, Mrs. SAIKI, Mr. BERMAN, Mr. MAZZOLI, Mr. FAZIO,
and Mr. PORTER) introduced the following bill; which was referred to the
Committee on the Judiciary

---

# A BILL

To amend title 18, United States Code, to prohibit the
possession or discharge of a firearm in a public school zone.

1     *Be it enacted by the Senate and House of Representa-*

2 *tives of the United States of America in Congress assembled,*

3 SECTION 1. SHORT TITLE.

4     This Act may be cited as the "Gun-Free School Zones

5 Act of 1990".

6 SEC. 2. PROHIBITIONS AGAINST POSSESSION OR DISCHARGE

7        OF A FIREARM IN A PUBLIC SCHOOL ZONE.

8     (a) IN GENERAL.—Section 922 of title 18, United

9 States Code, is amended by adding at the end the following:


ERIC

8

4

2

1    "(q)(1)(A) It shall be unlawful for any individual know-
2  ingly to possess a firearm at a place that the individual
3  knows, or has reasonable cause to believe, is a public school
4  zone.

5    "(B) Subparagraph (A) shall not apply to the possession
6  of a firearm—

7        "(i) on private property;

8        "(ii) if the individual possessing the firearm is li-
9    censed to do so by the State in which the public school
10   zone is located or a political subdivision of the State,
11   and the law of the State or political subdivision re-
12   quires that, before an individual obtain such a license,
13   the law enforcement authorities of the State or political
14   subdivision verify that the individual is qualified under
15   law to receive the license;

16       "(iii) which is—

17           "(I) not loaded; and

18           "(II) in a locked container, or a locked fire-
19       arms rack, which is in a motor vehicle;

20       "(iv) by an individual for use in a program ap-
21   proved by a public school in the public school zone; or

22       "(v) by an individual in accordance with a con-
23   tract entered into between a public school in the public
24   school zone and the individual or an employer of the
25   individual.

5

3

1    "(2)(A) Except as provided in subparagraph (B), it shall

2 be unlawful for any person, knowingly or with reckless disre-

3 gard for the safety of another, to discharge or attempt to

4 discharge a firearm at a place that the person knows is a

5 public school zone.

6    "(B) Subparagraph (A) shall not apply to the discharge

7 of a firearm—

8         "(i) on private property;

9         "(ii) as part of a program approved by a public

10    school in the public school zone, by an individual who

11    is participating in the program; or

12        "(iii) by an individual in accordance with a con

13    tract entered into between a public school in the public

14    school zone and the individual or an employer of the

15    individual.".

16    (b) DEFINITIONS.—Section 921(a) of such title is

17 amended by adding at the end the following:

18    "(25) The term 'public school zone' means—

19        "(A) in, or on the grounds of, a public school; or

20        "(B) within a distance of 1,000 feet from the

21    grounds of a public school.

22    "(26) The term 'public school' means a public school

23 which provides elementary or secondary education, as deter-

24 mined under State law.

6

4

1      "(27) The term 'motor vehicle' has the meaning given

2  such term in section 10102 of title 49, United States Code.".

3      (c) PENALTY.—Section 924(a) of such title is amended

4  by adding at the end the following:

5      "(4) Whoever violates section 922(q) shall be fined not

6  more than $5,000, imprisoned for not more than 5 years, or

7  both. Notwithstanding any other provision of law, the term of

8  imprisonment imposed under this paragraph shall not run

9  concurrently with any other term of imprisonment imposed

10 under any other provision of law.".

11     (d) EFFECTIVE DATE.—The amendments made by this

12 section shall apply to conduct engaged in after the end of the

13 60-day period beginning on the date of the enactment of this

  Act.

1

7

Mr. HUGHES. Before turning to our first panel I would like to ask if the ranking Republican perhaps has an opening statement, then I'm going to ask the sponsor of the bill if he has an opening statement. The gentleman from New Hampshire.

Mr. DOUGLAS. No, I don't.

Mr. HUGHES. The gentleman from Ohio.

Mr. FEIGHAN. Thank you very much, Mr. Chairman. Let me tell you how grateful I am for your scheduling this bill and so quickly following the markup that we had a few weeks ago on the crime package.

I have worked very closely with BATF, as all the members of this subcommittee have, over the past several years. I think we've all been consistently impressed with the professionalism and the expertise of those representatives, and I am delighted to have them testifying before us today.

I am particularly pleased as well that the National Education Association, the Center to Prevent Handgun Violence, and the American Academy of Pediatrics are able to join us as well.

I would like to point out that one of our witnesses is the chief of police for the city of Cleveland, who is delayed due to a change in flight schedules, but I understand he will be here momentarily.

Mr. Chairman, as your opening statement indicated, nothing really shocks the conscience of this country more than the news of a schoolroom shattered by gunshots. And I think we all have very vivid mental images of the incidents that you identified, involving Laurie Dann and Patrick Purdy. As you indicated, those are not isolated, unfortunately; though celebrated, they are not isolated instances.

We are going to hear from several witnesses today and hear of studies that consistently find that thousands of students carry firearms to school each and every day.

I would tell this audience that just last week in Cleveland, on the first day of school at one of our high schools, shots rang out in the schoolyard during the lunch hour. Eyewitness reports indicate that the weapon used was an assault pistol: An assault pistol in an American high school schoolyard.

In 1987, the National School Safety Center estimated that 135,000 students carried handguns to school daily, and another 270,000 carried handguns at least once.

The National Education Association has found that some 282,000 students are physically attacked in secondary schools each month.

The NEA study found that about 8 percent of junior and senior high school students had missed at least 1 day of school a month the previous year because they were simply afraid to go to school. And they have good reason, unfortunately, in many cases, since schools are no longer safe.

Mr. Chairman, the Gun-Free School Zones Act is the first Federal legislative proposal to address the devastating tide of firearm violence in our Nation's schools. The bill would make it illegal to bring a gun within 1,000 feet of an elementary or secondary school. There would be an additional further penalty for those who shoot their guns within those areas. The bill exempts school-approved programs, school security officers, unloaded guns that are locked in



8

cars, and those with State licenses obtained after a background check.

The Senate voted unanimously to include the Gun-Free School Zones Act in its comprehensive crime package.

Again, Mr. Chairman, I want to thank you for calling this hearing today and putting together the expert panels of witnesses that we have. Our childrens' futures hinge on the quality of their education; certainly we owe them no less than a secure environment in which to learn.

Thank you, Mr. Chairman.

Mr. HUGHES. I thank the gentleman.

We welcome back our first witness, Mr. Richard Cook, from the Bureau of Alcohol, Tobacco and Firearms of the Treasury Department. Mr. Cook has testified several times before this subcommittee in his capacity as the Chief of ATF Firearms Division. As Division Chief, Mr. Cook has supervisory oversight over the Firearms Enforcement Branch which is charged with the responsibility regarding investigative matters and in determining eligibility for restoration of rights to possess firearms; and for the Technology Branch, which tests and evaluates firearms.

This is just the latest in a series of supervisory positions held by Mr. Cook during his some 19 years at ATF.

Mr. Cook is accompanied today by Mr. Bradley Buckles ATF's Deputy Chief Counsel since 1983. Mr. Buckles has been an attorney with the ATF since 1974.

We welcome you. We have your prepared statement, which, without objection, will be made a part of the record.

Before you proceed, I am going to recognize the distinguished gentleman from Pennsylvania to see if he has an opening statement.

Mr. GEKAS. Thank you, Mr. Chairman, only to the extent that we are, of course, eager to hear the testimony of the various witnesses. And, as best we can, we will keep our minds open to all the various views so that we can eventually conclude the issue with the best minds possible helping to fold in the final resolution of the problem.

We are all interested in safety. We're all interested in our school children; how to approach it, and how finally to resolve the problem yet remains to be seen.

I thank the Chair.

Mr. HUGHES. I thank the gentleman.

Mr. Cook, we welcome you back.

## STATEMENT OF RICHARD COOK, CHIEF, FIREARMS DIVISION, BUREAU OF ALCOHOL, TOBACCO AND FIREARMS, U.S. DEPART- MENT OF THE TREASURY, ACCOMPANIED BY BRADLEY A. BUCKLES, DEPUTY CHIEF COUNSEL

Mr. COOK. Thank you, Mr. Chairman, members of the subcommittee, good morning.

I thank you for the opportunity to appear before you today to discuss H.R. 3757, the Gun-Free School Zones Act of 1990. And as you stated, appearing with me today is Mr. Bradley A. Buckles, the Deputy Chief Counsel for ATF.





9

This proposed legislation would amend the Gun Control Act of 1968 to make it a crime punishable by up to 5 years imprisonment for an individual to possess or discharge a firearm in a public school zone.

Under this proposed bill, a public school zone would cover the school grounds as well as the area around the grounds up to 1,000 feet. As you know, investigative jurisdiction with respect to the Gun Control Act lies with the Secretary of the Treasury, who has delegated the responsibility to ATF. Therefore, if the bill is enacted, ATF would have the primary jurisdiction of the enforcement of its provisions.

To enforce these and other laws within its jurisdiction, ATF has approximately 1,800 special agents nationwide. They are concentrated in large urban areas of the country.

Our firearms enforcement activities are focused on violent criminals and illegal drug traffickers. As you can see from these numbers, and the law enforcement demands placed upon us, ATF could not provide direct protection to all the Nation's schools, and could not be expected to be the first line of defense against guns and violence in schools. We believe that this function is, and should remain, primarily the responsibility of State and local law enforcement officials.

ATF joins the sponsors of this legislation in deploring the increasing incidents of gun-related violence in and around schools, and we support the goal of reducing gun-related violence in our schools. Our schools must be kept free from the horrors of gun-related violence so that our children can attend schools in safety.

We know that State and local authorities are increasingly called upon by schools when firearms are found in or around school property. While we believe that this problem is best handled by State and local authorities, we stand, as always, ready to assist them. Indeed, the primary purpose of the Gun Control Act is to assist State and local law enforcement in their fight against crime and violence.

I'd like to address the substance of the bill by sharing with the subcommittee our preliminary thoughts on how the bill might be improved.

First, the exception relating to the transportation of an unloaded firearm is slightly different than a similar provision of existing law relating to the transportation of firearms interstate contained in 18 U.S.C., section 926A.

The subcommittee may wish to compare the two provisions to determine whether there may be a benefit to having consistent rules relating to the transportation of a firearm.

Second, we would point out that the bill contains no exception for the possession of firearms by law enforcement officials or personnel of other governmental entities who carry firearms in the exercise of official duties. Therefore, the subcommittee may wish to consider an amendment to 18 U.S.C. 925(a)(1), which would exempt the possession and use of firearms by these officials in the course of official duties. A similar amendment to the statute is proposed in the administration's crime bill, S. 1225.

Third, while the bill currently contains an exception for persons lawfully possessing firearms under certain State licensing schemes

10

it may unnecessarily preempt other State firearms laws governing the transportation or possession of firearms which have been tailored to meet local needs.

Finally, we would note that the source of constitutional authority to enact the legislation is not manifest on the face of the bill. By contrast, when Congress first enacted the prohibitions against possession of firearms by felons, mental incompetents and others, the legislation contained specific findings relating to the Commerce Clause and other constitutional bases, and the unlawful acts specifically included a commerce element.

That concludes my testimony. I'd be happy to answer your questions.

[The prepared statement of Mr. Cook follows:]



Case 1:23-cr-00010-MAC-ZJH Document 22-3 Filed 02/07/23 Page 16 of 93 PageID #: 256

11

PREPARED STATEMENT OF RICHARD COOK, CHIEF, FIREARMS DIVISION, BUREAU OF
ALCOHOL, TOBACCO AND FIREARMS, U.S. DEPARTMENT OF THE TREASURY

Mister Chairman and Members of the Subcommittee:


Thank you for the opportunity to appear before you today to
discuss H.R. 3757, the "Gun-Free School Zones Act of 1990."
Appearing with me is Bradley A. Buckles, Deputy Chief
Counsel.


This proposed legislation would amend the Gun Control Act of
1968 to make it a crime punishable by up to 5 years
imprisonment for an individual to possess or discharge a
firearm in a "public school zone." Under this proposed
bill, a "public school zone" would cover the school grounds
as well as the area around the grounds up to 1,000 feet.


As you know, investigative jurisdiction with respect to the
Gun Control Act lies with the Secretary of the Treasury who
has delegated this responsibility to ATF. Therefore, if the
bill is enacted, ATF would have the primary jurisdiction
over the enforcement of its provisions. To enforce these
and other laws within its jurisdiction, ATF has
approximately 1,800 special agents nationwide. They are
concentrated in large urban areas of the country. Our
firearms enforcement activities are focused on violent
criminals and illegal drug traffickers. As you can see from
these numbers, and the law enforcement demands placed upon
us, ATF could not provide direct protection to all

- 2 -


16



12

of the Nation's schools, and could not be expected to be the
first line of defense against guns and violence in schools.
We believe that this function is, and should remain,
primarily the responsibility of State and local law
enforcement officials.

ATF joins the sponsors of this legislation in deploring the
increasing incidents of gun-related violence in and around
schools, and we support the goal of reducing gun related
violence in our schools.  Our schools must be kept free from
the horrors of gun-related violence so that our children can
attend schools in safety.  We know that State and local
authorities are increasingly called upon by schools when
firearms are found in or around school property.  While we
believe that this problem is best handled by State and local
authorities, we stand ready to assist them.  Indeed, the
primary purpose of the Gun Control Act is to assist State
and local law enforcement in their fight against crime and
violence.

I would like to address the substance of the bill by sharing
with the Committee our preliminary thoughts on how the bill
might be improved.

First, the exception relating to the transportation of an
unloaded firearm is slightly different that a similar
provision of existing law relating to the transportation of
firearms interstate contained in 18 U.S.C § 926A.  The

- 3 -



13

Committee may wish to compare the two provisions to determine whether there may be a benefit to having consistent rules relating to the transportation of a firearm.

Second, we would point out that the bill contains no exception for the possession of firearms by law enforcement officials or personnel of other governmental entities who carry firearms in the exercise of official duties. Therefore, the Committee may wish to consider an amendment to 18 U.S.C. § 925(a)(1) which would exempt the possession and use of firearms by these officials in the course of official duties. A similar amendment to the statute is proposed in the Administration's crime bill, S. 1225.

Third, while the bill currently contains an exception for persons lawfully possessing firearms under certain state licensing schemes it may unnecessarily preempt other state firearms laws governing the transportation or possession of firearms which have been tailored to meet local needs.

Finally, we would note that the source of constitutional authority to enact the legislation is not manifest on the face of the bill. By contrast, when Congress first enacted the prohibitions against possession of firearms by felons, mental incompetents and others, the legislation contained specific findings relating to the Commerce Clause and other constitutional bases, and the unlawful acts specifically included a commerce element.

I'll be happy to answer your questions.



18

14

Mr. HUGHES. Mr. Cook, has the administration taken a position on H.R. 3757 or its Senate counterpart, which is in their crime bill?

Mr. COOK. I'm not aware of the position that the administration has taken as yet. However, in the past, I know the administration has been inclined to favor the penalty enhancement for existing provisions such as the drug-free school zone enhancements.

Mr. HUGHES. This would be a major change, would it not, in Federal jurisdiction, in that basically, we've played a supportive role in endorsement of gun laws throughout the country, supportive of local and State efforts to attempt to license and, as a matter of fact, to restrict and punish. This would, it seems to me, put us in the position of, for the first time, playing a direct role in the enforcement of a particular Federal law—a gun law—at the local level, the school district level.

Mr. COOK. ATF has always been involved with supporting State and local people in their prosecutions.

Mr. HUGHES. I say that's been our role—as supportive. Does this give us the original jurisdiction?

Mr. COOK. In this particular instance, this legislation would give us original Federal jurisdiction, which would——

Mr. HUGHES. That would be a major departure from basically what has been the practice in the past.

Mr. COOK. As far as schools are concerned, yes, it is.

Mr. HUGHES. A major departure from a traditional federalism concept which basically defers to State and local units of government to enforce their laws.

Mr. COOK. Yes.

Mr. HUGHES. How many ATF agents would you have to have to enforce the law—assuming ATF had the original jurisdiction over enforcement?

Mr. COOK. We have approximately 1,800 right now. We have 22 district offices in major urban areas. Outside of the major urban areas, we have about 160 suboffices, which we call post of duties. Those locations were by no means meant to locate in or around school facilities.

Mr. HUGHES. Any idea how many school districts there are in the country?

Mr. COOK. No, sir, I don't.

Mr. HUGHES. I'm sure that there are tens of thousands.

Mr. COOK. There are many, many school districts. Many more than we have the resources to address.

Mr. HUGHES. Just recently I believe you assisted in some arrests in a drug-free school zone where some guns were involved. Where was that, can you tell us?

Mr. COOK. Yes, Mr. Hughes, that was in Detroit within the last 6 days so it's very topical. This happened on August 30, where ATF and other members of the Detroit Task Force, which consisted of the Detroit Police Department and the Wayne County Sheriff's Office, executed 31 Federal and State search warrants as part of the drug-free school zone's project. This project, which was undertaken by the members, was initiated to guarantee a drug-free perimeter around elementary and secondary schools in the Detroit area. They had been plagued by narcotics and firearms trafficking violations around schools. We saw the young children and teens



15

who were needlessly dying in large numbers—staggering numbers—each year because of the drug trafficking in that area.

This combined effort was developed to tackle these violations both on the State and Federal levels. Armed with Federal/State statutes involving drug trafficking, the crews presented specifics of cases to both Federal and State prosecutors for evaluation on how to proceed. When the warrants were all executed, the results were tallied. We made 58 arrests and seized 157 grams of cocaine and 137 grams of heroin. We also seized some 21 firearms and ended up with several prosecutable firearms cases.

Mr. HUGHES. What kind of firearms were they?

Mr. COOK. They didn't give me the specific breakdown, but it was the normal array. There was a mixture of assault weapons, handguns, and rifles.

Mr. HUGHES. Do you have the capacity at ATF to work what is, in essence, street crime at that level? Do you have the assets, informants, and other information available in sufficient numbers to attempt to work cases in school districts?

Mr. COOK. No, we don't. We would have to divert from existing resources and our existing priorities in the violent crime and narcotics-related area.

Mr. HUGHES. From where would you divert, because we're strained right now. We're lucky if we can inspect a firearms dealer once in 15 years at this point.

Mr. COOK. That's correct. That would be a hard decision. There are no good areas to divert from. Every single one of our agents is working on our highest priorities. To address this situation would either require additional resources or we'd have to take somebody off the things that were more important; not to say that these cases wouldn't be important but we'd have to look at the case individually and decide whether that had a higher priority than what we're already doing.

Mr. HUGHES. Mr. Cook, you've been in this business 19 years—at least at the ATF level—and in law enforcement all of your adult life, really. Let me ask you, is this a role that the Federal Government should be playing? Should we be taking the lead in this area?

Mr. COOK. Should the Federal Government be taking the lead?

Mr. HUGHES. Yes, should we be in fact taking the primary role basically away from State and local law enforcement?

Mr. COOK. I think that we should be supporting the State and local departments in their fights.

Mr. HUGHES. The gentleman from Pennsylvania.

Mr. GEKAS. Yes, thank you, Mr. Chairman.

As to your statement of how you would have to divert from existing resources, you say one of the priorities—I think you said—was drug-related violent crimes which is one of your top priorities.

Mr. COOK. Exactly.

Mr. GEKAS. So you're fearful in answer to the chairman's question about diverting from where there is specific work to be done. But in the Detroit situation that you mentioned, it seems that that's a combination of what is already one of your priorities. It seems like the priority that you stated, drug-related violence, brought about your involvement in the Detroit situation which, incidentally, was a school problem as well.



16

So maybe if something of this order should ever evolve as reflected in this bill, it's really not a diversion that we're talking about but rather a folding in of the school problem into the drug violence priority that you've already set.

Am I being too erudite for a change?

Mr. Cook. The facts as they existed—and I'm not sure if you are or not, but——

Mr. Gekas. Pardon me?

Mr. Cook. I'm not certain.

Mr. Gekas. You're not certain I'm erudite?

[Laughter.]

Mr. Cook. What I wanted to point out about the Detroit and other existing cases that we worked is that the statutes that we presently have and that we presently enforce would more or less overlap. We have a mandatory sentencing provision which provides the minimum mandatory sentence for somebody trafficking drugs and possessing firearms, whether it be on school grounds or off school grounds. So that currently exists.

Other ATF statutes prohibit unlicensed dealing in firearms, whether they occurred on school grounds or off. So there are existing things which would overlap.

Mr. Gekas. That's the point, that we already have a body of law, which if this bill had never seen the light of day, fully enforced could solve some of the problems which this bill seems to want to project to try to solve. Isn't that correct?

Mr. Cook. That's correct.

Mr. Gekas. That brings me to just one other specific question. This particular bill calls for a magical zone of a thousand feet and so forth.

Are there any statistics, or do you have any knowledge of anyone who within a thousand feet—maybe the Detroit situation is an example of it—within a thousand feet of the school who brought about injury to someone in the use of a revolver or the illegal use of firearms who has not escaped the net of prosecution or investigation for illegal use of firearms?

Mr. Cook. I don't have any information or statistics on that.

Mr. Gekas. And conversely, the statistics have to be garnered as to how many of these things happen 1,002 feet away from a school zone to see whether or not this is a practical—how shall I say, zone, there's no other way to put it. If the laws were fully enforced, whether it's 500 feet, 800 feet, or 1,003 feet, we have an adequate body of laws, do we not, to pursue those perpetrators?

Mr. Cook. We have adequate laws in our jurisdiction to address what we think are the very serious crimes that are happening out there.

Mr. Gekas. I have no further questions.

Mr. Hughes. The gentleman from Ohio.

Mr. Feighan. Thank you very much, Mr. Chairman.

Thank you, Mr. Cook, for your testimony. I thought it was very thoughtful testimony, it's very helpful, and I particularly appreciate the time that you've obviously spent in your office looking at the legislation and making what I think are very helpful comments and recommendations to improve it.



17

I don't know if you've had an opportunity to see the testimony that Chief Kovacic will give. I don't know if that has been distributed early to you or not.

Mr. COOK. No, I haven't.

Mr. FEIGHAN. One thing that I think we all agree on is that there's a serious problem here and we need help in the local community—wherever that help can come from—in dealing with a phenomenon in the schools that just becomes more and more troubling every year. Chief Kovacic's testimony speaks to that issue.

He has—and I'll just give you a very, very quick overview of it—but he has given just some data about the incidence of gun use in the Cleveland school system over the past 7 years. It is very disturbing information. We have seen an increase of 100 percent the number of gun incidents on school property since 1986 alone.

In 1989, we reported 29 incidents in the Cleveland schools. And this year so far we've reported 34, which in itself represents a 17-percent increase just over last year, and obviously we're not finished with 1990. So we're very concerned that we will have perhaps a 50-percent increase just over last year.

What I'd like to find out from you if you have that information, Mr. Cook, or if you're familiar with it, is how consistent the Cleveland experience over the past 7 years would be with national trends.

Does this strike you as something that must be unique to Cleveland schools or is this consistent with what you understand to be happening at least in the urban school districts across the country?

Mr. COOK. I don't have any specific information and I haven't had a chance to look at the testimony that you're referring to.

I think that what is stated there probably is not a localized phenomena. We have recognized that there's a problem and we have taken some limited steps to address that. We have a Treasury initiative which is named Project Outreach. And under Project Outreach, every ATF agent in the United States is tasked with making a presentation either to a civic group or to a school group nationwide.

This year we've talked to over 41,000 people, and 80, 85, 90 percent of those people are schoolchildren. While we primarily are addressing the drug issues in schools, we also are addressing the issue of firearms and how dangerous they can be.

So having recognized that there is something happening in the schools, we're trying to address this within existing means. We feel Project Outreach has been successful in that nature.

Mr. FEIGHAN. Just one other issue on the testimony that we're going to hear from Chief Kovacic a little later—he had suggested that if this bill is enacted that police and school officials be required to notify the appropriate ATF field office of any incidents.

Do we keep such records now and is that a workable system? I assume that we have those records now.

Mr. COOK. Of the fact that we've been notified?

Mr. FEIGHAN. Yes.

Mr. COOK. No, we don't keep records on the notification, whether by a school official, or by some other type of citizen making notification of an ATF violation.

Mr. FEIGHAN. Is that a workable system to collect the data?



18

Mr. COOK. To separate the incidents by the person notifying?

Mr. FEIGHAN. Right.

Mr. COOK. I think the computer could be programmed to obtain that information but it would take resources to do it. We don't capture that at the present time.

Mr. FEIGHAN. Let me turn to a couple of specific recommendations and items that you mentioned in your testimony.

On page 3 of your testimony you state that the exemption regarding firearms and motor vehicles might be slightly different than a similar provision of existing law.

I wonder if you could comment a little bit on what you might see as the inconsistencies of those sections. As I read it, section 926A requires that the firearm be unloaded and not readily accessible, or directly accessible, from the passenger compartment; and if there's no separate compartment, that the firearm be locked in a container.

The bill before us would require that if there's a separate compartment that it must be locked.

Is your concern only that the identical language is not used or is it that you consider the bill before us to be a broader restriction than the one that might exist in existing law?

Mr. COOK. I'm going to ask Mr. Buckles, if I could, to address that.

Mr. FEIGHAN. Please.

Mr. BUCKLES. Our primary is the fact that the two provisions do not use the same language. Also, your bill would permit the firearm to be in a locked gun rack, while this would not be allowed under section 926A. So in that sense, your exemption is somewhat broader.

The other aspect of section 926A which precludes the passenger compartment is not included in yours. However, I think your bill is basically aiming at the same thing, other than the firearms rack.

If two sections within the statute are to address locked containers and the circumstances under which they are to be locked, we would prefer the use of identical language. If there was a reason to add on the locked gun rack, that could be done separately.

Mr. FEIGHAN. I can understood the benefit of having consistency in the law on that issue, and I appreciate that recommendation.

Either witness: You had stated also in your testimony that the bill's current exemption for those who have received a State firearms license, if that licensing procedure includes some type of background check, may unnecessarily preempt other State firearms laws.

I am wondering what you're thinking about there. The bill merely exempts certain persons whose background has been checked.

Mr. BUCKLES. We examined some of the State laws in order to compare your provision against different State laws. I'm not sure "preempt" is exactly the word that we should be using—but there seems to be some inconsistency. For example, it's our understanding that the Illinois system requires what's called an Illinois firearms owner's ID card. That is basically a license to purchase the firearm. It's not a license to possess a firearm. They do a background check before the card is issued, so in one sense it would



19

meet the purpose of your statute. That is, it ensures compliance with State law. But, it's technically not a license to "possess" firearms. Consequently, someone in Illinois would technically be unable to meet the exemption of your statute which requires a license to possess.

In other States what we see most frequently is that licenses to possess firearms, or carry firearms, are primarily limited to handguns. So that in a particular State there may be no way in which a person could meet the exemption in your bill in the case of a long gun, the State will only issue that license to carry a pistol or a handgun.

There were a lot of other State laws we looked at, regulating the transportation of firearms. We saw some differences within our statute here that we pointed out earlier with respect to section 926A, and there are similar differences between your statute and various State laws that may have regulations on how a firearm can be lawfully transported in an automobile.

I believe it was a California statute we looked at that was similar to yours except that it didn't require that it be unloaded. It required that it be locked in the trunk of the vehicle. So you could be in compliance with California law by transporting your loaded hunting rifle locked in the trunk of your vehicle. Nonetheless, this conduct still wouldn't be complying with your bill because the firearm was loaded.

Mr. FEIGHAN. Right.

Mr. BUCKLES. There were different twists in every one of the statutes on how the firearm could be transported. Some of them simply required that the firearm be unloaded as the only condition to transporting it in a motor vehicle.

Mr. FEIGHAN. Again, thank you, Mr. Cook, and I appreciate your testimony very much. As this exchange has demonstrated, the thoughtful recommendations that you made are helpful. Thank you.

Thank you, Mr. Chairman.

Mr. HUGHES. The gentleman from New Hampshire.

Mr. DOUGLAS. Thank you, Mr. Chairman.

Mr. Cook, I'm just curious what this law adds to your arsenal other than a lot of problems at this point. I read the Handgun Control Report on School Violence. And in every instance it's a minor, a ninth grader. Oakland, 14-year-old; Redondo Beach, 17-year-old; Fort Myers, 14-year-old. Third graders, fourth graders.

What happens when this is law and a school calls up and says, "we just had a fourth grader shoot a fifth grader, send the ATF agent over?" What are you going to do with the kid?

Mr. COOK. As you are aware, one example is that the penalty wouldn't apply. The person would be prosecuted under the juvenile offender statutes.

Mr. DOUGLAS. The 5-year felony isn't going to apply anyway.

Mr. COOK. That's correct.

Mr. DOUGLAS. See, that's my problem here. I agree with the PTA and with everyone else, there is a problem of guns in schools. I have a solution but this bill is certainly poorly drafted and in no way will help that solution.


ERIC

20

You're not going to be able to do anything for any of the cases mentioned here because every one of them is a minor; correct?

Mr. COOK. I haven't had an opportunity to read that, but if they're all minors, certainly the penalty provision under this statute wouldn't apply.

Mr. DOUGLAS. Is the problem adults in the neighborhood, because this is a thousand foot zone? I live one block from a school, and I'm not aware we've ever had problems anywhere in my State with adults. If there are problems, according to the handgun people, it's kids in the school grounds themselves.

Are you aware of adults? Because now we're talking those who would be subject to the law, within a thousand feet of schools doing something to create school violence?

Mr. COOK. The adults that we're primarily concerned with are covered under the existing statutes, which are normally related to narcotics traffickers who are armed at the time they're committing those violations; or those who are selling firearms to children, in other words, dealing in firearms without a license. They are covered under existing statutes.

Mr. DOUGLAS. How would this law even help the chief in Cleveland? This is a Federal law. He has no jurisdiction to make an arrest under a Federal law anyway, does he?

Mr. COOK. If there were an existing Federal law and a violation occurred in their presence, they could detain and call ATF, and we would make the decision whether to prosecute.

Mr. DOUGLAS. But if this bill became law and I'm chief of police in Cleveland, I can't make a single arrest under this law anyway, can I?

Mr. COOK. No, I don't believe so.

Mr. DOUGLAS. Of course not, because I'm not a Federal law enforcement official.

So if this becomes law, I've got to call ATF and say, will you guys come down? And you say, what's it, another 14-year-old?

Yes.

Well, that's not on our watch, we don't have anything to do with kids.

So the law can't be enforced by the local police, and it won't be enforced by you folks. And yet somehow we're going to pass a law to do something about handgun violence in schools. So there's a disconnect here.

Mr. COOK. Yes, sir, we would have a hard time directing—resources to enforce that type of violation when there are other serious violations occurring.

Mr. DOUGLAS. Let me ask you this: The drug-free school zone is an enhanced penalty provision for what is already an illegal act; namely, having drugs anywhere, whether it's in school, church, this building, or anywhere else; am I correct?

Mr. COOK. Yes, sir.

Mr. DOUGLAS. But it's legal to have guns within 1,000 feet, or 200 feet, or 3 miles of the school; is it not?

Mr. COOK. Yes, it is.

Mr. DOUGLAS. I live one block from the Kimball school in Concord, NH. When I get in my car and drive past that school with a

25



21

gun on the back seat of my car to go out target shooting, I've violated this law if it becomes law; am I correct?

Mr. COOK. Yes, unless you're one of the exceptions, you've violated the law.

Mr. DOUGLAS. I have an exception for a pistol because I'm licensed to carry a pistol. But there's no license in New Hampshire for rifles or shotguns. So you can make a good arrest under this—I get a 5-year felony conviction for driving past the Kimball school, which I have to drive past because I only live one block from it.

Mr. COOK. Unless you've met the provisions——

Mr. DOUGLAS. It's within 1,000 feet, yes. I'm one block from it. And it's from the outer edge of the property. In other words, if the school is on a 40- or 50-acre tract, it's the outer perimeter of the property that applies; am I correct?

Mr. COOK. That's the way I understand the legislation.

Mr. DOUGLAS. Not the building itself?

Mr. COOK. No, it's on the grounds and well within 1,000 feet from the property line.

Mr. DOUGLAS. As I say, we have a problem.

Wouldn't the answer be the same one that we've had to do at Federal courthouses, and that's namely metal detectors. The only thing that works. We have laws against bringing guns into Federal courthouses and people still do it; do they not?

Mr. COOK. That's correct. That's one solution. It depends on whether you consider it an infringement of a person's rights to search school children.

Mr. DOUGLAS. But if a school in an urban area had a real problem with firearms and wanted to make sure they had a gun-free school, the answer is a metal detector, not some law that can't be enforced against the kids anyway.

Mr. COOK. That would be an answer.

Mr. DOUGLAS. OK.

Thank you, Mr. Chairman.

Mr. HUGHES. I thank the gentleman.

The gentleman from Kentucky.

Mr. MAZZOLI. Thank you very much, Mr. Chairman.

Mr. Cook, I was interested—you had said earlier that ATF does do some on the school premises seminars, mostly with respect to drugs, but now the question of guns and gun safety comes into it.

Do you have any kind of estimate, or any sort of figures on whether or not in those schools to which ATF agents have gone or in which ATF seminars have been conducted there is any more awareness on the part of the local school authorities as to some things they can do, for example, metal detectors?

Do you have any kind of wisdom for that?

Mr. COOK. No, we don't keep any statistics, although we have received letters of appreciation and we've received some followup inquiries from some of the children that we spoke to relating to their interest in ATF and our jurisdictions. But no statistics are kept on the success or failure.

Mr. MAZZOLI. Because it's certainly especially grievous, it seems to me, that handgun violence, gun-related violence, takes place on school property, I think what this bill seeks to do is certainly commendable.



22

As a cosponsor of it, I generally agree with that. We're trying to find some answer to this very difficult problem. We have to be aware of the good faith concerns raised by law enforcement—and you've expressed them today. But there does seem to be something to do more than just simply stand around and say, well, you could put metal detectors in.

Have you got any ideas? Do you think enhanced penalties would help? But as the gentleman from New Hampshire has pointed out, a lot of these are kids who are youngsters who aren't going to be penalized by the system even if they injured a playmate.

Mr. Cook. That's exactly the problem. I really don't have many solutions. I'm not sure that if you've taken a juvenile and even prosecuted him under the juvenile provisions, whether when this person grows up—is a couple of years older—that that's going to have a deterrent effect. I don't have a good feel for how that would work with children.

My enforcement, other than when I was a local officer, dealt primarily with the adult offenders. When I was a local police officer, of course we went after schools—and most of what we did was try to educate. And I think that's what ATF has said to this point, that there is some value with focusing on the education of our children.

Mr. Mazzoli. Thank you very much.

Thanks, Mr Chairman.

Mr. Hughes. I thank the gentleman.

Just one additional question.

Mr. Cook, when the local department has a problem, whether it be a school district or a problem with the transportation of weapons, or the abuse of weapons in violation of laws, and a request is made of your department, what is the standard operating procedure when a request for assistance is made?

Mr. Cook. ATF will, in all instances, try and respond. And wherever there are resources available, we will respond.

Mr. Hughes. Let's say Cleveland has a problem with existing law, their gun laws, whether it be a school district or otherwise, you would respond to that request?

Mr. Cook. Yes, we would. We do respond if a firearm is found on a school ground or in the possession of a student and they want to know where the firearm came from, ATF would always be called and we would trace the firearm back to the adult. If there were a violation that occurred because the adult committed a violation within ATF's jurisdiction, or may within State jurisdiction, we would follow up in that respect.

Mr. Hughes. I know that that's your practice in all areas of jurisdiction. For instance, you have special expertise in the area of arson, particularly incendiary devices; do you not?

Mr. Cook. Yes, we do.

Mr. Hughes. Over the years, your role has been a supportive role. There was a time when you had to determine that an incendiary device was involved. Today you don't have to do that; you can move right in with your expertise and work with the local department if it's an arson—the same thing with firearms violations. Is that not so?

Mr. Cook. That is correct.



23

Mr. HUGHES. And of course you send your experts in, they work with the local department, and you attempt to pursue an investigation.

Mr. COOK. That is correct.

Mr. HUGHES. Basically, if this law were enacted, it would give you the original jurisdiction, you would have primary jurisdiction in school districts?

Mr. COOK. Yes.

Mr. HUGHES. Which is just a total reversal of your role?

Mr. COOK. Yes.

Mr. HUGHES. Thank you very much, I appreciate it.

We all agree that we have some serious problems in school districts around the country, and the question is how we can best address those problems. That's why this particular hearing is so important because I think we have to take some additional steps to deal with the increasing violence in school districts. It's unacceptable and it's creating tragic results; so we look forward to working with ATF in trying to craft the very best response we can.

Mr. COOK. Thank you, Mr. Chairman, and the subcommittee.

Mr. HUGHES. Thank you very much.

Our next panel of witnesses consists of Chief Edward Kovacic, chief of police for Cleveland, OH; Ms. Barbara Lautman, executive director of the Center to Prevent Handgun Violence; Mr. Joel Packer, legislative specialist, National Education Association, and Dr Mark Widome, associate professor of pediatrics at the Pennsylvania State University College of Medicine.

Mr. GEKAS. Mr. Chairman.

Mr. HUGHES. The gentleman from Pennsylvania.

Mr. GEKAS. A request for personal privilege to add to the credentials of Dr. Widome who is one of the panelists.

Mr. HUGHES. I am going to do that——

Mr. GEKAS. Good.

Mr. HUGHES [continuing]. After I recognize the gentleman from Ohio to introduce the distinguished chief of police from Cleveland, OH

The gentleman from Ohio.

Mr. FEIGHAN. Thank you very much, Mr. Chairman.

As I mentioned at the opening of the hearing, we have the privilege and the honor today to have testimony from the chief of police, Chief Kovacic, of the city of Cleveland. Chief Kovacic has served as police for about 1 year now, I believe. Mr. Kovacic has absolutely an outstanding and distinguished record in law enforcement in the Greater Cleveland area. I think that it is probably fair to say that there is no single figure in law enforcement in the Greater Cleveland northern Ohio area who commands greater respect from both his peers in law enforcement as well as the public at large.

I am delighted that he has taken the time to join us today to testify on this very important subject.

Thank you very much, Mr. Chairman.

Mr. HUGHES. Chief, we're happy to have you, and I want to tell you that in Ed Feighan, you have one of the finest Members of the House. Over the years Ed has worked on most of the crime initiatives that have come out of this subcommittee, whether it be for-



24

feiture, which this subcommittee wrote; or a money laundering statute, which Ed Feighan helped write; and about 36 other crime initiatives. So we are very happy that Ed Feighan is a member of this subcommittee.

The gentleman from Pennsylvania.

Mr. GEKAS. Yes, thank you, Mr. Chairman.

I want to add, too, to the credentials of a member of the panel, Dr. Widome, who comes to us from Hershey Medical Center. But he is not a newcomer to being a lobbyist or proponent for legislative matters. In the Commonwealth of Pennsylvania, he was one of the leading figures in a strong movement to enact car seat legislation to protect our youngsters in moving vehicles. And a highly successful venture it was on his part. So that what he tells us has a legislative context beyond some of the normal expectations that we would have from our medical community.

So I am happy to welcome him personally as well as a Member of Congress.

Mr. HUGHES. Dr. Widome, I don't know whether George here is your Congressman, but he is our resident expert on the death penalty.

Dr. WIDOME. Yes, he is my Congressman.

Mr. HUGHES. He's a good one. He has other interests besides the death penalty but he is the foremost expert.

Barbara Lautman is the executive director of the Center to Prevent Handgun Violence, which was established, I believe, in 1983, as a nonprofit education research group headquartered in Washington, DC. Among the center's many activities it has developed gun violence prevention and other school curricula. Ms. Lautman has held numerous positions with political and nonprofit groups and was the director of Communications for Handgun Control, Inc., for the 8 years prior to her present position.

Mr. Joel Packer has been a legislative specialist with the National Education Association [NEA] since 1983. Mr. Packer is responsible for, among other areas, environmental hazards in the schools and gun control. Prior to joining the NEA, he was the assistant director of government relations with the National Association of State Universities and Land Grant Colleges.

While this is Mr. Packer's first appearance before this subcommittee, he has testified before Congress on many, many occasions—probably some 30 occasions. We are happy to have you with us this morning.

We have your statements, which, without objection, will be made a part of the record in full. We hope you can summarize. Why don't we start with you, Chief? We welcome you here this morning.

## STATEMENT OF EDWARD P. KOVACIC, CHIEF OF POLICE, CITY OF CLEVELAND, CLEVELAND, OH

Mr. KOVACIC. Good morning, Mr. Chairman and members of the subcommittee.

My name is Edward P. Kovacic. I am chief of police for the city of Cleveland, OH. I am pleased to testify in support of the bill introduced by Congressman Edward Feighan. Congressman Feighan is a personal friend of longstanding and a strong supporter of the



25

Cleveland Police Department and law enforcement. I thank him for the opportunity to testify on behalf of this bill, which has the backing and strong support of myself as well as the Honorable Michael R. White, mayor of the city of Cleveland.

I would also like to thank you, Mr. Chairman, for the opportunity to testify.

"Cleveland city schools open with a bang." Those were the words of a local newscaster commenting on the events of the first day of school in Cleveland last week. A young man, armed with a handgun, fired several shots outside a crowded high school.

Just days earlier, shots were fired at Cleveland police officers from armed gunmen from the safety of an elementary school playground. That incident resulted in the arrest of seven individuals and the seizure of two handguns, four shotguns, and one rifle. The seven confiscated weapons could have been directed at the students and teachers instead of the police officers. The two groups had been seeking each other out throughout the day in the area of that playground. Fortunately, they clashed late at night.

Since 1983, Cleveland police have recorded 203 incidents involving the use of firearms on school property. I have a breakdown by the year in the handout. In each of these years, with the exception of 1985, the number of incidents has shown an increase over the previous year. With 4 months remaining in 1990, Cleveland has already recorded a 17-percent increase over the total number of incidents reported in 1989.

1990 is proving to be a record year, but it's a record that no community wants. A close examination of the reported incidents reveal that firearms have been used in a wide variety of offenses in and around the schools—offenses such as felonious assault, aggravated robbery, kidnaping, and rape have all been reported in which firearms were used.

In previous years, the possession and use of firearms came to police attention primarily through the reporting of threats and assaults.

In 1990, we now seize firearms from individuals involved in drug trafficking in and around the schools. Our experience indicates the predominant firearm use in school incidents is the handgun. There have been, however, incidents involving shotguns, rifles, and semi-automatic assault weapons.

Since 1983, more than 200 firearms were seized in school-related incidents.

The Ohio Legislature has reacted to the school firearms problem by introducing Ohio's senate bill 52 on January 24, 1989. Senate bill 52 makes possession of a firearm on school property a felony of the second degree punishable by a term of incarceration of 2, 3, 4, or 5 to 15 years. The proposed Ohio legislation differs from the Gun-Free School Zones Act in that it applies only to firearms in school or actually on school property.

The Gun-Free School Zones Act establishes a zone which extends 1,000 feet in any direction from the school. Its coverage is broader and would more directly address the problem of pushers attempting to solicit drug sales among children in areas adjacent to school property following possession of a firearm.



26

In addition to covering a wider geographic area than Ohio's senate bill 52, the act's provisions require that the term of imprisonment shall run consecutive to any other term of imprisonment imposed under any other provisions of law. This will serve as a potent deterrent to those who may contemplate engaging in armed criminal activity in and around schools.

Therefore, those who are not deterred and are arrested and convicted, the aggregate period of incarceration for State and Federal offenses will keep them from committing any further crimes for a considerable period of time

I would, however, suggest one modification to this act which would clarify the exceptions to the law's coverage. While providing protection in and around the schools, this act, as drafted, will not interfere with the lawful activities of anyone otherwise entitled to possess a firearm. Through explicit language the act excludes private residences, schools, security officers, and those legally transportir 3 firearms.

It does not, however, specifically exempt Federal, State, or local law enforcement officers who are authorized to carry firearms and who at the time in question are acting within the scope of their duties.

An examination of chapter 44, title 18, section 925, reveals language excepting firearms imported for, sold, or shipped to, or issued for the use of political subdivisions from coverage under chapter 44. The Gun-Free School Zones Act will fall under chapter 44 but deals with possession and use of a firearm while the remaining provisions of chapter 44 deal with firearms, importation, and transactions.

The inclusion of specific language in the act which excludes law enforcement officers acting within the scope of their duties would leave no doubt as to the act's intended coverage.

If the Gun-Free School Zones Act is enacted into law, I would promulgate a directive which would require that in each case of a person being found in possession of a firearm in, on, or within 1,000 feet of any school, the local field office of the Bureau of Alcohol, Tobacco and Firearms be advised so that the matter may be prepared for presentation to the U.S. attorney for prosecution.

In summary, conditions in Cleveland cannot be that different from the rest of our Nation's cities. Over the past 7 years, we have seen a marked, virtually continuous rise in the number of incidents involving firearms in or around school property.

It is almost as if the purpose of our schools has been changed from a place devoted to education and preparing for the future to an open marketplace for drug dealers and those that prey upon children. Therefore, I urge you to act promptly and favorably consider passage of the Gun-Free School Zones Act of 1990.

You have the power to restore confidence in the ability of government to safeguard our children, our Nation's most valuable resource. Passage of this act will enable our children and their teachers to travel to and from and attend their schools without an overriding fear for their personal safety.

I'd like to add here that what we are seeing in the city of Cleveland is an acceleration of violence, not only by juveniles but by young people up to the age of 21 who are banding together and



31

27

forming gangs and trying to take control of drug trafficking. And since these young people hang out primarily in the playgrounds around the schools, and have members that are attending schools, the incidence of weapons in the schools has risen, and the number of incidences being reported to the Cleveland police has risen accordingly.

In regard to this, just the other day before yesterday, this article appeared in the Cleveland newspaper: "Curiosity played a dirty trick on Steven Lauter, 16, when shotgun pellets started flying Friday night near 55th and Central. 'I had my back to where the shooting was going on. I turned around to see who was doing it and something hit me in the eye and I couldn't see after that,' said Steven, an East Technical High School student, from his bed at St. Vincent Charity Hospital. He said doctors informed him yesterday following surgery he may regain normal sight in his right eye after some time. A juvenile and an adult from Cleveland are being held in connection with the shootings.

"The first attack occurred about 11:30 p.m. Friday when three youths, dressed in black jumpsuits, opened fire with shotguns on Clara Edgerson, 18, of Cleveland, and Steven, who were talking in a playground on East 55th. He was treated for shotgun and pellet wounds to the head, neck, and cheek. Steven suffered pellet wounds to the chest and back in addition to the eye injury. The young lady was the one that was wounded in the back.

"Witnesses say no words were spoken. They just began to fire. Steven said the three youths did not seem to have any specific target in mind, they were just firing the guns. They hit the girl standing, too. 'I don't remember much.'

"The following night at 11:30, a carload of youths wearing black opened fire on a group of people near the 2400 block of Unwin Road. Michael Oats and William Williams, 19, both of Cleveland, were hit in the legs and back by shotgun pellets.

"Police would wait until witnesses come forward to identify the suspects before any charges are filed. But Steven said the identification of the suspects may pose a problem since the attackers wore black scarves around their faces during the attack.

"Martin said some who saw the attack identified the youths as members of the street gang known as the 30th Street Crips."

On our official police report, the victim of this crime says that this was in retaliation to a gang fight which had taken place at East Technical High School a couple of days ago. This was what we believe the shooting was about in front of that high school. And we believe that at almost anytime these two gangs could clash while school is in session and we could have serious injury done to a large group of innocent people on school property.

Thank you.

Mr. HUGHES. Thank you very much, Chief Kovacic.

[The prepared statement of Mr. Kovacic follows:]



28

PREPARED STATEMENT OF EDWARD P. KOVACIC, CHIEF OF POLICE, CITY OF CLEVELAND, OH

Mr. Chairman, Members of the Judiciary Committee.

Thank you for inviting a representative of the Cleveland Division of Police to testify on House of Representatives Bill 3757, the "Gun-Free School Zone Act of 1990." My name is Edward Kovacic. I am the Chief of Police for the City of Cleveland, Ohio.

"CLEVELAND CITY SCHOOLS OPEN WITH A BANG." Those were the words of a local newscaster commenting on the events of the first day of school in Cleveland where several shots were fired in close proximity of a high school. This closely followed an August 13th incident where shots were fired at Cleveland police officers from the safety of an elementary school yard. We arrested seven (7) males and confiscated two (2) handguns, four (4) shotguns and one (1) rifle.

Since 1983, the Cleveland Division of Police has recorded two hundred and three (203) incidents involving the use of firearms in and on school property. In each of these years, with the exception of 1985, the number of incidents has shown an increase over that of the previous year. With four (4) months remaining in 1990, the Division has already recorded a seventeen percent (17%) increase over the total number of incidents for all of 1989. It is for this reason that I am encouraged to learn that Congress has recognized that there exists a need to ensure the safety of our children and teachers while they are engaged in the vital process of education and has moved to address this need through the Gun-Free School Zones Act of 1990.

Ohio's state legislature, as with other states, is currently considering similar legislation, however, this does not obviate the need for legislation at the federal level. First, Ohio's proposal is restricted to school property, thus would have less coverage and apply to fewer incidents than this Act. Further, by requiring consecutive sentencing of violators, the Gun-Free School Zones Act will operate as a greater deterrent to those contemplating armed criminal activity on or near schools.

If any modification were to be made to this Act, I would suggest that a specific exclusion be incorporated which would exempt federal, state and local law enforcement officers who are authorized to carry a firearm and at the time in question acting within the scope of their duties.

In summary, conditions in Cleveland cannot be that different from the rest of our nation's cities. You have the power to restore confidence in the ability of government to safeguard our children, our nation's most valuable resource. Passage of this Act will enable our children and their teachers to travel to and from and attend their schools without an overriding fear for their personal safety.

Thank you for allowing me the opportunity to express my views on this important subject.



29

Mr.  Chairman,  Members of the Judiciary Committee.

Thank  you for  inviting a  representative of  the Cleveland
Division of  Police to testify  on House of  Representatives Bill
3757, the "Gun-Free  School Zone Act of 1990." My  name is Edward
Kovacic.  I  am the Chief  of Police  for the City  of Cleveland,
Ohio.

On the  29th of  August of this  year, the  Cleveland Public
Schools opened.   A newscaster  commented on  the opening  day by
stating, "Cleveland City schools open with a bang", and then went
on to relate  that several shots had been fired  in the immediate
area of the East Technical High  School building on the first day
of school.   This is  just one  incident in  a growing  number of
incidents involving  firearms and  schools in  the City  of
Cleveland.

Since the  year 1983, the  Cleveland Division of  Police has
recorded two hundred and three  (203) incidents involving the use
of firearms in and on school property, as follows:

| YEAR | INCIDENTS | HANDGUN | SHOTGUN | RIFLE | FAKE GUN | UNKNOWN |
|------|-----------|---------|---------|-------|----------|---------|
| 1983 | 21        | 25      |         |       |          |         |
| 1984 | 24        | 23      | 2       |       |          |         |
| 1985 | 17        | 15      | 1       | 1     |          |         |
| 1986 | 23        | 22      | 2       |       |          |         |
| 1987 | 27        | 31      | 2       |       | 3        |         |
| 1988 | 28        | 22      | 2       | 2     | 1        | 1       |
| 1989 | 29        | 31      |         |       | 1        |         |
| 1990 | 34        | 38      | 4       | 1     | 1        |         |

34

Case 1:23-cr-00010-MAC-ZJH   Document 22-3   Filed 02/07/23   Page 35 of 93 PageID #: 275

In each of these years, with the exception of 1985, the number of incidents has shown an increase over that of the previous year. With four (4) months remaining in 1990, the Division has already recorded a seventeen percent (17%) increase over the total number of incidents for all of 1989. It is for this reason and with this sense of urgency that I ask that Congress act with all due speed to ensure the safety of our children and their teachers while engaged in the vital process of education through passage of the Gun-Free School Zones Act of 1990.

In looking more closely at the incidents, it is observed that firearms have been employed in a wide variety of offenses in and around schools. Such offenses as Felonious Assault, Aggravated Robbery and Aggravated Menacing to Kidnapping and Rape, Witness Intimidation and Child Enticement have been recorded. In previous years, the possession and use of firearms came to the Division's attention mainly through the investigation of threats and assaults. In 1990, we are now recording firearms being possessed by persons arrested in connection with the violation of state drug law offenses in and around schools.

The predominate firearm of choice in all classes of offenses is the handgun; however, there have been incidents recorded involving the use of shotguns and rifles. To illustrate, on August 13th of this year, Cleveland police officers were fired upon from an elementary school yard. As a result, seven (7) males were arrested and seven firearms were confiscated. Three of these firearms were shotguns and one was a rifle. Of the two

2

31

hundred and three (203) incidents recorded, a total of two
hundred and thirty-one (231) firearms were used.

As in the case of Congress, the Ohio Legislature has reacted
to the school firearm problem by introducing Senate Bill 52 on
January 24, 1989. Senate Bill 52 makes it a second degree felony
punishable upon conviction for a period of incarceration of 2, 3,
4 or 5 years to 15 years for anyone found in possession of a
firearm on school premises. It differs from the Gun-Free School
Zone Act in that it applies only to firearm possession in schools
or on school premises. As the Gun-Free School Zone Act
establishes a "zone" which extends 1000 feet in any direction
from the school, its coverage is broader and would more directly
address the problem of "pushers" attempting to solicit drug sales
among children in areas adjacent to school property while in
possession of a firearm.

In addition to covering a wider geographic area than Senate
Bill 52 and therefore providing law enforcement with an
additional weapon against armed pushers who would attempt to
market their poison to children while proceeding to and from
school, the Act's provision which requires that the term of
imprisonment shall run consecutive to "any other term of
imprisonment imposed under any other provision of law" will serve
as a potent deterrent to those who may contemplate engaging in
armed criminal activity in and around schools. And for those who
are not deterred and are arrested and convicted, the aggregate
period of incarceration for state and federal offenses will keep

3

32

then from committing any subsequent or like offenses for a considerable period of time.

If I might. I can suggest but one modification to this Act which would clarify the exceptions to the law's coverage. While providing protection in and around schools, this Act, as drafted, will not interfere with the lawful activities of anyone otherwise entitled to possess a firearm. Through explicit language, the Act excludes private residences, school security officers and those legally transporting firearms. It does not, however, specifically exempt federal, state or local law enforcement officers who are authorized to carry a firearm and who at the time in question are acting within the scope of their duties. An examination of Chapter 44, Title 18, Section 925 reveals language excepting firearms imported for, sold or shipped to, or issued for the use of political subdivisions from coverage under Chapter 44. The Gun-Free School Zones Act will fall within Chapter 44, but deals with possession and use of a firearm while the remaining provisions of Chapter 44 deals with firearms importation and transactions. The inclusion of specific language in the Act which excludes law enforcement officers acting within the scope of their duties would leave no doubt as to the Act's intended coverage.

If the Gun-Free School Zones Act is enacted into law, I would promulgate a directive which would require that in each case of a person being found in possession of a firearm in, on, or within 1000 feet of any school that the local field office of

4



33

the Bureau of Alcohol, Tobacco and Firearms be advised so that
the matter may be prepared for presentation to the U.S.
Attorney.

In summary, conditions in Cleveland cannot be that different
from the rest of our nation's cities. Over the past seven (7)
years, we have seen a marked, virtually continuous rise in the
number of incidents involving firearms in or around school
property. It is almost as if the purpose of our schools has
changed: from a place devoted to education and preparing for the
future to an open marketplace for drug dealers and those that
prey upon children. Therefore, I urge you to act promptly and
favorably consider passage of the Gun-Free School Zones Act of
1990. You have the power to restore confidence in the ability of
government to safeguard our children, our nation's most valuable
resource. Passage of this Act will enable our children and their
teachers to travel to and from and attend their schools without
an overriding fear for their personal safety.

Thank you, Mr. Chairman and Members of the Judiciary
Committee, for allowing me the opportunity to express my views on
this important subject.

5





38



**City of Cleveland**
Gun Involvements on School Property





City of Cleveland
Gun Involvements on School Property

35



40

# City of Cleveland
## Gun Involvements on School Property



| | Handgun | Shotgun | Rifle | Fake gun | Unknown |
|---|---|---|---|---|---|
| 1983 | 25 | | | | |
| 1984 | 23 | 2 | | | |
| 1985 | 15 | 1 | 1 | | |
| 1986 | 22 | 2 | | | |
| 1987 | 31 | 2 | | 3 | |
| 1988 | 22 | 2 | 2 | 1 | 1 |
| 1989 | 31 | | | 1 | |
| 1990 | 38 | 4 | 1 | 1 | |

41



Mr. HUGHES. Ms. Lautman, welcome. Likewise, we have your statement, and we hope you can summarize.

## STATEMENT OF BARBARA LAUTMAN, DIRECTOR, CENTER TO PREVENT HANDGUN VIOLENCE, WASHINGTON, DC

Ms. LAUTMAN. Thank you. Mr. Chairman. for inviting us to testify today on H.R. 3757.

As you know, the Center to Prevent Handgun Violence is a nonprofit education and research organization. While we do not advocate passage of specific legislation or endorse specific legislation, we appreciate the invitation to discuss the epidemic of guns in and around our Nation's schools, and to share with this subcommittee our research on the issue.

We commend the subcommittee and you, Mr. Chairman, for your efforts in this area, and I especially want to thank Congressman Feighan for his extraordinary work toward reducing gun violence in this country.

As children across the country return to school this week, they are facing a crisis in education that has reached epidemic proportions. While parents have always worried about their children's education and their ability to read, write and do basic mathematics, many are horrified by a new threat: they fear their children may not come home from school at all.

Today's children and teenagers are at greater risk of handgun death and injury than any other previous generation of American youth. Last fall, the Centers for Disease Control issued a study that found that 1 of every 10 youngsters who died in 1987 was killed with a gun.

A recent study by a leader of the American Academy of Pediatrics found that gunshot wounds increased 300 percent among urban youth from 1986 until 1988.

In a statistical analysis of youth homicide which the Center released recently found that 1989 was the record year for gun murders among youngsters 19 and under. In fact, gun murders of youngsters have increased 97 percent since 1984.

Our Nation's schools, once thought to be safe havens, have fallen victim to this increase in gun violence, and educators and children are caught in the crossfire. One old, but true, education adage goes, "Schools are reflections of their communities."

As we worked on a new study on gun violence that we have issued today, one fact became very clear. If a community suffers from gun violence, its school children also suffer.

Even children playing in schoolyards and sitting in classrooms are no longer safe from gunshot death and injury. In Houston, a 17-year-old was wounded as he turned in a math test, and dozens of other students dove for cover when gunfire erupted outside Booker T. Washington High School.

Lindberg Junior High School in Long Beach, CA, another school frequently sprayed by random gunfire from the neighboring community, constructed a 10-foot-high, 300-foot-long concrete wall to protect teachers and students.



38

Here in the Washington area, a 17-year-old student was shot in the stomach while trying to break up a fight among outsiders at Fairmont Heights Senior High School in Hyattsville.

The sad fact is that America's drug wars are being fought in and around our Nation's schools. In two separate incidents, two students were murdered by gang members in front of hundreds of students in Detroit and Fort Lauderdale during the first day of school in 1988.

In April of this year, a 16-year-old student was wounded as he sat on his own front porch when gunfire erupted among rival gang members across the street at an El Paso, TX, high school.

In California, the only State that publishes annual data on gun confiscations in school, the number of gun incidents increased 40 percent in the 1988-89 school year over the previous year. In the last 4 years, a 100-percent increase was reported. Other jurisdictions all across the country are experiencing similar increases in gun confiscations among our Nation's schools.

Our newest research shows that school shootings or hostage takings have occurred in 35 States and the District of Columbia during the past 4 school years. During this same period, 71 children, educators, and other school employees have been shot and killed in school, and 200 others have been wounded. Another 242 students and school employees were held hostage at gunpoint. Seventy-five percent of the time, the weapon of choice was a handgun.

We have also seen an increase in gun violence involving adults in our Nation's schools. An estranged husband of a teacher in Texas shot his wife and raped two teachers in front of 100 preschool students. Upset by a fight involving their daughters, mothers of two third grade girls carried guns on an elementary campus and shot each other and one of the children.

A 19-year-old man walked into an elementary school in Greenwood, SC, opened fire on a third grade class, killing two students and wounding seven others.

Equally shocking is the fact that students themselves are committing many of these crimes.

What's causing this epidemic?

Gun violence in schools we believe is fueled by any number of reasons: Drugs, poverty, low self-esteem, lack of parental supervision and interest, increased glorification of guns in the movies, and many kids' attitudes that having a gun will unlock many doors. Guns allow them to do anything that they wish and go any place they want.

One other fact that must not be overlooked—the sheer availability of guns in America. For every household in the country there are two guns in the hands of private citizens. Studies done on the availability of guns to children and teenagers show that kids have little or no trouble getting these weapons—most often from their own homes.

A report issued by the Florida School Boards Association found that 86 percent of the weapons confiscated from students came from students' own homes.

Our research that we conducted with parents and students in Dade County, FL, revealed that most children of gun-owning parents believe they could take their parents' guns without detection



39

because those weapons were kept unlocked and loaded. Parents agreed.

We at the center believe that we can take action to reduce this threat to our children's lives. We feel we need to educate children about the dangers of carrying handguns and the seriousness of such offenses. We need to help parents understand their critical role in protecting their children by educating adults on the need to lock up guns in the home. And, we need gun-wielding individuals, whether student or adult, to understand the serious consequences of gunplay.

Our research with 16 classrooms of students in Dade County, FL, found that students do fear punishment for carrying weapons. It's interesting to note also that many students reported a fear of expulsion for bringing guns into the school and, therefore, told us that many guns were simply locked in students' cars, loaded and ready for use, before school, after school, and during breaks.

Surveys have found that adults, too, fear swift and sure punishment for breaking the law. In sum, gun offenders in and around schools do fear strong penalties, and this would suggest to us that enactment of this legislation could well have a strong impact on the use of guns in and around our schools and could well reduce the violence.

We all know that our children can't learn basic skills that are necessary for adulthood if they attempt to learn in an environment of fear. Rather than concentrating on English, math, and the sciences, many students are learning other lessons—lessons in basic survival. "You have to be careful in the hallways and who you mess with, because you don't know if they're carrying a gun or not," said an Omaha, NE, high school student.

A Baltimore student recently told a newspaper, "You've got to be prepared—people shoot you for your coat, your rings, your chains, anything."

In an era where schools teach students the old nuclear war duck-and-cover drills to protect them from gunfire coming from the city streets, where schools in 15 States search students with metal detectors, and where an increasing number of school systems are using gun sniffing dogs and SWAT teams, strong, effective action is necessary. We cannot tolerate our children dying in ever-increasing numbers. We cannot sit by while America's drug war is being fought in our schoolyards.

We again commend the subcommittee for airing this problem and for searching for effective solutions. We feel we must make it known to drug dealers, armed and dangerous students, gang members and school intruders, that bringing guns into or around schools will be treated with swift punishment. Our students in schools are our future. If we don't act now, America's future may be filled with the constant crackle of gunfire and the sounds of frightened students diving beneath their desks for cover.

Thank you.

Mr. HUGHES. Thank you very much, Ms. Lautman.

[The prepared statement of Ms. Lautman follows:]



44

Case 1:23-cr-00010-MAC-ZJH   Document 22-3   Filed 02/07/23   Page 45 of 93 PageID #: 285

40

## CENTER TO PREVENT HANDGUN VIOLENCE

**TESTIMONY BEFORE THE U.S. HOUSE OF REPRESENTATIVES'
COMMITTEE ON THE JUDICIARY
SUBCOMMITTEE ON CRIME**

**September 6, 1990**

**BY**

**BARBARA LAUTMAN, EXECUTIVE DIRECTOR
CENTER TO PREVENT HANDGUN VIOLENCE**

Thank you, Mr. Chairman, for inviting us to testify today on H.R. 3757, the Gun-Free School Zones Act of 1990. As you know, the Center to Prevent Handgun Violence is a nonprofit, education, research, and legal action organization located here in Washington, D.C. While we do not advocate passage of specific legislation, we appreciate the invitation to discuss the epidemic of guns in and around our nation's schools and to share with this committee our research on the issue. The Center commends the Subcommittee and you, Mr. Chairman, for your efforts in this area.

As children across the country return to school this week, they are facing a crisis in education that has reached epidemic proportions. While parents have always worried about their children's education and their abilities to read, write and do basic mathematics, many are also becoming horrified by a new threat. They fear that their children may not come home from school.

Today's children and teenagers are at greater risk of handgun death and injury than any previous generation of American youth. Last fall, the Centers for Disease Control's National Center for Health Statistics issued a study that found that one of every ten youngsters who died in 1987 was killed with a gun. A recent study by a leader of the American Academy of Pediatrics found that gunshot wounds increased 300 percent among urban youth from 1986-88. A statistical analysis of youth homicide that the Center to Prevent Handgun Violence recently issued found that 1989 was a record year for gun murders among youngsters, 19 and under. In fact, gun murders of youngsters have increased 97 percent since 1984.

Our nation's schools, once thought to be safe havens, have fallen victim to this increase in gun violence, and educators and children are caught in the cross fire. One old, but true, education adage goes, "Schools are reflections of their communities." This is particularly true in this issue. As we worked on a new study on gun violence in schools that we are issuing today, one fact became very clear. If a community suffers from gun violence, its schoolchildren also suffer.



Case 1:23-cr-00010-MAC-ZJH   Document 22-3   Filed 02/07/23   Page 46 of 93 PageID #: 286

Even children playing in schoolyards and sitting in classrooms are no longer safe from gunshot death and injury. In Houston, a 17-year-old was wounded as he turned in a math test, and dozens of other students in the second-story classroom dove for cover when gunfire erupted outside Booker T. Washington High School. Lindberg Junior High in Long Beach, California, another school frequently sprayed by random gunfire from the neighboring community, constructed a 10-foot-high, 300-foot-long concrete wall to protect teachers and students. Here in the Washington metropolitan area, a 17-year-old student was shot in the stomach while trying to break up a fight among outsiders at Fairmont Heights Senior High in Hyattsville.

The sad fact is that America's drug wars are being fought in and around our nation's schools. In two separate incidents, two students were murdered by gang members in front of hundreds of students in Detroit and Fort Lauderdale during the first day of school in 1988. In April of this year, a 16-year-old student was wounded as he sat on his own front porch when gunfire erupted among rival gang members across the street at an El Paso, Texas, high school.

Based on a national survey of students, the National School Safety Center estimated that 135,000 boys carried guns to school daily in 1987. An estimated 270,000 others carried guns to school at least once during the year.

In California, the only state that publishes annual data on gun confiscations in school, the number of gun incidents increased 40 percent in the 1988-89 school year over the previous year. In the last four years, a 100 percent overall increase was reported, including a 50 percent rise in elementary schools and 80 percent increase in middle schools. The increase at the high school level was 142 percent.

In Florida, a 42 percent increase in gun incidents was reported during the 1987-88 school year. The Chicago Public Schools reported a 50 percent rise in gun incidents in 1988. Hundreds of other school systems--from the Seattle, Washington, school district to the Charlotte-Mecklenburg school system in North Carolina--have reported similar trends. In Little Rock, Arkansas, three school shootings were reported in a one-month period in early 1989. The shootings were the first ever in the city's schools.

Our newest research shows that school shootings or hostage takings have occurred in 35 states and the District of Columbia during the past four school years. During this same period, 69 children, educators, and other school employees have been shot and killed in school, and 190 others have been wounded.

A student in Woodbridge, Virginia, was shot because he was walking down the hall with a girlfriend of a former student. An estranged husband of a teacher in Texas shot his wife and raped two other teachers in front of 100 preschool students. Upset by a fight involving their daughters, mothers of two third-grade girls carried guns on to an elementary school campus and shot each other and one of the children. A 19-year-old man walked into an elementary school in Greenwood, South Carolina, and opened fire on a third-grade class, killing two students and wounding seven others.

2

ERIC

I

Equally shocking is the fact that students themselves are committing many of these crimes. We all remember the horrifying Stockton shootings and the terrible crimes committed by Laurie Dann in Winnetka, Illinois. But, what seems to go unnoticed is the tragic toll gun violence committed by youngsters is taking on schoolchildren and educators.

An eight-year-old student in New Jersey pulled a gun on a teacher because he wanted to be promoted. A 12-year-old Missouri boy shot and killed a classmate in class because he was tired of being teased about his weight. A 15-year-old student in Norfolk, Virginia, killed one teacher and wounded another before his assault weapon jammed as he tried to shoot into a classroom full of third-grade students. A 10-year-old Texas boy, caught skipping school, reportedly murdered the school bus driver that caught him and returned him to school. A 14-year-old student in Phoenix held her teacher and 13 other students hostage at gunpoint after getting into a fight with her girlfriend. And, a seven-year-old boy threatened two first-grade girls with a loaded gun in Lakeland, Florida.

Nearly 70 percent of the school shootings and hostage situations we examined in this study were committed by youngsters -- either youngsters who are students at the schools or other youngsters who come onto or near school campuses.

What's causing this epidemic? Gun violence in schools is fueled by any number of reasons -- drugs, poverty, low self-esteem, lack of parental supervision and interest, increased glorification of guns in the movies, and many kids' warped "make my day" attitudes about life. Many youngsters look at guns as the key to unlocking many doors -- in their minds, guns allow them to do anything they wish and go any place they want.

One other factor must not be overlooked -- the sheer availability of guns in America. For every household in the country there are two guns in the hands of private citizens. Studies done on the availability of guns to children and teenagers show that youngsters have little or no trouble getting these weapons -- most often from their own homes. In fact, a report issued by the Florida School Boards Association found that 86 percent of the weapons confiscated from students in 1986-88 came from students' homes. Our research with students and parents in Dade County, Florida, revealed that most children of gun-owning parents believe they could take their parents' guns without detection. Parents agreed. A study by a Baltimore County grand jury found that one-third of the students knew where their parents kept guns and the vast majority could take the guns without their parents ever knowing.

We at the Center believe that we can take action to reduce this threat to our children's lives. We need to educate children about the dangers of carrying handguns and the seriousness of such offenses. We need to help parents understand their critical role in protecting their children by educating adults on the need to lock up guns in the home. And, we need gun-wielding individuals, whether student or adult, to understand the serious consequences of gunplay.

Our research with 16 classrooms in Dade County, Florida, found that students do fear punishment for carrying weapons. Surveys have found that adults too, fear swift and sure punishment for breaking the law. In sum, gun offenders in and around schools do fear

3

43

strong penalties. This would suggest to us that enactment of this legislation could well have a strong impact on the use of guns in and around our schools. And, could well reduce the violence.

We all know that our children cannot learn basic skills that are necessary for adulthood if they attempt to learn in an environment of fear. Rather than concentrating on English, math, and the sciences, many students are learning other lessons -- lessons in basic survival. "You have to be careful in the halls and who you mess with, because you don't know if they're carrying a gun or not," said an Omaha, Nebraska, high school student. A Baltimore student said, "You gotta be prepared -- people shoot you for your coat, your rings, chains, anything."

In an era where schools teach students the old nuclear war duck-and-cover drills to protect them from gunfire, where schools in 15 states search students with metal detectors, and where an increasing number of school systems are using gun sniffing dogs and school SWAT teams, strong, effective action is necessary. We cannot tolerate our children dying in ever-increasing numbers. We cannot sit by while America's drug war is being fought in our schoolyards.

We commend this Subcommittee for airing this problem and for searching for effective solutions. We must make it known to drug dealers, armed and dangerous students, and school intruders that bringing guns into or around schools will be treated with swift, severe punishment. Our schools and students are our future. If we don't act now, America's future may be filled with the constant crackle of gunfire and the sounds of frightened students diving under desks for cover.

4



44

Mr. HUGHES. Mr. Packer, we welcome you.

## STATEMENT OF JOEL PACKER, LEGISLATIVE SPECIALIST, NATIONAL EDUCATION ASSOCIATION AND NATIONAL PTA, WASHINGTON, DC

Mr. PACKER. Thank you, Mr. Chairman.

I am Joel Packer, a legislative specialist for the National Education Association, which represents 2 million education employees around the country. On behalf of the NEA and the 6.8 million member National Parent-Teacher Association, which has also endorsed this statement, I appreciate the opportunity to speak on the pressing need to assure the safety of America's school children.

The Gun-Free School Zones Act of 1990, we believe, is directly tied to the national goals in education, recently endorsed by President Bush and the Nation's Governors. Goal six states, "By the year 2000, every school in America will be free of drugs and violence and will offer a disciplined environment conducive to learning."

The threat of gunfire impedes more than the accomplishment of the national goal in education dealing with safety. The threat of violence is a significant factor in the dropout rate, the stress related to fear of violence threatens the educational goals related to student achievement, and fear of violence impedes the ability of schools to attract and retain qualified school personnel.

Each month some 5,200 secondary schoolteachers are assaulted at school; about 282,000 secondary school students are physically attacked at school.

In 1989, some 5,600 Americans under the age of 19 were killed with firearms—more than 15 children each day.

A number of schools in California, including Los Angeles, Long Beach and Oakland, have scheduled "yellow code alerts" from kindergarten up, in which students are taught to hit the deck when bullets start flying.

The problem of guns in the schools has reached alarming proportions:

Between 1988–89 and 1989–90 school year, the Los Angeles public schools experienced a 36-percent increase in assaults with a deadly weapon against students.

Over the same period, the number of guns recovered by school officials in Los Angeles rose by 29 percent.

Across the Nation, thousands of guns are confiscated from students each year in diverse places around the country. In fact, in 1987–88, Miami; Jacksonville, FL; Portland and Detroit all reported more gun confiscations per 10,000 students than Los Angeles did.

The incidence of the possession and discharge of firearms on school grounds and environs are not limited to the "combat zones" of urban ghettos. In every State, in communities of every size, in schools with populations of all socioeconomic strata, gun-related incidents in the schools can and do occur.

My written statement goes through several anecdotes from States around the country: Alabama, Georgia, Arizona, Ohio, and others of gun and shooting incidents in the schools.



45

The National School Safety Center estimates that more than 5.5 million boys and 3.2 million girls have access to handguns. And as we have already heard, 135,000 boys carry guns to school on a daily basis.

The Census Bureau's National Crime Survey reported that 3 million incidents of street crime—assault, robbery, rape, and theft—took place in schools or on school campuses during 1986.

NEA and PTA strongly support this legislation that would send a strong signal nationwide that it is not acceptable for students, staff, or adults and youth not connected with the school to carry firearms on school grounds or in the vicinity of the school.

This measure, which passed the Senate unanimously, is part of the omnibus crime bill—thanks to the efforts of Senator Kohl—builds on the success of the drug-free school zones. This proposed law will not, by itself, stop the threat of violence in schools or in our society in general. However, it would be a significant step forward in efforts to protect the safety of young people on school grounds.

Many other education groups have endorsed the bill, including the American Association of School Administrators, the Council of Chief State School Officers, the Council of Great City Schools, the National Association of Elementary School Principals, and the National School Boards Association.

Preservation of school safety must be a national priority. Gun-free school zones would be a significant tool in the hands of law enforcement officials assuring serious penalties for those who knowingly and carelessly carry or discharge firearms on school grounds or the immediate vicinity.

The Gun-Free School Zones Act would be most effective in conjunction with enactment of two other legislative measures currently under consideration in this Congress: (1) Legislation to limit the sale, manufacture, and distribution of assault weapons—also passed by the Senate as part of the crime bill and already reported by the House Judiciary Committee—and (2) the Handgun Waiting Period Act, known as the Brady bill, also passed by the House Judiciary Committee and awaiting House floor action.

NEA and PTA are actively working to secure passage of both of these bills.

Together, we can eliminate violence in the schools. We appreciate Representative Feighan's leadership in introducing this measure and look forward to its enactment.

Thank you.

Mr. FEIGHAN [presiding]. Thank you very much, Mr. Packer, for your testimony. We appreciate it.

[The prepared statement of Mr. Packer follows:]

50



46

PREPARED STATEMENT OF JOEL PACKER, LEGISLATIVE SPECIALIST, NATIONAL
EDUCATION ASSOCIATION AND NATIONAL PTA, WASHINGTON, DC

Mr. Chairman and Members of the Subcommittee:

I am Joel Packer, a legislative specialist for the
National Education Association, which represents 2 million
professional and classified education employees in the
nation's elementary, secondary, vocational, and
postsecondary schools. On behalf of the NEA and the 6.8
million-member National PTA, which has endorsed this
statement, I appreciate the opportunity to comment on the
pressing need to assure the safety of America's
schoolchildren.

This Subcommittee is now considering legislation, the
Gun-Free School Zones Act of 1990, H.R. 3757, that is
directly tied to the National Goals in Education, endorsed
by President Bush and the nation's governors. Goal 6
states, "By the year 2000, every school in America will be
free of drugs and violence and will offer a disciplined
environment conducive to learning."

The threat of gunfire impedes more than the
accomplishment of the national goal in education dealing
with safety. The threat of violence is a significant factor
in the dropout rate, the stress related to fear of violence
threatens the education goals related to student
achievement, and fear of violence impedes the ability of
schools to attract and retain qualified school personnel.

Each month, some 5,200 secondary school teachers are
assaulted at school; about 282,000 secondary school students
are physically attacked at school. In 1989, some 5,600
Americans under the age of 19 were killed with firearms --
more than 15 children each day. Surely, the sheer volume of
guns in the U.S. increases the likelihood that young people
will obtain and use them. The more people who have guns,
including children in the elementary grades, the more people
believe they must carry guns in self-defense.

A number of schools in California, including Los
Angeles, Long Beach, and Oakland, have scheduled "yellow-
code alerts" from kindergarten up, in which students are
taught to hit the deck when bullets fly.

According to an article in Time magazine last year,
Fred Busher, the head of the Stockton, California, school
district's psychology staff says students "realize now that
school is not the safe place it used to be and that
something terrible can happen at any instant." Students in
Chicago, New York, Miami, and elsewhere are exhibiting signs



47

2

of "post-traumatic stress syndrome."  Young children exposed
to violence in the schools and in the neighborhood have
become numb -- seemingly immune to sights of brutality in
the same way as the children of Belfast, Beirut, or
Johannesburg.

The problem of guns in the schools has reached alarming
proportions:

- Between 1988-89 and 1989-90, Los Angeles Public Schools
  experienced a 36 percent increase in assaults with a
  deadly weapon against students, from 278 to 379.

- Over the same period, the number of guns recovered by
  school officials rose 29 percent, from 274 to 354.  By
  comparison, only 93 guns were confiscated in 1987-88.

- Across the nation, thousands of guns are confiscated
  from students each year in such places as Cleveland;
  Houston; Jacksonville, Florida; Philadelphia; Portland,
  Oregon; Atlanta; Durham; and Bridgeport, Connecticut.
  In 1987-88, Miami, Jacksonville, Portland, and Detroit
  reported more gun confiscations per 10,000 students
  than Los Angeles.

The incidence of the possession and discharge of
firearms on school grounds and environs are not limited to
the "combat zones" of urban ghettos.  In every state, in
communities of every size, in schools with populations of
all socioeconomic strata, gun-related incidents in the
schools can and do occur.

- In Birmingham, Alabama, a seventh-grader was wounded
  when a handgun fell off his desk at Glenn Middle
  School.

- In Macon, Georgia, a 17-year-old accidentally wounded
  himself while unloading a handgun in a Central High
  restroom.

- In Phoenix, Arizona, an eighth-grader held her teacher
  and 13 classmates hostage for an hour at Cholla Junior
  High.

- In Orange, Ohio, a kindergartner took a loaded gun to
  Moreland Hills Elementary and told his teacher, "I
  brought something to school to show people, and I'd
  like you to see it."

- In Dolton, Illinois, a freshman at Thornridge High
  School shot a math teacher.



48

3

- In De Kalb, Missouri, a 12-year-old, tired of being teased about his weight, killed a classmate and himself at De Kalb High School.
- In Hackensack, New Jersey, a 16-year-old was killed following a regional basketball game. On the same day, another regional final was played without spectators in a secret location after threats of violence.

The National School Safety Center estimates that more than 5.5 million boys and 3.2 million girls have access to handguns. Almost 1 million boys carried a knife to school daily, and 135,000 boys carried a gun to school daily.

According to the Census Bureau's National Crime Survey, 12- to 19-year-olds are more likely to be victims of crime than any other segment of the population.

- One in six youths was the victim of street crime, compared with about one in nine adults.
- One of every 18 young people was assaulted, robbed, or raped in 1986 -- more than double the rate for adults.
- Of the 1.6 million attempted or completed crimes against juveniles, 40,000 were rapes, 230,000 were robberies, 450,000 were aggravated assaults, and 875,000 were simple assaults.
- Only about one-third of all violent crimes committed against youths were reported to police.

The Census Bureau also reported that 3 million incidents of "street crime" -- assault, robbery, rape, and theft -- took place in schools or on campuses during 1986. Anecdotal evidence would indicate the numbers will be much higher for all of 1990.

NEA and PTA strongly support proposed legislation that would send a strong signal nationwide that it is not acceptable for students, staff, or adults and youth not connected with the school to carry firearms on school grounds or in the vicinity of a school. This measure, which passed the Senate as part of the omnibus crime bill, S. 1970 -- thanks to the efforts of Sen. Kohl -- builds on the success of the Drug-Free School Zones. This proposed law will not, by itself, stop the threat of violence in schools or in our society in general. However, it would be a significant step forward in efforts to protect the safety of young people on school grounds.

Many other education groups have endorsed the bill, including the American Association of School Administrators,



49

4

Council of Chief State School Officers, Council of Great City Schools, National Association of Elementary School Principals, and the National School Boards Association.

The bill would make it unlawful for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a public school zone.

Preservation of school safety must be a national priority. Gun-Free School Zones would be a significant tool in the hands of law enforcement officials assuring serious penalties for those who knowingly and carelessly bring firearms on to school grounds or their immediate vicinity. The legislation is carefully crafted with exceptions for persons who own or carry firearms in their own home, unloaded and locked up in their own vehicle, or other legitimate circumstances.

The Gun-Free School Zones Act would be most effective in conjunction with two other legislative measures under consideration in this Congress: 1) legislation to limit the sale, manufacture, and distribution of assault weapons, passed by the Senate as part of S. 1970, the omnibus anticrime legislation; and 2) the Handgun Waiting Period Act, H.R. 467, known as the Brady bill, passed by this committee in July. NEA and PTA are actively working to secure passage of both of these bills.

Together, we can eliminate violence in the schools. We appreciate Representative Feighan's leadership in introducing this measure, and pledge to support this Subcommittee in efforts to see its enactment.

Thank you.

54



50

Mr. FEIGHAN. Finally on the panel, Dr. Mark Widome.

## STATEMENT OF MARK D. WIDOME, M.D., ASSOCIATE PROFESSOR OF PEDIATRICS, PENNSYLVANIA STATE UNIVERSITY COLLEGE OF MEDICINE, HERSHEY, PA. ON BEHALF OF THE AMERICAN ACADEMY OF PEDIATRICS, WASHINGTON, DC

Dr. WIDOME. Thank you very much, Mr. Feighan. Thank you for inviting the American Academy of Pediatrics to testify before this panel. My name is Mark Widome. I am a pediatrician from Hershey, PA. I am testifying today on behalf of the American Academy of Pediatrics, whose 39,000 members are committed to protecting children from preventable injuries.

Of course we're here today to underscore the academy's strong support of the Gun-Free School Zones Act of 1990. Firearms are a growing problem for our children and your subcommittee is to be applauded for focusing sharper public attention on this problem.

Every year in the United States approximately 3,000 children and adolescents die as a result of gunshot injuries. It's a mix of homicides, suicides, and unintentional shootings. In addition, there is an unknown but very large number of children who are seriously injured, often irreversibly, but who survive.

It's estimated that in addition to the 10 gun deaths each day of children and adolescents, there are 30 or 40 who are wounded. One in every 25 admissions to American Pediatric Trauma Centers is due to gunshot wounds; in fact, 10 or 11 percent of all pediatric deaths are due to firearms.

For inner-city black adolescent boys and young men, firearms are the leading cause of death in this country.

I hope this hearing will mark the beginning of the end of this disastrous story. The legislation which we're discussing today would make the children's environments safer. Guns have no business being near children as they play in their homes, as they visit their friends, or as they endeavor to study in school.

We adults must do all we can to ensure that guns do not come in contact with our children. But saying that guns do not belong in your schools is not enough. Guns near and in schools are coming from somewhere, and by all indications they're mostly coming from homes. Keeping guns away from schools must be just one part of getting guns entirely out of the environments of children.

In listening to some of the stories of Stockton, CA, and Winnetka, IL, we may be misled to believe that this is a problem that's just a matter of controlling a handful of deranged and disturbed individuals. But this is clearly not the case.

We've heard evidence this morning that it's a widespread problem. In fact, we could call it an epidemic. But it's an epidemic that's being spread by people that are more like you and me than we might care to admit. Guns, in fact, are a part of our entire society.

Some say there are 100 million guns out there. Some say there are 200 million. We don't really know. But they are used; they are bought casually. It's a state of affairs that's absolutely too shocking to citizens of the rest of the industrialized world. It's a problem of epidemic proportions.



51

Now it's not an epidemic of typhoid, scarlet fever, or polio. or diphtheria—gratefully, those are relics of the past. Yet the effect is the same and the epidemic is contagious and it's spreading. It's incubating in our towns and in our cities where the casual use of guns as everyday instruments of business and negotiation status, and the means of settling differences, are turning our school children into victims. They don't even know what's happening.

We as a society—physicians, educators, legislators, parents and grandparents—we're all called upon to make some sense out of this senseless waste of young lives.

The position of the American Academy of Pediatrics on this issue is very clear. Based on our background in public health and preventive medicine, we conclude that children simply cannot coexist in the same environment with firearms.

Children living in an environment with deadly weapons may die of gunfire—accidental or intentional—as surely as children playing in the street will be run over by cars, and as surely as children swimming during a thunderstorm will be hit by lightning.

A public health principle that has withstood the test of time is that you must separate in time and space children and the things that will surely harm them. It's true for the measles virus, it's true for drain cleaner, it's true for a contaminated supply of drinking water, and it's true for guns.

Every other solution for the problem of gun violation—and heavens knows, there have been no shortage of suggestions for how we might keep guns and keep our children, too—every other solution ignores this very basic principle. By ignoring this principle we are sacrificing 10 children and adolescents today, tomorrow, and the next day.

The question has been raised—and in fact, alluded to this morning—whether or not the limiting of guns from some geographic environments would begin to impinge upon our personal freedoms. We say that it does not—it does not if you will accept that with freedom comes responsibility. Indeed, a safe society requires that we accept controls. We control automobile driving on our highways. We specify who can drive and under what conditions.

We specify the kind of electrical wiring we can install in our homes. Copper is OK; aluminum is not.

We specify what kinds of toys can be sold to our children. Those that pose a choking hazard, those that have sharp edges, and those that are painted with lead paint are restricted. In fact, some of these toys may be far more difficult to find than to purchase a handgun.

Are we restricting personal freedom when we deny people access to unpasteurized milk? Because we choose not to live with tuberculosis, we accept controls.

And now we're called upon to decide whether we choose to live with brain injuries, paralyzed arms and legs of children; whether we choose with a morning newspaper that routinely reports 8- and 10-year-olds who have been gunned down on their way to school.

Last year, the academy called together 30 experts from fields of medicine, public health, the law, and so forth, as well as parents of victims. We met in Chicago at a forum sponsored by the Henry J. Kaiser Family Foundation. I can tell you that the central conclu-



52

sion reached by that panel was that widespread availability of guns is the single factor most responsible for childhood deaths from gunfire.

It was determined and recommended that in incremental steps, if necessary, we as a society must begin to separate children from guns.

If we're going to take this problem seriously, if we believe that our kids are worth saving, isn't the schoolyard, the school bus, the classroom and the lunchroom, aren't these appropriate places to start?

Isn't it time to send a message that we care enough about our children—white children, black children, Hispanics, rich, poor—we'll insist on separating them from weapons because these are barbaric relics of a less civilized society.

Let me conclude by making a plea for the need for continuing to collect data—and I think that was also mentioned earlier this morning. The data is scarce and sketchy. It's important that we keep records. It would be our recommendation that gun violence in schools, and particularly in our school systems, be a reportable event, much the way measles and AIDS are reportable diseases.

It would be reasonable, for example, to add to the legislation under consideration today, a requirement for schools to record and report how often guns appear, and how often someone gets hurt. A steady flow of this information would help keep us working on the task at hand.

The greatest tragedy is that firearm deaths are among the most preventable of all childhood fatalities. Were guns not so readily available, most of these deaths would be avoided.

Pediatricians are prepared to support your leadership and that of this subcommittee to ensure that further preventable firearm deaths and disabling injuries do not befall our children simply because we lack the political will to protect them.

Thank you very much. I'll be happy to answer any questions.

Mr. FEIGHAN. Thank you very much, Doctor. And I want to thank all the members of this panel for their very helpful testimony.

[The prepared statement of Dr. Widome follows:]



Case 1:23-cr-00010-MAC-ZJH   Document 22-3   Filed 02/07/23   Page 58 of 93 PageID #: 298

PREPARED STATEMENT OF MARK D. WIDOME, M.D., ASSOCIATE PROFESSOR OF PEDIAT-
RICS, PENNSYLVANIA STATE UNIVERSITY COLLEGE OF MEDICINE, HERSHEY, PA, ON
BEHALF OF THE AMERICAN ACADEMY OF PEDIATRICS, WASHINGTON, DC

Mr. Chairman, my name is Mark D. Widome, M.D., and I am an associate
professor of pediatrics at the Pennsylvania State University College of
Medicine in Hershey, Pennsylvania.  In addition to my full-time
practice of general academic pediatrics, I am also chairman of the
American Academy of Pediatrics Committee on Injury and Poison
Prevention.  I appreciate the opportunity to appear today on behalf of
the Academy, whose 39,000 pediatricians have a longstanding and deep
commitment to protect infants, children and adolescents from
preventable injuries.

More specifically, I am here of course to underscore the Academy's
strong support of the "Gun-Free School Zones Act of 1990" (H.R.3757),
which is sponsored by your colleague, Rep. Edward Feighan (D-Ohio).
Children and firearms are a growing problem in our society, and the
subcommittee is to be applauded for focusing sharper public attention
on this devastating area of childhood injury which too often goes
unmentioned.  Under the "cloak" of Constitutional guarantees, our
children are being injured and worse--they are losing their lives and
their futures.

Relevant statistics offer little promise.  For black adolescents and
young men, particularly, firearm injuries are the leading cause of
death.  Overall, an estimated 135,000 students carried handguns to
school daily in 1987, and another 270,000 carried handguns to school at
least once, based on a survey of 11,000 students.  Nearly 8.7 million
children and adolescents have access to handguns.  Florida reported a
42-percent increase in gun incidents in schools during 1987-88, and 86
percent of the guns that were traced came from the students' homes.



54

2

California schools reported a 43-percent increase in student gun
confiscations in middle schools, and a 50-percent increase in high
schools over the past three years.

I hope this hearing will mark the beginning of the end of this
disastrous cycle. Thousands of children carry guns to school each
year; children are killed in schools by handguns and in school yards by
semiautomatic weapons; major urban trauma centers are reporting an
increase of 300 percent in the numbers of children treated for gunshot
wounds; and young children are being shot in re aliation for the gang
activities of their older siblings.

The legislation which we are discussing today would make children's
environments safer. Guns have no business being near children as they
play in their own homes, as they visit their friends', or as they
endeavor to study and learn at school. We adults must do all that we
can to ensure that guns do not come in contact with our children. But
saying that guns do not belong near schools is not enough. Guns near
and in schools are coming from somewhere, and indications are that
these guns mostly come from homes. Keeping guns away from schools must
be just one part of getting guns entirely out of the environments of
chldren.

For obvious reasons. In a survey conducted by the Academy, it was
determined that one in six pediatricians has treated injuries caused by
handguns. Sixty-two percent of those injuries occurred during
unsupervised play with a gun found in the household. Nearly



**55**

3

three-fourths of the pediatricians surveyed strongly agreed that they
and their colleagues should support community efforts to enact
gun-control legislation.

The Academy is focusing increased attention on the scourge of childhood
and adolescent firearm injuries. We are alarmed by the degree to which
the American firearm injury epidemic intrudes into the child and
adolescent population. We believe that the time is right for our
society to undertake initiatives to reduce the frequency of firearm
injury and death. Pediatricians are becoming involved in efforts to
reduce the prevalence of firearm injuries--as educators of parents, as
experts on children and adolescents, and as advocates in the political
process.

In 1988, a deranged woman carried her legally obtained weapons into a
grade school in Winnetka, Illinois, and started shooting
indiscriminately. One child was killed and several more injured before
the assailant killed herself. The children who saw the carnage and the
community in which they live are still recovering. The months that
followed saw a number of copy-cat assaults in schools around the
country, some with deaths, all of them traumatic to the children and to
the communities.

Early in 1989, a deranged man carried his legally obtained arsenal of
assault rifles and handguns to a school yard in Stockton, California.
When he finished firing two minutes later, five children were dead.
Nearly 30 other children and a teacher were injured.

60



**56**

4

By such lurid accounts, the public might be misled that this is nothing more than a problem of controlling a handful of deranged and disturbed individuals--but it is not. We might believe that it is a problem involving a small criminal element that need only be eradicated from our most desperate inner city neighborhoods--but it is not. It is an epidemic that is being spread to, and being spread by, people who are more like you and me than we perhaps care to admit. Guns, after all, are a part of our general society, even a part of "polite" society. They are bought and used casually throughout America, which disquieting fact the rest of the civilized world regards with utter astonishment.

Firearms are a problem of epidemic proportion. I use the word epidemic because it is, in the considered judgment of pediatricians, perfectly apt. It is not an epidemic of typhoid, or of scarlet fever, or of polio or diphtheria--those are gratefully behind us now. It is, however, an epidemic that is spreading. It is incubating in our cities and towns, where the accepted use of guns as everyday instruments of business, negotiation, status, and as a means of settling differences, are turning our schoolchildren into victims, usually at an age too young to understand what is happening or why.

Every year . . the United States approximately 3000 children and adolescents die as the result of gunshot injuries. This is a mix of homicides, suicides and unintentional shootings. In addi ion, there is an unknown but large number of children who are seriously injured (often irreversibly) but who survive. It is estimated that in addition

57

5

to the 10 gun deaths to children and adolescents that occur every day,
there are 30-40 children who are wounded. One in every 25 admissions
to American pediatric trauma centers is due to gunshot wounds. In
1987, gun injuries were the fourth-leading cause of unintentional
injury death for children ages 14 and under.

As a society, we are all of us--physicians, educators, legislators,
parents and grandparents--called upon to make some sense out of this
senseless waste of young lives. We are losing our children; bright
futures are being extinguished.

The position of the Academy on this issue could not be clearer. It is
the product of everything which we pediatricians know about the health,
growth, development and needs of our youngest citizens. It is based on
our background in public health and preventive medicine. It is simply
that children cannot coexist in an environment with firearms. Children
living in proximity to deadly weapons may die of gunfire (accidental or
intentional) as surely as children playing in the street may be run
over by cars, and as surely as children swimming during a thunderstorm
may be hit by lightning.

It is axiomatic, and instructive, that children must be separated, in
time and space, from things that harm them. It is true for the measles
virus, it is true for drain cleaner, it is true for a contaminated
supply of drinking water, and it is true for guns. Yet putative
"solutions" persist--hopeless proposals by persons who argue (in the
face of mounting evidence to the contrary) that we can keep all our



**58**

6

guns and shield all our children.  The result of this improvident
claim?  We continue to sacrifice 10 children and adolescents today, 10
more tommorrow, and 10 more every day thereafter.

Would prudent restrictions on guns in some environments egregiously
curb our freedom?  Not if one accepts that with freedom comes
responsibility:  responsibility to our families, our communities, our
schools and our children.  Indeed, a safe society requires that we
accept some controls.  We control automobile driving on our
highways--we specify who can drive and under what conditions.  We
define the kind of electrical wiring that we can install in our
homes--copper is permitted, aluminum is not.  We specify what kinds of
toys can be sold to our children--restrictions are placed on those that
pose a choking hazard, those that have sharp edges and those with lead
paint.  (In fact, some of these toys may be far more difficult to
purchase than is a handgun.)  Now we are called upon to decide whether
we choose to continue to live with brain injuries, paralyzed arms and
legs, and with morning newspaper reports of children gunned down on
their way to or from or during school.

Last year, the Academy called together 30 experts from fields including
medicine, public health, the law, and injury prevention, as well as
parents of victims.  They gathered in Chicago to participate in a forum
on guns and children sponsored by the Henry J. Kaiser Family
Foundation.  The central conclusion reached by that distinguished group
was that widespread availability of guns is the single factor most
responsible for childhood deaths from gunfire.  It was determined that,



**59**

7

in incremental steps if necessary, we as a society must begin to
separate our children from guns.

If we are going to take this problem seriously, if we believe that our
children's lives are worth saving, aren't schoolyards, school buses,
classrooms and lunchrooms appropriate places to start?  Isn't it time
to send out the message that we care enough about our children--white,
black, Hispanic, rich and poor alike--to insist on separating them from
weapons which the rest of the Western world views as relics of
barbarism, instruments of less civilized societies governed more by
impulse and violence than by thoughtfulness and reason?


Conclusion

    The carnage caused by guns among children and adolescents
occasionally receives media attention.  However, systematic and
sustained attention to the problem has been lacking.  Part of the
reason for this is the scarcity of data concerning the involvement of
children in the gun epidemic, and a lack of necessary detail in the
data that are available.  The Academy urges Congress to take steps to
ensure that proper records are kept, so that the gravity of the
situation can be properly assessed and that steps can be taken to end
the maiming and killing of our children.  Gunshot injuries should be
reportable and reported, just as are cases of measles and AIDS.  It
would be reasonable, for example, to add to the legislation under
consideration today a requirement for schools to record and report how



**60**

8

often guns appear at school, where they come from, and how often someone gets hurt. A steady flow of this sobering information would help to keep us working on the task of reducing gun injuries to children.

The greatest tragedy in the facts which I have presented today is that firearm deaths are among the most preventable of all childhood fatalities. Were guns not so readily available, most of these deaths would be avoided. Pediatricians are prepared to support your leadership, and that of this committee, to ensure that further preventable firearm deaths and disabling injuries do not befall our children simply because we lack the political will to protect them.



61

Mr. FEIGHAN. Ms. Lautman, I wonder if you could address one of the concerns that my colleague from New Hampshire raised earlier, and that is the incidence of gun use in school zones, schoolyards, involving either adult students, other adults, or students whose age would subject them possibly to the adult criminal justice system.

Apparently in one of your reports which my colleague has reviewed, there was not significant evidence of incidence where there would be prosecution of someone as an adult. I wonder if that is a fair interpretation of the data as you understand it, or if that data actually is available.

Ms. LAUTMAN. The report that Congressman Douglas was reading from was simply done to address the issue of kids victimizing other kids. That's why there are no reports of adults in that. We were looking simply at the increasing violence where the perpetrators were indeed children themselves.

As we look at the data we've collected from newspaper clippings, the reports that we've looked at that some persons do keep, we find that while the majority of offenders in school buildings, on school grounds, are youths—the majority between the ages of 14 and 17—there are large numbers, and I don't have the specific numbers here today—but there are large numbers of kids between the ages of 17 and 21 and large numbers of adults standing on street corners dealing drugs. We see as many drive-by shootings that are committed by people who are not juveniles.

So that the numbers of adults that are committing the offenses in and around school grounds is very large from the data we've seen. I'd be happy to provide the subcommittee with more complete data on that when we can pull it together.

Mr. FEIGHAN. That would be very helpful if you could, just so that we have a sense of the population that this legislation would be impacting.

[The information was not submitted.]

Mr. FEIGHAN. Chief Kovacic, I had the opportunity—I think it might have been prior to your arrival in the committee room this morning—to talk with Mr. Cook about a chart that you had submitted as part of your testimony dramatizing the significant increase in the incidence of gun use in the Cleveland school systems.

I don't have it immediately before me but I think that the chart reflected an almost 100-percent increase in incidence between 1985 or 1986 and 1990.

As you indicated in your testimony, Chief, so far in 1990 we have witnessed a 17-percent increase over last year, and there are several months remaining in the year.

Have you had the opportunity to reflect on this significant increase and arrive at any conclusions as to what you think is happening in our system, which I suspect, and Mr. Cook suspected as well, was typical of what is happening in urban areas across the country?

What are the factors that are contributing to such a significant annual increase?

Mr. KOVACIC. Congressman, I believe that what we're witnessing in Cleveland is the beginnings of organized gangs trying to take



62

over drug trafficking, extortion of schoolchildren, and a myriad of criminal activities that were scattered in the past.

These are gang members who furnish school-age students with weapons and send them into the schools. They will frequent the area of the schools to get together with those students who are still there.

I think that the other side of it is, it almost becomes self-preservation the way other youngsters see this; they are being intimidated by these hoodlums; and so in some cases they are carrying a weapon for self-preservation. That's what I feel is happening, coupled, of course, with the drug problem, which is what most gangs struggle over—fighting for that trade.

Mr. FEIGHAN. Chief, I want to address an issue that you raised in your testimony regarding the exemption for law enforcement officers—Federal, State, and local—which clearly we want to accomplish and we don't want any ambiguity in the legislation on that.

It was my understanding from speaking with our legislative counsel's office in the preparation of this legislation that would cover law enforcement officers—the language that we have—in the scope of their duties.

Is it your interpretation as you read the legislation that just a very modest amendment would specifically exempt law enforcement officers and resolve any ambiguity that exists in this proposed statute?

Mr. KOVACIC. Yes, it could lead to different interpretations by various layers of government—school government, so forth and so on. This language would be very specific and take away that area— that sort of gray area—that seems to exist now under the present law.

I have several police officers who are attorneys, and I asked them to research the law. Their feeling was, yes, we probably are exempted but they, too, felt that a clear statement of that exemption is necessary.

Mr. FEIGHAN. I appreciate your pointing that out and your commentary on it because we definitely want that exemption very clear in our legislation.

Ms. Lautman, if I could ask you again, I was told recently that Dade County—or maybe I even saw this in the extended version of your testimony—that Dade County currently has a gun awareness class.

Are you familiar with that curriculum requirement?

Ms. LAUTMAN. Yes, I am. In fact, the Center to Prevent Handgun Violence wrote that curriculum in its program in conjunction with Youth Crime Watch of Dade County and the Dade County public schools.

Mr. FEIGHAN. How long has that been in effect?

Ms. LAUTMAN. Since December of last year.

Mr. FEIGHAN. Has anyone had the opportunity in that relatively short timeframe to evaluate the impact of that curricula requirement?

Ms. LAUTMAN. There has been preliminary evaluations done. Our evaluation shows that students are learning a lesson that guns are dangerous, that the long-term effects of gun violence are tragic, and what can happen to them if they bring guns to school.



63

The Miami Herald reported a decrease this year in the number of gun incidents and gun deaths among students since the program kickoff. And they have partially credited the gun awareness program with that decrease in violence in Dade County schools.

Mr. FEIGHAN. At what level is that curriculum requirement?

Ms. LAUTMAN. It's kindergarten through 12th grade.

Mr. FEIGHAN. Dr. Widome, if I could ask you, the written testimony that we had from the National Education Association—Mr. Packer—referred to post-traumatic-stress syndrome. Post-traumatic-stress syndrome is a condition with which I'm familiar with regard to Vietnam veterans but not with regard to children.

I wonder if you could address that issue from your professional perspective. Explain to us what that is, what the impact is on American schoolchildren.

Dr. WIDOME. I think over the past 10 or 15 years, we continue to learn more about the emotional lives of children. And we've learned how really some children give signals to express the emotional stress that they're having. It could be stress from an illness; it could be stress from an automobile crash that they were involved in; it could be stress from gunfire. And particularly harmful is the problem of stress associated with seeing a friend or a loved one, a parent, an older brother or sister, being hurt, or being killed.

Children will sleep poorly, children will eat poorly, some children will even grow poorly. Children will be unable to do their schoolwork, will be unable to enjoy life. And it's a process that can be well documented, not only in the year after the occurrence, but even for years later.

It's analogous to the post-traumatic-stress syndrome that you mentioned, Mr. Feighan, that we saw in people returning from Vietnam. The problem is it's only been more recently recognized in children, but the impact is the same or greater.

We're particularly concerned about the effects of gun violence on adults, the effect that that has on children. I think if you look at places like Winnetka, IL, for example, you will see an entire community of children, many of whom did not witness what went on in that school, who were having these kinds of problems.

So I think our children are growing up in that environment. I think, unfortunately, we're going to see more and more of it— something we think about in New York City and Washington, DC, perhaps in Chicago and Los Angeles. But I was speaking the other day with a colleague of mine who spent 12 years as a pediatric surgeon in Richmond, VA—a town of 200,000, maybe a metropolitan area of 600,000—and it was a routine occurrence, he told me, to see ambulances arriving from schools, and seeing entire families experiencing emotional turmoil through the hospitalization, through the period of rehabilitation, and for months thereafter.

Mr. FEIGHAN. Thank you. Again I want to thank the members of this panel. I think you've been exceptionally helpful in a very chilling fashion, painting a very broad picture for us, explaining the dimensions of this problem in our country.

Thank you very much.

Thank you, Mr. Chairman.

Mr. HUGHES [presiding]. I thank the gentleman.

The gentleman from Pennsylvania.



64

Mr. GEKAS. Yes, I thank the Chair.

I suppose it's been apparent from the tenor of the questions that we posed and some of the statements that we've made, and from the accumulation of testimony that you've heard thus far from yourselves, your colleagues, that we all are interested in doing something about the subject; and how is the best way to approach it becomes the overall problem.

Education among the populous comes forward as a number one prerequisite, in my judgment, no matter what legislation we pass or fail to pass here.

I wanted to ask Mr. Packer if he had heard today, because I had not, about the existence of the Bureau of Alcohol, Tobacco and Firearms outreach program in which it was stated that some 41,000 youngsters have been exposed to this kind of forum in the past. Have you heard of that program?

Mr. PACKER. I personally have not heard of it. Others in my association might have, but perhaps at our local level. We have 12,000 local affiliates, and there might have been contacts there.

Mr. GEKAS. I think it would be helpful for us if you would, through your association, determine where this has occurred, and what the results are, and how the administration of the particular school evaluates it, and what impact it might have had on the children if there are some conclusions drawn from these things. I think that is an important feature, because an alternative to this legislation, which the chairman is advocating and which we were discussing, might be to further this outreach on the Bureau's part. So I think, in conjunction with your work, we ought to be beneficiaries of what statistics you can give us on that.

Mr. PACKER. We would be happy to do that.

[The information follows:]

The NEA has not had any contact with the BATF Outreach Program to date. The Bureau apparently provides agents to speak at schools at the request of a local school administrator and has not worked with teacher groups. However, several NEA representatives will be meeting with BATF staff in October to develop a working relationship in order to publicize the Bureau's outreach efforts among NEA members and affiliates.

Mr. GEKAS. That brings us in line with Ms. Lautman's report that part of the curriculum in this one instance that you are talking about raises the awareness of our children as to the overall consequences of gun use, gun violence, et cetera. So, again, we are on the same beam in trying to get the message out. This is very salutary, in my judgment, to see unanimity on talking about it more and making awareness a top priority.

Dr. Widome, in his statement, was emphasizing increasing the volume or the tenor of data gathering. But what I want to ask you, Dr. Widome, is this. Right now, a physician in the Commonwealth of Pennsylvania, and I suppose elsewhere, has to report a gunshot wound, of course. So we have that body of information already lodged. You are suggesting—and I am taking this into account, because I think it is important—that the school administrations be mandated, if they don't undergo willingly the process of reporting each incident of gun possession, gun use, or gun exposure of some type in the schools. Is that what you are talking about?



65

Dr. WIDOME. Exactly, Mr. Gekas. I think, as in so many problems, we have got an iceberg with both the tip and the main mass of the problem, and we have heard some documentation today from surveys about how frequently children take guns to school.

But I think the data still needs to be collected with more specificity—the types of guns, where they are coming from, what grades, what geographic distribution. We collect data for a great number of things in this country, particularly for a variety of reportable illnesses, and invariably this data has been helpful in directing us toward strategies and countermeasures. I think we are little bit behind in terms of guns, and I think it would be a perfectly reasonable thing to do to have the appropriate government agency—and I don't know what that agency might be—develop better data on exactly how much of a gun environment the school environment is.

Mr. GEKAS. I think you may be correct.

We heard testimony from the Bureau in which they, when responding to a call from a school district, will trace the origin of a firearm and so forth. So presumably they will have recorded then that particular incident. But there are probably many other occasions in which the school district never contacts any agency but handles it on its own or somehow considers it so minor that it doesn't bring in another agency, and that would go unrecorded.

One other question. A physician, as we said, is required to give a report on a gunshot wound in Pennsylvania and elsewhere, I trust. But there is no requirement, is there, for them to report a case in which they definitely make a diagnosis that this was emotional stress drawn from a gun incident? Is that correct?

Dr. WIDOME. That is correct. That data is not collected.

Mr. GEKAS. I am wondering if, within the medical community, there ought to be some movement toward seeing if we can collate that into the whole body of statistics having to do with gun incidents.

Dr. WIDOME. I think that is a suggestion that clearly deserves some consideration. It is more difficult because of a matter of definitions, obviously.

Mr. GEKAS. Yes.

Dr. WIDOME. But there is no question that we are seeing in the medical literature, which is a good reflection of what is happening on an underlying basis—we are certainly seeing, we are recognizing, stress syndromes and effects on families with far greater frequency than we did in the past.

Mr. GEKAS. Would this, do you envision, violate the physician-patient relationship of confidentiality in any way?

Dr. WIDOME. Well, you know, we report a great number of diseases, and there is opportunity to report product-related hazards without identifying information for epidemiologic purposes, and I don't see any reason why that couldn't be done to better define the effects of gunfire.

Mr. GEKAS. I thank the panel.

Mr. HUGHES. The gentleman from New Hampshire.

Mr. DOUGLAS. Chief Kovacic, I take it, if senate bill 52 becomes law in Ohio, you would have a law on the books that your policemen could enforce.

Mr. KOVACIC. That is correct.



66

Mr. DOUGLAS. If this bill, H.R. 3757, becomes law, there is nothing there that your policemen can enforce.

Mr. KOVACIC. No, sir.

Mr. DOUGLAS. So you support it, even though it won't have any effect in the city of Cleveland in terms of your hundreds of police officers.

Mr. KOVACIC. It will have an effect, sir.

Mr. DOUGLAS. How?

Mr. KOVACIC. We can hold and detain people for a variety of things. If we find somebody counterfeiting U.S. money, we can haul them before the Secret Service. My program would be that in these areas where these weapons are deliberately taken into the school area and used in a crime, that we ask ATF to prepare the Federal court cases. Sure, we can detain, we can hold, we can turn them over to the Federal Government and give them additional cases.

In Ohio, we had a law passed on using a weapon in an armed robbery, and it was accompanied by a great deal of publicity, which I feel a bill of this type would need. Our armed robberies with weapons dropped way down. I think this would have the same effect that, with the proper publicity campaign, the bringing of weapons into that school area would diminish greatly.

Mr. DOUGLAS. But it would be better, would it not, for you, as a law enforcement officer, if you didn't have to split jurisdiction—in other words, if you could just keep it all within your own department?

Mr. KOVACIC. Oh, no, sir. I like the idea of going to the Federal Government on a variety of things. We work very closely in Cleveland with all the Federal agencies, and we find out that, when you really want to drive something home, that is the way to go. If we were to try and cope with the drug problem on our own, we would be stymied. If we tried to go against the gangs on our own, we would meet with very little success, and what we are trying to do here is keep guns where they belong, in the fields, on the target range, and the last place in the world that a gun belongs is in a school zone.

Mr. DOUGLAS. I agree with you, and that is why I am looking for what will work.

You heard ATF indicate that they don't have the manpower to administer this law. Were you here when that gentleman testified?

Mr. KOVACIC. I believe I caught something along that line, yes.

Mr. DOUGLAS. What would happen to a typical 14-year-old, 15- to 16-year old, under Ohio law? Keep in mind that ATF said, under Federal law, even if you detain the kid, nothing is going to happen, so they are going to give them right back to you. Now what are you going to do with this kid—16, who pulled a gun on a teacher? A 14-year-old pulled a gun on a fellow student in a men's room? What will happen to that kid under Ohio law?

Mr. KOVACIC. He would be turned over to the juvenile court, and if it were judged by the juvenile court that the case was serious enough, and if he met a certain age criterion, he would be held through the common police court.

However, I think that what you have here is the aider and abettor statutes. I don't think that an 11- or a 15-year-old youngster is going to get a gun pretty much on his own. The kind that I am



67

concerned about are when these gang leaders, who know the age differentials, present a youngster with a gun and send them into that school. Under aider and abettor statutes, if the offense is serious enough that ATF feels they want to step in, they could go after the person who furnished them with that weapon to bring into that school zone, and then the other end of it is, for the first time we will get a national series of statistics on just exactly how serious this problem is and what areas are being hit the hardest.

Mr. DOUGLAS. If you have 100 kids involved in school gun incidents in your State, how many are under age? How many are minors?

Mr. KOVACIC. The only thing I can tell you, Mr. Douglas, is that my observation of the past several years has been that they are all very close to the age of 18, the breaking point in Ohio for a juvenile.

Mr. DOUGLAS. But they are under it.

Mr. KOVACIC. Some are under; some are over.

Mr. DOUGLAS. What are most?

Mr. KOVACIC. I would have to say most are probably under the age of 18.

Mr. DOUGLAS. And Ms. Lautman's figures, all of her incidents were under the age, which leads me to my concern. Mr. Packer says we should pass this to send a signal. I am really concerned that we do something about it, not that we just pass a signal and say we have solved school violence when, in fact, ATF isn't going to prosecute because most of them are kids. You folks all know that the juvenile system doesn't work very well.

Isn't the answer perhaps a model law that the States could get passed that would cover both aiding and abetting—namely, adults arming kids that they know will go into the juvenile system and therefore escape real justice, as well as to provide something that would be immediate, which would be that for kids violating the law they are automatically treated as adults: There is no certification; you don't have a hearing. You are a kid in school above the age of 15 with a firearm; that's it; you are an adult; you are going to be indicted, tried, and treated, and jailed exactly as if you were Mr. Kovacic's age or my age. Now that would send a strong message and, in fact, would probably do a heck of a lot more to clean up the system, don't you think, than having ATF handing these kids back to you when they find out they are under age?

Mr. KOVACIC. No, I have to disagree with you. I think that the ATF and the Cleveland Police Department working in this area would have an impact, a bigger impact than the Cleveland Police Department has alone.

We also get into the area where these youngsters are crossing city lines with a great deal of immunity. In my community alone, it would require the banding together of about 60 or 70 different law enforcement agencies just to get the intelligence information that could be gotten by using a Federal agency as a central repository of the data collected and the information collected.

Mr. DOUGLAS. Let me follow that up, because I want to deal with the problem likewise. You think that the existing juvenile laws when you get these kids back are more than adequate to handle it,



68

that the punishment fits the crime under our current juvenile system such as in your State or mine?

Mr. KOVACIC. I think that the biggest flaw in the juvenile system is the lack of detention space, and that is a problem that cannot be solved by passing laws.

Mr. DOUGLAS. So I am still looking at down the road, assuming the ATF agent comes, you have made an arrest, you are holding the kid, and they say, "Well, he is only 16," and you heard the guy say, "If they are under age, we don't want them," and a majority of your problems are under age, all of Ms. Lautman's cases—every single one—are under age. So I am talking about the real world now. The ATF guy says, "Chief, he is back on your watch." Your juvenile system isn't going to serve as a deterrent to that kid, because that is why they armed the kids in the first place; they know that it isn't going to work. They will be out on the street how soon? Months?

Mr. KOVACIC. Days sometimes.

Mr. DOUGLAS. Days?

Mr. KOVACIC. That is correct.

Mr. DOUGLAS. So, in the end, after we have had this great media blitz, the kids will figure out, "Hey, this doesn't amount to anything any more than robbing a grocery store"—you know. "We are back on the street, we are back in school, and the new law didn't do anything." Is that the answer, to certify these kids, or treat them as adults instantly so that they do get packed away for 5 years?

Mr. KOVACIC. Mr. Douglas, I can agree with much of what you are saying, but I think that the point here is this. Most of the weapons used are handguns. By establishing that zone, that 1,000-foot zone, around an urban school, you have insulated that school from the discharge of that firearm, be it accidental or purposeful.

Most schools in the urban area consist of—a large portion of that school is made out of glass. A handgun fired at close proximity to the glass will penetrate the glass and injure a child inside that school. This law, by establishing a 1,000-foot area around that school—and that is the basics of this law, not whether somebody is 15, or 18, or 50—the basics of this law are to prevent a handgun, or a weapon, from being discharged within that area. Now we don't want to wait until the gun is actually fired, and so you have this portion of the bill that deals with bringing it into this area.

If you look at an urban area and an urban school and you get about 1,000 feet away from that school, you will find that it is very difficult to get a clear shot at the school; it is going to hit something else; it is going to hit a garage, it is going to hit another house.

But I think that the purpose of this law—whether they are 16 or 36, if they have that gun, the purpose of this law is to keep them from discharging that gun within 1,000 feet of the school.

Mr. DOUGLAS. OK. But, Chief, this could be done under State law. Ohio could pass such a law. What bothers me is your point: This is great for urban schools. But when Congress passes a law, it includes States like mine. Every time in a rural school district you drive by the rural school, you have committed a 5-year felony under Federal law if you haven't complied with all the strictures of



69

this. Now that is ridiculous. Every time we have hunting season in New Hampshire, you could theoretically have a road block, and in some little two-room schoolhouse out in Landaff, NH, that is 40 feet from the road, in a town of 300 people, everyone is going to get arrested. That is why this should be left to the States or to a State option, because it isn't going to work in rural areas.

Mr. FEIGHAN. Would the gentleman yield on that point?

Mr. DOUGLAS. Yes.

Mr. FEIGHAN. I think that it is unlikely, since BATF has already told us the burdens that they have, that they are likely to pursue a case against a hunter in your community that is caught in a road-block on his way to hunting. But, in any event——

Mr. DOUGLAS. But it could happen.

Mr. FEIGHAN [continuing]. I am not so sure that it could happen. But beside the point, it certainly is not something that is going to lead to prosecution.

I do think it is important that we recognize that in existing Federal law we have provisions for the treatment of juveniles as adults. Essentially as young as age 15, for crimes of violence, a youth can be tried as an adult and that should not be overlooked. So while we are talking about what appears to be at least a preponderance of incidents involving children under the age of 18, the majority of them, in fact, would be prosecutable under Federal law.

I appreciate the gentleman's yield.

Mr. DOUGLAS. If I also may ask just one other question, and then I am through, what is the percentage of incidents in the Cleveland schools involving the use of krives?

Mr. KOVACIC. I couldn't answer that question now. I would have to go back and get it.

Mr. DOUGLAS. Is it only guns that are the weapon of choice in the Cleveland schools, or are there also knife incidents as well?

Mr. KOVACIC. No, there are cases where youths have used baseball bats, hatchets, a variety of objects. But 'he devastating thing about a gun is that those other weapons are pretty personal, it is very much one on one. You fire a weapon in a school, you don't know where that bullet is going to wind up, and I think that is why the firearms are so singled out, because it is so devastating and the potential for striking a child is so great in the school. That is why we go for stats on guns as opposed to knives.

Mr. DOUGLAS. It is currently against the law, anyway, for kids to be having firearms, isn't it?

Mr. KOVACIC. Yes.

Mr. DOUGLAS. So I guess you folks have more confidence that Congress passing a law will immediately change the behavior of kids who are already violating the law today. What I am concerned with is, wouldn't a metal detector at an urban school pick up the knives, the shivs, the guns, and everything else? If all the kids knew that they had to go through a metal detector, just as I am sure your courthouses have laws against guns in courthouses, but if I was a judge, I would not rely on that law, I would want a metal detector out in the hall, because I know that criminals aren't going to obey the law, that is why they are coming in the building. Wouldn't that be the most effective way to know, if you are a teacher in a classroom, that the odds are now much higher, not

ERIC

70

that a Federal law was passed but that there is a metal detector there and every morning they file through it?

Mr. KOVACIC. I don't think that the passage of law, in and of itself, would deter too much of anything.

Mr. DOUGLAS. I agree with you.

Mr. KOVACIC. But I think enforcement, maximum sentencing, and those kinds of things, coupled with a campaign that, if you bring a gun into a school zone, you are going to do State time as well as Federal time, and it is going to be a long time. That kind of a campaign, I think, would have an impact, coupled with the fact that some of these punks that supply these weapons would be going away for a long period of time.

As far as the metal detectors are concerned, if the schools wanted to put those up, we would probably support them on that. But, again, the violence isn't just in the schools, it is in the school-yards, it is in the areas around the schools, and a metal detector would not in any way influence that kind of conduct outside of the school.

Mr. DOUGLAS. OK.

All right. Thank you, Chief.

Mr. KOVACIC. Thank you.

Mr. HUGHES. I thank the gentleman.

This has been an excellent panel, and I want to thank our colleague from Ohio for working with the staff and structuring this particular hearing.

I have a number of questions.

Chief, thank you. I understand from staff that you rearranged your schedule to be here today, and we certainly appreciate that very, very much.

I am interested in Ohio Senate bill 52 which you testified to earlier. I think the point you made was that you prefer the bill before this subcommittee, the Feighan bill, over S. 52 because it is broad-er. S. 52 is just crafted to deal with the use of a firearm in a school facility. What is wrong with getting the legislature in Ohio to broaden that—they obviously have the jurisdiction to do so—to cover 1,000 feet if that be their intent?

Mr. KOVACIC. I would support that too, Mr. Chairman.

Mr. HUGHES. Have you contacted the legislature to make that suggestion to them? Because that would seem to be a very good suggestion.

Mr. KOVACIC. I have not at this point, sir, but I will.

Mr. HUGHES. I was very interested in some of the data you had collected. That is about the most complete data I have seen from a police department on the number of firearms involved at school fa-cilities. I wonder if you can give me any idea about the average age of the youngsters involved in those incidents.

It is obvious that since 1983, the period that you studied, from 1983 to 1990, that the incidence of the abuse of firearms in and around school facilities has increased significantly. What can you tell us about the average age of the youngsters?

Mr. KOVACIC. Mr. Chairman, I didn't prepare any data on that, but just based on my knowledge of the situation, I would say that the majority are under the age of 18.



71

Mr. HUGHES. Yes. The reason I ask that is as a follow up to the questions from my colleague from New Hampshire, because I am sure all of us agree that it is becoming increasingly a problem. We all want to do the most effective thing, and the problem that I have, which I have already indicated—I am not very discreet about my questioning—is that we are not structured at the Federal level to run street investigations. Street crime is prosecuted generally by State and local authorities. We don't have the assets, the informants, the capacity. We don't have the structure to deal with juveniles systematically throughout the country. We have some facilities here in DC. We have a special situation in DC, being that it is the seat of our government. But, frankly, we are not equipped. We have no juvenile facilities to speak of. In fact, we have inadequate facilities for adult offenders, as you do in Ohio. You almost have to make an appointment to go to jail today, because we don't have facilities. But we are not equipped; we don't have the U.S. attorneys to prosecute juvenile cases.

Our declination policy—by that I mean dumping on local units of government—is terrible. In areas like bank robberies, we decline prosecution in many instances. At one time, we had a declination policy with regard to marijuana of a couple of tons. It has only been—what? Eight years ago, Mr. Feighan, we had the policy. That is because we didn't have resources to prosecute cases.

Then you raise some additional questions. If you are 101 feet from a school—after you get over the arguments as to whether it is a Federal case under this bill or a State case, if you are 101 feet and you commit an offense, it is a State offense; if you are within the 1,000 feet, it becomes a Federal offense.

What policy do you use with regard to treating juveniles as adult offenders? I frankly think the States should make that determination. My colleague from New Hampshire and I have a disagreement over what role we should play in the Federal Government, but I happen to agree with him that we ought to be reviewing throughout the country our treatment of adult offenders. I think we need to start treating more youthful offenders as adult offenders, particularly with regard to heinous offenses.

So those are all questions that concern me. We all want to try to channel our energies and resources in the most effective manner to deal with the problem. It is an increasing problem. But I wonder whether the answer is not possibly attempting to develop more help through support help from ATF, which has expertise in working with units of government such as yours where you have a particular problem. For example, the Cleveland school system could make a request for, let's say, a task force operation to come in and assist you where you have a particular problem, or where we have interstate problems, which happens, I am sure, to some degree. But the problems you are describing are intergovernmental but not necessarily interstate.

I suspect that we have weapons crossing into your city from other jurisdictions around you triggering a need for some coordination among the units of government. But, again, isn't that something that is best handled by State and local government?

Mr. KOVACIC. Mr. Chairman, it may well be. There is one element, however, that I think has been overlooked, and that is the



72

fact that we have had gangs in the city of Cleveland for some time which have created some minor problems. We have identified gang members coming from Los Angeles, Chicago, Detroit, and other areas of the country, coming into the Cleveland area and trying to organize our gangs. In some instances, it is over the supply of drugs. We have reason to believe that they are also supplying them with weapons. Our schools are deeply involved in the struggle to keep these youngsters from joining these gangs.

Very recently, we identified some members of the Cripps, which is a California-based gang, recruiting members in one of our parks. We arrested 97 young people in that park. One of them had a weapon. There is no doubt that the Cripps would have access to weapons and be able to bring them into the Ohio area, as would people from Chicago and Detroit. Those are the kinds of things that we would look to the Federal Government to help us with.

Mr. HUGHES. And I think rightfully so. That is one of the reasons I favor the expansion of the Organized Crime Drug Enforcement Task Force operations. ATF becomes a very important adjunct, because you can't talk about drugs today and not talk about guns, they are interrelated. It is unusual when you make a major bust if you don't seize some weapons at the same time.

So I quite agree with you. I think that that is a problem that we need to deal with through our task force operations.

We haven't done, in my judgment, at the Federal level the job that we need to do in beefing up our task forces. So that when a city like Cleveland has particular problems, it can make a request to the Federal Government for assistance, and then we could move a mobile task force in there to try to deal with the problems. Problems such as you have just described where there is interstate transportation of weapons perhaps and controlled substances are involved and there is a reason to try to develop some intelligence gathering on a regional basis that may cross State lines. You are absolutely right. We need to do more in that area.

But that is a different problem. I am talking about the average—if you can call it—run-of-the-mill case involving a youngster who walks to a corner store that happens to be located within 1,000 feet of a school, where kids hang out, and carries a firearm, and that concerns me. The question is: Who can best deal with that? I am not persuaded that we should not be attempting to assist local police departments and State organizations in developing State strategies to deal with that.

S. 52 would be an ideal vehicle, it seems to me, to do precisely what Mr. Feighan wants to do, just like we have done. You have a drug-free school zone; that is a State statute. The Feds have come in by way of support, but States have passed those laws, and it makes abundant good sense for us not to try to create another area of jurisdiction and then not adequately fund it.

How many school districts do we have, Mr. Packer, in the country?

Mr. PACKER. There are 16,000 public school districts with about 100,000 schools.

Mr. HUGHES. Sixteen thousand.

Mr. PACKER. With 100,000 schools.



73

Mr. HUGHES. With 100,000 schools. You see, we have more school districts, far more school districts, than we have special agents. We have—what?—1,800 special agents I think was the testimony— 1,800 special agents, not to mention no facilities, no ability to deal with juvenile offenders. I mean we don't handle very many juvenile offenders in the Federal system. We would have to create a whole new system to deal with that.

Do you have any idea, Mr. Packer, of the number of firearms that are involved in the 5,200 secondary schoolteacher assaults in schools each month?

Mr. PACKER. I don't have that information with me, but we can try to find it.

Mr. HUGHES. Can you furnish that to us?

Also, the number of firearms that were involved in the some 282,000 secondary school student attacks, physical attacks, each month. The figures are astronomical, and it points up that there is a serious problem that we need to deal with. If you have the data on how many of those assaults involve firearms, it would also be interesting.

[The information follows:]

The data we presented comes from a 1978 report to Congress by the National Institute of Education of the U.S. Department of Education. This report—"Violent Schools-Safe Schools"—is the most recent comprehensive study in violence in our Nation's schools. The report found that 282,000 secondary school students (out of a total at the time of 21 million secondary school students) were attacked at school on a monthly basis. While the report did not provide specific data on gun-related incidents, it found that only four percent of these attacks resulted in injuries requiring medical attention.

Regarding teachers, 5,200 of the 1.1 million secondary schoolteachers were physically attacked in school in a 1-month period. Compared to students, a much larger proportion, 20 percent, required medical treatment.

Mr. HUGHES. For instance, I am aware in my own home town that the kids congregate at lunch time. They are permitted in my home town to go out to lunch. They walk to shops that are a little more than 1,000 feet away and that is where they congregate, and, of course, that presents the problems that I described previously. You would have, basically, no jurisdiction. If they happened to be in that shop, they would be treated as a State offender, and if they were caught with a firearm, using it or not using it, just possessing it, within 1,000 feet, why, it would be Federal.

I am also very happy to learn that NEA has joined with the PTA in supporting a number of bills, including the Brady bill—Mr. Feighan is the prime sponsor of that legislation and has worked very hard for its passage for a number of years—and that you also support the Senate assault weapons legislation, and I would invite you to take a look at the House bill.

Mr. PACKER. And we support your version as well.

Mr. HUGHES. Which is even stronger.

You know, you don't have to be a masterful gun manufacturer to modify any one of the nine weapons that the Senate has banned; you just make one minor modification, and you are back in business again, Mr. Packer. We have done something on the House side which we think is much more effective in attempting to use the factoring criteria used by ATF, and I would invite NEA to take a look at that and start to promote that.



74

Mr. PACKER. We agree with you, and, as you know, the Senate bill was a matter of compromise as to what could be passed, and, as you know, that weaker version only passed by one vote.

Mr. HUGHES. When you are over in the Senate side, you push the Senate bill; when you are over here, you know, we encourage you to try to——

Mr. PACKER. We will be, before the bill comes to the House floor, sending a letter to each member.

Mr. HUGHES. It is coming, Mr. Packer. We need your help.

Mr. PACKER. We will be there.

Mr. HUGHES. It is coming in a couple of weeks.

Mr. PACKER. We will do that.

Mr. DOUGLAS. Mr. Chairman, may I ask also for the figures on knives as well?

Mr. HUGHES. Yes. That would be interesting.

Mr. PACKER. One figure on knives that we do have which comes from the same survey about guns shows that 135,000 boys carried a gun daily to school; the comparable figure for knives was 945,000. So about five or six times——

Mr. DOUGLAS. Carry knives?

Mr. PACKER. That is right.

I don't know the breakdown. Some of those may be simple pocket knives or Swiss Army knives.

Mr. DOUGLAS. I am just curious, because the concern is that this only deals with guns, and we are concerned about that. But if I were a teacher, a kid carrying a 7- or 8-inch knife, frankly, would be of equal concern to me. I had a mother who was a teacher, and I would like to know that they are not running around just saying, "Fine; don't bring guns to school; bring knives," and a year from now you are back here saying, "Well, now we have got a major knife problem in schools, and we want a knife-free zone."

Mr. HUGHES. If you have those figures, would you submit them also?

Mr. DOUGLAS. That would be helpful.

[The information follows:]

The National Adolescent Student Health Survey, funded by the Department of Health and Human Services, found that 23 percent of boys surveyed in secondary schools carried a knife to school at least once during the school year in 1987 (compared to 3 percent who carried a handgun to school.)

Mr. PACKER. I agree with the problem with knives. I think, however, there are certain legitimate—you know, people have pocket knives or Swiss Army knives that may be legitimate, they feel.

I think also the point that the chief made that a gun presents a threat to innocent bystanders and is just much more destructive than a knife—it is very difficult, I think, for a student to conceal a large butcher knife. I don't know, but I would just intuitively guess that a large number of these are small pocket or Swiss Army knives.

Mr. DOUGLAS. Do we have a copy of what you are reading from?

Mr. PACKER. I can provide it to the subcommittee. It is an article from an education newsletter.

Mr. DOUGLAS. Thank you.

[The article follows:]



12 EDUCATION WEEK · SEPTEMBER 7, 1988

# Survey of Teen Health and Safety Finds Crime Prevalent at Schools

By Lisa Jennings

More than one-third of 11,000 adolescents polled for a new federal survey reported they were threatened, robbed, or attacked at school in 1986.

Some 34 percent said they were threatened or hurt by another at school, 14 percent said they were robbed, and 13 percent said they were attacked.

Such incidents resulted in physical injury to a student more than a third of the time, the survey found.

These findings—which school-safety experts described as providing a disturbing picture of the severity of crime in and around the classroom—were contained in a wide-ranging new study of the status of student health. (See related story, this page.)

The National Adolescent Student Health Survey was released last month by the American Alliance for Health, Physical Education, Recreation, and Dance; the American School Health Association; and the Association for the Advancement of Health Education.

Funded by the U.S. Department of Health and Human Services, the study was based on the written responses of 8th and 10th graders in more than 200 public and private schools in 20 states.

The survey is one of the first federally funded studies in nearly 20 years to take a comprehensive look at the behavior, knowledge, and attitudes of adolescents on a number of health- and sex-related issues, including alcohol and drug abuse, sexually transmitted diseases, and suicide.

## 'A More National Perspective'

The survey's findings were greeted with particular interest by school-safety officials, for whom they provided a welcome glimpse into the statistically murky field of school crime.

No comprehensive study on the subject has been conducted since 1978, when the National Institute of Education issued the landmark two-volume report, "Violent Schools—Safe Schools."

Because the N.I.E. study, which was funded by the U.S. Department of Health, Education, and Welfare, has never been followed up, educators have had little but sketchy local data by which to discern trends over the past decade.

"We knew school crime was out there, but we hadn't suspected it was quite as prevalent" as the new survey shows, said Ronald W. Garrison, field-services director for the National School Safety Center. "Now we have a more national perspective."

"These statistics validate the need for schools to deal with these issues," added Stuart Greenbaum, a spokesman for the center, which is located in Encino, Calif.

## 'Violent Crime in School'

The survey found that about one-third of the crimes against students involved the use of a weapon.

More than one-third of the students—34 percent—reported that someone had threatened to hurt them at school during 1987.

Fourteen percent of those surveyed said they had been robbed while at school, and 13 percent said they had been assaulted at school or on a school bus in that year.

The survey also found that:

- Forty-nine percent of boys and 28 percent of girls reported having been in at least one fight during the past year. A fight was defined as an incident in which two people hit each other or attacked each other with weapons.
- Nearly one in five girls—18 percent—reported that someone had tried to force them to have sex against their will outside of school within the year.
- Forty-one percent of boys and 24 percent of girls reported said they could obtain a handgun if they wanted to.
- Twenty-three percent of boys said they had carried a knife to school at least once during the school year, and 7 percent said they carried one daily.
- Among boys questioned, 3 percent had carried a handgun to school once in 1987, and 1 percent said they carried one to school daily.

## Some National Estimates

Extrapolating from these figures, Mr. Garrison of the National School Safety Center offered estimates of the total level of crime among the 13.5 million students in secondary schools last year.

He estimated that in 1987:

- 6.6 million boys and 3.7 million girls were involved in a fight.
- 5 million students were threatened with harm, and 1.7 million were attacked.
- Nearly 2 million students were robbed.
- More than 5.5 million boys and 3.2 million girls had access to handguns.
- 516,000 boys carried a knife to school daily, and 135,000 boys carried a gun to school daily.

Mr. Garrison cautioned that his estimates were not statistically reliable. Even so, he said, they provide support for "what we've been hearing from police and school officials—the ages of the kids as offenders are going down, and the offenses are getting worse."

## 'Crimes Against Youths'

The health survey's findings are supported by some little-noticed statistics released last spring by the U.S. Bureau of the Census for the U.S. Bureau of Justice Statistics.

Those statistics, gathered in the Census Bureau's National Crime Survey, indicate that 12- to 19-year-olds are more likely to be victims of crime and violence than any other segment of the population. For example:

- One in six youths was the victim of street crime, compared with about one in nine adults.
- One of every 15 young people was assaulted, robbed, or raped in 1986—more than double the rate for adults. Of the estimated 1.6 million attempted or completed crimes against juveniles, 40,000 were rapes, 130 000 were robberies, 460,000 were aggravated assaults, and 975,000 were simple assaults.
- Only about one-third of all violent crimes committed against youths were reported to police.

The Census Bureau's survey did not isolate the incidence of violence to the young occurring in or around schools. But it found that, overall, nearly 3 million incidents of attempted or completed "street" crime—assault, robbery, rape, and theft—took place in schools or on campuses during 1986. That figure includes crimes against adults, according to James R. Wetzel, director of the Center for Demographic Studies at the Census Bureau.

Among these school-related incidents were an estimated 61,500 aggravated assaults, of which 28,800 caused injury; 44,600 robberies, 8,700 of which involved injury; and more than 260,000 simple assaults, 60,900 of which involved injury.

More than 70,000 of these incidents involved the use of a weapon—in an estimated 1,700 cases, a gun. More than 800,000 thefts involved the loss of goods or cash valued at $250 or more.

## New Data Expected

The findings of the National Crime Survey will be supplemented early next year by a new study measuring young people's perceptions of crime and safety in the nation's schools.

Edwin W. Zedlewski, a staff economist for the National Institute of Justice who is working on the new supplement, said that the questions used in the survey will "tap the same dimensions" as the 1978 N.I.E. study. But, he stressed, the supplement will not be a full-fledged follow-up to that study.

"We're convinced that 'Violent Schools, Safe Schools' numbers [estimating school-crime trends] are enormously high, but the National Crime Survey's numbers are extraordinarily low," he said. "The real answer is somewhere in between, and that's where we want to look."

Charles R. Kindermann, associate director of the Bureau of Justice Statistics, said the new supplement will not be based on a sufficiently large survey sample to provide an accurate measurement of school-crime rates.

"I don't want people thinking this is an N.I.E. II," he added.

BEST COPY AVAILABLE

ERIC Full Text Provided by ERIC

76

Mr. HUGHES. Ms. Lautman, I found some of your testimony also very, very interesting and very helpful. I wonder if you can share with us any more information about the 70 percent of the school shootings and hostage situations that you examined which were committed by youngsters, the vast majority, in schools or on school premises—anything about the average age of those youngsters.

Ms. LAUTMAN. The average age was 14 to 17 being most at risk. The average age of the offender, 70 percent were over the age of 15, under the age of 19.

Mr. HUGHES. OK. Thank you.

Finally, Dr. Widome, your testimony too was, I think, very helpful, and your suggestion about getting better data is an excellent one. We need to do that, and that is something I am going to ask staff to pursue. Thank you.

I want to thank the panel. They have been very, very helpful. That concludes today's hearing. We thank Mr. Feighan and his staff and the Crime Subcommittee staff for their help, and we want to welcome Mr. Mark Brinton, who is our new minority counsel, to the staff. We are happy to have you aboard, and I can assure you that you couldn't come at a more exciting time. We are going to keep you busy.

The subcommittee stands adjourned.

[Whereupon, at 12:20 p.m., the subcommittee adjourned, to reconvene subject to the call of the Chair.]

81



# APPENDIXES

## APPENDIX 1.—STATEMENT OF THE NATIONAL PTA



**The National PTA**
Office of Governmental Relations
1201 16th Street N.W.
Washington, D.C. 20036
(202) 822-7878

STATEMENT OF THE NATIONAL PTA
IN SUPPORT OF H.R. 3757,
THE GUN FREE SCHOOL ZONES ACT OF 1990
SEPTEMBER 6, 1990

The National PTA, the nation's largest child advocacy organization, with 6.8 million members in over 27,000 local units in schools around the country, the District of Columbia and Europe, urges immediate passage of the Gun Free School Zones bill, H.R. 3757.

One of the main objectives of the national PTA is to "secure adequate laws for the care and protection of children and youth." This includes advocating for federal laws that promote gun safety in the home, the community, and the school.

This bill does not infringe upon anyone's rights. Rather, creation of gun free school zones would send the message that schools are serious about providing safe environments so children can learn. Further, this bill is consistent with one of the national education goals set forth by the nation's governors and President—that "by the year 2000, every school in America will be free of drugs and violence and offer a disciplined environment conducive to learning."

H.R. 3757 establishes tough penalties for individuals who possess firearms within areas designated as public school zones. America has the unique distinction of leading the world in the number of children and youth killed with firearms. More than one out of every ten childhood deaths in America during 1987 was caused by a gun.

There are over 20 million unregistered handguns in the United States in addition to the millions of legally licensed firearms. Young people have access to these weapons and are carrying them in increasing numbers. As a result, the number of gun-related incidents at schools is rising dramatically. A 1988 survey in Boston, Massachusetts, reported that over one-quarter of high school students carried guns or knives, at least on occasion.

The Gun Free School Zones bill is not a panacea. It would build, however, on other measures, including the proposed ban on assault weapons and the Brady bill that would impose a waiting period before purchasing a handgun. The National PTA also supports schools working together with other community organizations to provide students with counseling, education, and other services they need to cope with the fear they experience because of gun-related violence.

We thank Representative Edward Feighan and the other sponsors of the Gun Free School Zones Act for their efforts to provide a safer school environment for children.

(77)


ERIC

78

APPENDIX 2.—ARTICLE FROM TIME MAGAZINE ENTITLED,
"SHOOTOUTS IN THE SCHOOLS," NOVEMBER 20, 1989

--- Education ---

# Shootouts in the Schools

*Educators adopt tough tactics to cope with classroom violence*

**NEW YORK CITY.** At PS 93 a youngster tells teacher Donald Miller: "Melvin has a toy." Since toys are not allowed in the lunchroom, the teacher confronts five-year-old Melvin and demands that he hand it over. Miller suddenly faces not a toy but a "Saturday-night special" pointed at his chest. The gun turns out to be loaded, cocked and ready for action.

**WASHINGTON.** A barrage of gunfire erupts just outside Woodrow Wilson High School as classes are dismissed for the day. Four students are shot, but all survive. Later, a teen-age boy who is not enrolled at Wilson is convicted of assault with a deadly weapon. The spark for the mayhem, an argument over a seat in the school cafeteria.

**CHICAGO.** At Harper High School, two boys enter a math class and start a fight. While students and the teacher try to break it up, one intruder lunges toward Chester Dunbar and stabs him in the back with a knife. As the two boys flee, Dunbar slumps to the classroom floor, fatally wounded.

"If schools ever were islands of safety within otherwise violent neighborhoods, they certainly are no longer," warns a new booklet of advice from the federally funded National School Safety Center at California's Pepperdine University. The center says 3 million crimes a year occur on school grounds, with 183,590 injuries reported in 1987. Another study estimates that on a typical day at least 100,000 U.S. pupils carry guns, and the firepower is getting heavier.

Schools, of course, cannot be insulated from neighborhoods plagued by drugs, gangs, crime and poverty. Says Miller, the teacher who faced a kindergartner's gun: "Whatever is out on the street seeps into the school." Violence, however, is no longer confined to tough areas. In an affluent part of Tallahassee last month one janitor shot another to death in front of about 100 grade schoolers. Last year in posh Winnetka, Ill., a woman opened fire in an elementary classroom, killing an eight-year-old. Other recent school slayings have occurred in middle-class areas of Greenwood, S.C.; Largo, Fla.; Little Rock and Virginia Beach.

As a result of all the violence, school administrators across the U.S. are searching through tight budgets to find money to beef up school security. If nothing else, the schools will face legal liability if they have not taken steps to be prepared. The New York City schools now operate the eleventh largest security force in the U.S. Most city schools have locked doors, 15 of them use metal detectors, ten schools allow entry only with computerized ID cards. Cost of all the security: $60 million annually.

The fortress mentality is taken literally at Lindbergh Junior High in Long Beach, Calif. After a bullet zinged past the head of gym teacher Joan Reedy last year, the school spent $160,000 to build a 10-ft. wall to separate the rear boundary from a housing project and its gang gunfights. Reedy, for one, is pleased: "Teaching here is so much more relaxed. It's given us a sense of safety, and you can feel the unity of the school growing and growing."

Other security measures that have been tested include staff training in handling emergencies, patrols by highly visible guards and police vehicles, two-way intercom systems so that trouble can be reported instantly, and cash awards to students who report problems. Along with the usual fire drills, some schools in Los Angeles, Long Beach and Oakland have scheduled "yellow-code alerts" for classes from kindergarten up. "We have to teach students to hit the deck when the bullets fly," explains one preparedness expert.

A backlash against heavy-handed defense measures, however, is starting to develop. "Why call it a school? Let's call it a prison," complains Robert Rubel, who directs the National Alliance for Safe Schools, a nonprofit advisory group based in Bethesda, Md. He argues that it is impossible to prevent random violence. Rubel thinks schools should be diligent in controlling all kinds of disorder, handling violations of their own rules and turning crimes over to the police.

For schools hit by bloodshed, the effects linger long after the police have done their job. In Stockton, Calif. a playground shooting last January left five pupils dead. Fred Barber, the head of the school district's psychology staff, says students "realize now that school is not the safe place it used to be and that something terrible can happen at any instant." The youngsters, he adds, are "dealing with things that we hoped they'd never have to face, or at least not until they were adults." He concludes that healing "will take months, even years."

School psychologists, most of whom are trained in learning disabilities or family problems, often summon specialists to deal with students' "post-traumatic stress syndrome." Teachers and parents, experts say, need to bring fears immediately to the surface after a shooting or other violent episode and allow younger students in particular to act out and talk out the horrors they experienced. Adults are shaken as well. At the Greenwood, S.C., school, Principal Eleanor Rice lost 25 lbs. in the months after a 19-year-old man barged in, shooting at random, killed two pupils and wounded nine other people. To her, the new door locks and limited access to the building are not guarantees against future incidents, but they serve to instill confidence in teachers, pupils and parents. "It has been a rough road," she admits, but "we're going to get better, not better." — *By Richard N. Ostling. Reported by Jordan Bonfante/Los Angeles, with other bureaus*



A "yellow-code alert" drill in Compton, Calif.

*We have to teach students to hit the deck when the bullets fly*

83

BEST COPY AVAILABLE

APPENDIX 3.—STATEMENT OF JAMES JAY BAKER, DIRECTOR,
NATIONAL RIFLE ASSOCIATION INSTITUTE FOR LEGISLATIVE ACTION

Mr. Chairman and members of the subcommittee:

Thank you for soliciting the views of the National Rifle
Association of America regarding H.R. 3757, the "Gun-Free School
Zones Act of 1990." As you know, the NRA is the preeminent
organization in the world devoted to firearms safety and
education. The purposes and objectives listed in our Bylaws
include the following: "To promote public safety, law and order,
and the national defense; To train members of law enforcement
agencies, the armed forces, the militia, and people of good
repute in marksmanship and in the safe handling and efficient use
of small arms . . . ." The safety of our children in our schools
is, of course, of paramount importance to all honest Americans
and the nearly three million family-oriented members of the NRA.
In fact, similar measures have been enacted at the state level
without opposition from the NRA.

The NRA is also committed to the enactment of swift and
certain punishment for the criminal misuse of firearms. NRA
members were to a large degree responsible for the enactment of
tough mandatory penalties at the federal and state level for the
mere carrying of a firearm during a crime of violence. Such laws
have recently been used as part of the arsenal against gang
violence perpetrated by the Crips and the Bloods. We join with
Chairman Hughes and Ranking Minority Member McCollum in their
repeated calls to the Justice Department to step up application
of those minimum mandatory penalties. Unfortunately, felon-in-
possession and penalty enhancement cases are too often seen as
nuisance cases by prosecutors.

Therein rests the central failure of H.R. 3757, as well as
the inclusion of similar language in the Senate-passed S. 1970
(Title XXXV). At a time when federal resources are stretched to
the breaking point and many potential cases against career
criminals and felons in possession of firearms are not being
made, H.R. 3757 preempts the states on intrastate
transport/carrying by creating a new federal offense in
duplication of or overriding many existing state statutes. There
is no state in which the carrying of a loaded firearm with
criminal intent is not a crime -- whether within the boundaries
of an arbitrarily designated school zone or on a public street.
Unless Congress intends to establish and fund a "Federal School
Patrol Division" within the Bureau of Alcohol, Tobacco and
Firearms or within the Department of Justice -- something the NRA
would join the ACLU in adamantly opposing -- H.R. 3757 will
remain a political exercise completely devoid of any impact on
public safety or the lives of our children. It is not at all
surprising that this hearing comes only two months from the
general elections. It is a symbolic gesture which will punish no
serious criminals but will likely wreck the lives of a few honest
citizens caught in a carelessly prepared and ineptly cast net.

This legislation is patterned after the "drug-free school
zones" measure, but the analogy is flawed. The "drug-free school
zones" statute makes a more serious federal crime of what is



already a crime in all fifty states and the District of Columbia,
as well as at the federal level. H.R. 3757 creates a new federal
offense, and one which may not be an offense at the state level.
Indeed, it may be taking what the state constitution interprets
as a guaranteed right and making it a federal felony. The drug-
free school zone concept attacks something generally outlawed --
drug possession -- and makes it a more serious felony. The gun-
free school zone elevates something which is generally lawful,
indeed constitutionally protected -- firearms possession -- to
the level of a serious federal felony under certain
circumstances.

     There are two areas in which this bill could have an impact.
First, it could provide grounds to prosecute otherwise law-
abiding citizens who are transporting firearms in compliance with
state and local law -- but in violation of this new federal
proposal. Second, it appears to give new powers to public
schools, powers previously held by the state or by the locality
in which the school is located. We are unaware of many other
fields in which public school officials have been given the
authority to regulate -- either restrictively or leniently --
activities in an area up to 1,000 feet from the grounds of a
public school. Yet H.R. 3757 appears to permit the possession of
a gun within a public school zone -- but not on school property -
- if pursuant to a contractual relationship with the school or as
part of a program approved by the school.

     While there are thus two good reasons to continue to leave
the regulation of firearms carrying and transportation to the
states by rejecting H.R. 3757, several amendments could lessen
the dangers this legislation poses to law-abiding firearms
owners.

     Our principal concern is the potential prosecution of
parents who unwittingly violate the provisions of a new federal
law while dropping their children off at school on the way to the
range or a hunt. The drafters of H.R. 3757 may not realize that
their exemption for a "locked firearms rack" makes little sense
considering most, if not all, firearms racks are not equipped
with locks nor designed in a way that makes addition of a padlock
a practical alternative.

     The NRA recommends the following amendments:
     *  Prosecution should require a willful violation.
     *  The penalty should be a misdemeanor that does not
prohibit otherwise law-abiding citizens from owning firearms as a
felony conviction would. This will not permit serious criminals
to escape as other felony charges will be available.
     *  The exemptions should be clarified by making it a bar to
federal prosecution if the transporting or carrying was not
unlawful under state or local law.
     *  Finally, considerations of due process require
appropriate notice through posting. Signs should be posted on a
perimeter approximately 1,000 feet from each of the nation's
80,000 public schools on each street at that point. A sign near
a school announcing a "Gun Free School Zone" with another sign
indicating "End School Zone" a few yards away would fail a due
process test since the notice provided would be conflicting and
confusing.

     Thank you again for soliciting our views on this
legislation.



Case 1:23-cr-00010-MAC-ZJH   Document 22-3   Filed 02/07/23   Page 86 of 93 PageID #: 326

### APPENDIX 4.—CAUGHT IN THE CROSSFIRE: A REPORT ON GUN VIOLENCE IN OUR NATION'S SCHOOLS, SEPTEMBER 1990. SUBMITTED BY THE CENTER TO PREVENT HANDGUN VIOLENCE

#### INTRODUCTION

As children across the country return to school this week, they are facing a crisis in education that has reached epidemic proportions -- violence in school. While parents have always worried about their children's education and their abilities to read, write and do basic mathematics, many are also becoming horrified by a new threat. They fear that their children may be severely injured or may not come home from school at all.

Our nation's schools, once thought to be safe havens, have fallen victim to an increase in gun violence, and educators and children are caught in the crossfire. One old, but true education adage goes, "Schools are reflections of their communities." This is particularly true when it comes to gun violence. As the Center to Prevent Handgun Violence worked on this report, one fact became very clear -- if a community suffers from gun violence, its schoolchildren also suffer.

#### ABSTRACT

This report, "Caught In The Crossfire: A Report on Gun Violence In Our Nation's Schools," focuses on the increasing gun violence occurring in and around our schools. In the past four academic years, beginning in September 1986:

- At least 71 people - 65 students and 6 school employees - have been killed with guns at school; another 201 were severely wounded; and 242 individuals were held hostage at gunpoint.

- Shootings or hostage situations in schools have occurred in at least 35 states and the District of Columbia.

- Males are most frequently the offenders (93%) as well as the victims (76%).

- Schoolchildren aged 14-17 are most at risk of gun violence at school.

- Gun violence in schools occurs most often in hallways (25%) and in classrooms (19%).



82

- Gang or drug disputes were the leading cause of school gun violence (18%). Long-standing arguments (15%), romantic disagreements (12%), fights over material possessions (10%), and accidents (13%) are also common.

- Handguns were the overwhelming choice of firearm (75%) for those who committed gun violence in schools.

## METHOD

The Center to Prevent Handgun Violence examined gun violence in both public and private schools during the past four academic years, beginning with September 1986. The information in this report was abstracted from more than 2,500 news stories in our nation's newspapers. For purposes of this study, we examined all incidents which we were able to uncover where shootings occurred at school during school functions or where individuals held others hostage at gunpoint on school property during school functions. The Center examined 227 such incidents in this report. It should be noted that the accuracy and frequency of the information in this report is based solely on newspaper accounts. This method was necessary because only the state of California requires that such information be publicly disclosed.

## RESULTS

During the past four school years, at least 71 people have been killed with guns at school (Table 1). At least another 201 were severely wounded. In addition, at least 242 individuals were held hostage by gun wielding assailants.

**Table 1: Individual Deaths or Woundings**

|  | Deaths | Woundings | Total |
|---|---|---|---|
| Students | 65 | 186 | 251 |
| School Employees | 6 | 15 | 21 |
| Total | 71 | 201 | 272 |

School shootings or hostage taking occurred in 35 states and the District of Columbia (Table 2). Besides the most populated states having the most incidents, there was no clear geographic pattern for gun violence in school. It seemed to strike every area of the country.



2



Case 1:23-cr-00010-MAC-ZJH   Document 22-3   Filed 02/07/23   Page 88 of 93 PageID #: 328

Table 2:  Number of Incidents, Deaths, and Woundings By State

| State | # Incidents | Deaths | Woundings |
|---|---|---|---|
| California | 29 | 16 | 45 |
| Florida | 25 | 10 | 10 |
| New York | 23 | 3 | 21 |
| Texas | 17 | 4 | 10 |
| Georgia | 14 | 1 | 15 |
| Maryland | 10 | 1 | 9 |
| Michigan | 9 | 3 | 6 |
| Missouri | 8 | 3 | 6 |
| North Carolina | 7 | 0 | 12 |
| Illinois | 7 | 7 | 12 |
| Alabama | 5 | 1 | 4 |
| Arizona | 5 | 1 | 2 |
| Arkansas | 5 | 3 | 4 |
| New Jersey | 5 | 2 | 3 |
| Oregon | 5 | 1 | 0 |
| South Carolina | 5 | 2 | 9 |
| Tennessee | 5 | 1 | 2 |
| Connecticut | 4 | 0 | 2 |
| Louisiana | 4 | 2 | 2 |
| Pennsylvania | 4 | 0 | 3 |
| Virginia | 4 | 2 | 3 |
| Washington | 4 | 0 | 2 |
| Mississippi | 3 | 0 | 3 |
| Ohio | 3 | 0 | 2 |
| Dist. of Columbia | 2 | 1 | 4 |
| Kentucky | 2 | 1 | 0 |
| Massachusetts | 2 | 0 | 2 |
| Oklahoma | 2 | 0 | 2 |
| Rhode Island | 2 | 1 | 2 |
| Colorado | 1 | 0 | 1 |
| Indiana | 1 | 1 | 0 |
| Iowa | 1 | 0 | 1 |
| Minnesota | 1 | 0 | 0 |
| Montana | 1 | 3 | 1 |
| Nevada | 1 | 0 | 1 |
| Utah | 1 | 1 | 0 |
| | | | |
| Total | 227 | 71 | 201 |

Most of these incidents took place in high schools (Table 3). Incidents were more than twice as likely to occur in high schools than any other level.

3

84

**Table 3. Schools Affected
By Gun Violence**



Four types of gun violence were recorded in this report (intentional shootings of or at other individuals, suicide, accidental shootings, and hostage taking at gunpoint). Intentional shootings of or at other individuals were reported four times more frequently than any other type (Table 4). Accidental shootings were the second most common form.

**Table 4.  Types of Gun Violence**



Males were far more likely to be the offenders in school shootings and hostage takings (Table 5).  Males were also more likely to be the victims or targets of school shootings (Table 6).  Please note that one or more persons could have been the offenders and victims of gun violence, and this is reflected in these numbers.

| Table 5:  Offenders | | Table 6:  Victims or Targets | |
|---|---|---|---|
| Males | 260 (93%) | Males | 270 (76%) |
| Females | 20  (7%) | Females | 85 (24%) |

Youngsters aged 14-17 were most likely to be the offenders and victims of gun violence (Table 7).  When students, 12 and under, were the victims of gun violence in schools, 94 percent of the students were victimized by adults.  When students, 13 and older,

4

85

were victims, 82 percent of the offenders were other students or other teenagers who came on school campuses.

Table 7: Age Breakdown of Offenders and Victims

| Age | Offenders | Victims or Targets |
|---|---|---|
| Adults | 23 | 38 |
| 19 | 8 | 7 |
| 18 | 17 | 18 |
| 17 | 48 | 49 |
| 16 | 53 | 46 |
| 15 | 43 | 37 |
| 14 | 31 | 30 |
| 13 | 18 | 13 |
| 12 | 12 | 4 |
| 11 | 1 | 2 |
| 10 | 2 | 7 |
| 9 | 0 | 12 |
| 8 | 1 | 25 |
| 7 | 2 | 17 |
| 6 | 1 | 10 |
| 5 | 1 | 3 |
| Undetermined Teen | 19 | 20 |
| Undetermined Child | 0 | 17 |
| TOTAL | 280 | 355 |

There was not one major cause for gun violence in schools (Table 8). Rather, there were five causes that sparked most of the incidents -- gang-drug related activity, continuations of long-standing disagreements, playing with or cleaning guns in schools, fights over material possessions, and romantic disagreements.

Table 8: Root Causes for Gun Violence in Schools

| Cause | Incidents | Percentage |
|---|---|---|
| Drugs/Gangs | 40 | 18% |
| Long-Standing Disagreements | 35 | 15% |
| Playing with or Cleaning guns | 30 | 13% |
| Romantic Disagreements | 27 | 12% |

(continued on next page)

5

90

86

| | | |
|---|---|---|
| F  its over Material | | |
| Possessions | 22 | 10% |
| Depression | 21 | 9% |
| Vendetta Against Society | 14 | 6% |
| Racial | 12 | 5% |
| Name Calling | 10 | 4% |
| Vendetta Against School | | |
| Employee | 8 | 4% |
| Undetermined | 8 | 4% |

Handguns were the weapon of choice for students and adults who committed gun-related violence in schools (Table 9).

Table 9.  Weapons



Activities during the regular school day were the most common for school shootings and hostage takings (Table 10).  Periods between classes were the most common times for shootings, followed by actual classroom learning situations.

Table 10:  Activities When Gun Violence in School Occurs

| Activity | Incidents | Percentage |
|---|---|---|
| Between Classes | 72 | 32% |
| During Class | 51 | 22% |
| After School | 36 | 16% |
| Lunchtime | 20 | 8% |
| Athletic Events | 20 | 8% |
| Transporting to and | | |
| from School (buses) | 15 | 7% |
| Before School | 11 | 5% |
| School Carnival | 1 | 1% |
| Transporting to Field | | |
| Trip | 1 | 1% |

6



Case 1:23-cr-00010-MAC-ZJH   Document 22-3   Filed 02/07/23   Page 92 of 93 PageID #: 332

Most of the shootings and hostage taking occurred inside schools, with hallway and classroom being the most common locations (Table 11). A sizable number occurred on school grounds and areas located adjacent to school grounds.

**Table 11: Locations of Shootings or Hostage Takings**

| Location | Incidents | Percentage |
|---|---|---|
| Hallways | 57 | 25% |
| Classrooms | 44 | 19% |
| School Grounds | 35 | 15% |
| Adjacent Property | 20 | 9% |
| Athletic Facilities | 19 | 8% |
| School Buses | 16 | 7% |
| School Parking Lot | 11 | 5% |
| Cafeteria | 8 | 4% |
| Restroom | 5 | 2% |
| Auditorium | 1 | 1% |
| Undetermined | 11 | 5% |

## PREVIOUS DATA ON GUN VIOLENCE IN SCHOOLS

Based on a national survey of students, the National School Safety Center estimated that 135,000 boys carried guns to school daily in 1987. An estimated 270,000 others carried guns to school at least once during the year.

In California, the only state that publishes annual data on school gun confiscations, the number of gun incidents increased 40 percent in the 1988-89 school year over the previous year. In the last four years, a 100 percent overall increase was reported, including a 50 percent rise in elementary schools and 80 percent increase in middle schools. The increase at the high school level was 142 percent.

In Florida, a 42 percent increase in gun incidents was reported during the 1987-88 school year. The rate in Florida has maintain this high level. The Chicago Public Schools reported a 50 percent rise in gun incidents in 1988. Hundreds of other school systems, from the Seattle, Washington, school district to the Charlotte-Mecklenburg schools in North Carolina, have reported similar trends in recent years.

## CONCLUSION

Guns and gun violence are a growing concern among educators, students, and parents. While this study examined actual violence, i.e. shootings and hostage taking at gunpoint, we must also be concerned with the potential for gun violence that exists in our nation's schools. With an estimated 400,000 boys carrying handguns to school yearly, there is a tremendous potential for even greater rates of death, injury, and violence.

7

88

There are many reasons why gun violence is increasing in our schools. But, one simple factor leading to these shootings must not be overlooked -- the sheer availability of guns in America. For every household in the country there are two guns in the hands of private citizens. Often these guns are falling into the hands of youngsters and they are ending up in schools. A report issued by the Florida School Boards Association found that 86 percent of the weapons confiscated from students in 1986-88 came from students' homes.

Our nation's parents, educators, lawmakers and law enforcement officials must work together to reduce the gun violence in our schools. Students must be educated about the great danger involved in carrying guns and the real facts about gun violence. Parents must be informed about the steps they can take to reduce the potential for violence -- i.e., making sure youngsters do not have access to guns in the home. And, lawmakers and law enforcement officials must work together to make sure that those who carry guns and those who commit gun violence on school property receive swift, severe punishment.

There is no place in our nation's schools for guns and gun violence. We must act now if we are going to reduce the tragic toll guns in schools are taking upon our children and our nation's future.

• • •

This report was written and supervised by Dennis Smith, the Center's director of public education. Barbara Lautman, Vanessa Scherzer and Jacqueline Sternberg of the Center contributed to the completion of this report.

All information in this study is based solely on the accuracy and frequency of newspaper articles from across the country.

8

ERIC

35-526  (96)