IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 1:23-CR-10 |
| | § | Judge Crone |
| AHMED ADBALLA ALLAM | § | |
| | § | |

**GOVERNMENT'S RESPONSE TO
ALLAM'S MOTION TO DISMISS**

Ahmed Allam is charged with possessing a firearm in a place that he knew and had reasonable cause to believe was a school zone, in violation of 18 U.S.C. § 922(q)(2)(A).  Dkt. 9 at 1.  Allam moves to dismiss the charge, Dkt. 22 ("Mot."), claiming that it violates the Second Amendment as construed in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *United States v. Rahimi*, __ F.4th __, 2023 WL 1459240 (5th Cir. 2023).  His claim fails for two reasons, either of which suffices to deny relief.

*First*, the Second Amendment does not protect Allam's "course of conduct." *Bruen*, 142 S. Ct. at 2134.  He was not carrying a firearm "publicly for self-defense." *Id*.  Nor was he keeping it at home.  *Rahimi*, 2023 WL 1459240, at *1, *5.  Instead, armed with a semiautomatic rifle, Allam parked his SUV across the street from a Catholic school and lurked there for hours at a time over the course of six days. Four of those days were school days.  For much of that time, Allam was no further

1

than 40 feet from school grounds.  The Supreme Court has repeatedly made clear that the government may prohibit "the carrying of firearms in sensitive places *such as* schools and government buildings."  *Bruen*, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626) (emphasis added); *see McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality).  That principle extends to where Allam set up shop.  He was all but on school grounds.  And absent intervention, he was well situated to attack students or school personnel.

*Second*, even assuming the Second Amendment "presumptively protects" Allam's conduct, Section 922(q)(2) is valid because it is "consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2126, 2130.  Starting shortly after the Founding, some public universities heavily regulated firearms on campus.  And starting in the latter half of the 19th century, some States heavily regulated firearms in and near schools.  In some ways the restrictions were narrower than Section 922(q)(2).  But in other ways they were broader, and there was no apparent dispute about their constitutionality.  Anyhow, under *Bruen*, a modern-day restriction need not be a "dead ringer for historical precursors."  *Id*. at 2133.  It need only be "relevantly similar" to the precursors in "how" and "why" it burdens the "right to armed self-defense."  *Id*. at 2132-2133.  Section 922(q)(2) passes that test.  The Court should uphold it and deny Allam's motion.

## FACTS

On reading Allam's motion, one might get the impression that he was just passing through a school zone on a quiet Sunday evening, minding his own business, when officers stopped him, arrested him, searched his car, and seized a firearm that as far as anyone could tell was for lawful self-defense.  *See, e.g.*, Mot. 5 (saying that he "was not engaged in any criminal activity at the time of his arrest," and he "merely possessed a firearm in his vehicle on a public roadway"); Mot. 16 (saying that he "was arrested on a Sunday evening" when no children were present).  His account omits important facts and distorts the rest.

Allam is from New York.  When family members last saw him there in 2022, he "wasn't in a good mental state of mind": he was "freaking out" and "breaking things around the house."  Without explanation, he left for California, where he has no relatives.  On the way, he bought the firearm at issue here, a Diamondback DB15.  It is an AR-15 style semiautomatic rifle, and it uses a 30-round magazine.

Until December 2022, Allam was in California.  By early January 2023, he turned up in Beaumont, Texas, where he likewise has no relatives or community ties.  On January 5, a deacon at St. Anthony Cathedral Basilica saw Allam near the basilica.  Also in January, Beaumont police received reports that Allam was parking his SUV for extended periods in front of Temple Emanuel, a Jewish synagogue.

3

On January 24, a Tuesday, the principal of St. Anthony Cathedral Basilica School saw Allam's SUV for the first time.  The school is on Forsythe Street in Beaumont.  Its grounds are shown in the aerial photograph attached hereto as Exhibit 1.  A red line has been drawn to reflect the school's boundary.  For hours at a time from January 24 through January 29, Allam was parked on the right-hand side of Forsythe Street, facing northeast, just short of the intersection with Archie Street.  As shown in Exhibits 2 and 3, Allam was parked a few feet ahead of a speed-limit sign that indicated a nearby school.[1]

In other words, for the better part of a week, when school was in session, Allam was just across the street from St. Anthony's gym and fields, and he was catty-corner to its playground.  He was no more than 40 feet outside school grounds.  From that vantage, he had a clear view of the on-grounds gym and fields, the on-grounds playground, and the off-grounds Jefferson Street crosswalk that students routinely use to cross Forsythe on their way to the off-grounds basilica.

Allam periodically got out of his SUV.  The school principal called the police several times each day to express her concern.  By Sunday, January 29, members of the school community had asked Allam to move his car.  He refused, telling them that "[you] will not need to worry about me after Monday."  By that same day, police

---

[1]  Exhibit 2 is a patrol-video capture from the night of Allam's arrest.  It shows Allam's SUV in its usual spot.  For illustration, Exhibit 3 depicts a different SUV, from a different angle, in about the same spot.

officers had interacted with Allam many times.  When they asked him if he had a firearm, he said no.

That Sunday night, January 29, police officers stopped Allam for a traffic violation.  He initially refused to roll down his window, and he did not comply with other instructions.  Eventually he was arrested.  On conducting an inventory search and then a warranted search, officers found, among other things:

- The DB15 rifle.

- 150 rounds of matching ammunition, including 30 rounds in a fully loaded magazine detached from the rifle.

- Children's clothing, even though Allam has no children.

- Pamphlets with information about Beaumont tourist attractions, including children's museums.

- Pamphlets and business cards for military recruiters in California.

- A digital camera equipped with a telephoto lens.

- Six copies of a September 2022 tabloid depicting Osama bin Laden and Ayman al-Zawahiri.  The tabloid's subheading said: "Al Qaeda revenge for drone strike on bin Laden successor."  Exhibit 4 (typeface altered).

- Journal entries about rape, murder, "killing moms," "taking the AR in," "taking no hostage," and "blow[ing] up the base."  Dkt. No. 29 at 3.

Investigators reviewed Allam's social media accounts.  The accounts contained images of buildings exploding and burning, along with a photo of the new World Trade Center under construction.  *See* Exhibits 5 through 8.

5

On February 1, the grand jury returned the 922(q)(2) charge.  Dkt. 9 at 1. After a detention hearing in which the government presented many of the facts above, Dkt. 25, the magistrate judge ordered Allam detained pending trial, Dkt. 29. The judge found that no conditions of release would reasonably ensure community safety.  Dkt. 29 at 2.  The judge cited, among other evidence, an FBI agent's testimony that Allam "showed definite signs of radic[a]lization."  Dkt. 29 at 3.

## ARGUMENT

## I.   Allam Does Not Show That the Second Amendment Protects His Possession of a Firearm in a Sensitive Place Next to School Grounds.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.  In *Heller*, the Supreme Court held that the Amendment guarantees "an individual right to keep and bear arms."  554 U.S. at 595.  The "central" aspect of that right, the Court observed, is "the inherent right of self-defense."  *Id*. at 628.  The Court emphasized that, like other rights, "the right secured by the Second Amendment is not unlimited."  *Id*. at 626.  And it cautioned that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id*. at 626-627.  In a footnote, the Court added that those

were "examples" of "presumptively lawful regulatory measures," and that the list was not "exhaustive."  *Id*. at 627 n.26.

Two years after *Heller*, the Supreme Court held that the Second Amendment right applies to the States.  *McDonald*, 561 U.S. at 750.  The plurality went out of its way to "repeat" the Court's "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id*. at 786 (quotation omitted).

Twelve years later, the Supreme Court decided *Bruen*.  There, it struck down a New York law that prohibited a law-abiding citizen from carrying a firearm in public unless he could demonstrate a special need for self-defense.  142 S. Ct. at 2122.  In doing so, the Court rejected the use of "means-end scrutiny" because that methodology was "inconsistent with *Heller*'s historical approach."  *Id*. at 2129; *see id*. at 2126-2130.  Making *Heller*'s approach "more explicit," *id*. at 2134, the Court laid out a two-part framework for deciding whether a firearm restriction comports with the Second Amendment, *see Rahimi*, 2023 WL 1459240, at *5 ("*Bruen* articulated two analytical steps").  The first question is whether "the Second Amendment's plain text covers an individual's conduct."  *Bruen*, 142 S. Ct. at 2126.  If it does not, the analysis ends, and the restriction is valid.  If instead the conduct is

covered, the Constitution "presumptively protects" it, and the analysis continues to a second stage. *Id*. at 2126, 2130. At that stage, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126; *see id*. at 2130.

*Bruen* did not address which party has the burden to show, at the first stage, that the Second Amendment's text does or does not cover the person's conduct. But it assigned the second-stage burden to the government based on an analogy to the First Amendment. 142 S. Ct. at 2130. In that context, the Court explained, the government must prove the validity of a regulation that "restricts speech." *Id*. (quotation omitted). Tellingly, in First Amendment cases, the Supreme Court and the Fifth Circuit have held that the challenging party must show at the outset that the regulation in fact restricts speech. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("the person desiring to engage in assertedly expressive conduct" must "demonstrate that the First Amendment even applies"); *Voting for America, Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013) ("the party invoking the First Amendment's protection" must, as a "threshold" matter, "prove that it applies"). The same burden-shifting approach should apply in the Second Amendment context, because the "general rule" in any context is that the "one seeking relief bears the burden of demonstrating that he is entitled to it." *Clark*, 468 U.S. at 293 n.5.

In short, because Allam is the one who invokes the Second Amendment as a basis for relief, he has the initial burden of showing that it applies to his conduct. He does not meet that burden.  He relies primarily on the Fifth Circuit's decision in *Rahimi*, where the defendant prevailed even though he was "neither responsible nor law-abiding."  2023 WL 1459240, at *3; *see* Mot. 4-5.  It is true that, under *Rahimi*, a defendant can sometimes satisfy the first part of *Bruen* even if he is not, in general, a law-abiding *person*.[2]  But that does not excuse him from showing that the Second Amendment extends to his case-specific *conduct*.  In *Bruen*, it was "undisputed" that petitioners Koch and Nash were law-abiding citizens, but the Court still went on to consider "whether the plain text of the Second Amendment protects Koch's and Nash's proposed *course of conduct*," namely, "carrying handguns publicly for self-defense."  142 S. Ct. at 2134 (emphasis added).  Similarly, the Fifth Circuit did not say one way or the other whether the Second Amendment would have extended to Rahimi's conduct if, e.g., he had stalked his ex-girlfriend with a rifle in hand. Rather, the court decided that the Second Amendment protected possession of the firearms that Rahimi kept at home.  2023 WL 1459240, at *1, *5.

---

[2]  The government disagrees with *Rahimi* and will be seeking further review.  *See* Department of Justice, Statement from Attorney General Merrick B. Garland Regarding United States v. Rahimi (Feb. 2, 2023), justice.gov/opa/pr/statement-attorney-general-merrick-b-garland-regarding-united-states-v-rahimi (last visited Feb. 18, 2023).

Allam says that he had a right "to possess a firearm in his vehicle for his own protection."  Mot. 16.  But he does not allege that that is what he was doing.  Nor would such an assertion square with his conduct, which was consistent with that of a potential shooter casing the scene and gearing up.  Allam cites no decision holding that the text of the Second Amendment extends to anything similar.  The high-water mark is *Rahimi*, and it does not suggest that, for the sake of "security" and "free[dom]," U.S. CONST. amend. II, the government must wait until *after* an attack to respond to conduct like Allam's.  *See Rahimi*, 2023 WL 1459240, at *11 (Ho, J., concurring) (the Second Amendment right is "entirely compatible" with "the fundamental role of government in protecting citizens against violence").

Anyway, even when a person wishes to carry a firearm only for self-defense, he may not do so anywhere he chooses.  *Bruen* reaffirmed the Supreme Court's earlier assurances that it was not casting doubt on "longstanding laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 142 S. Ct. at 2133 (quotation omitted).  On reviewing the historical record, the Court discerned "no disputes regarding the lawfulness of such prohibitions" in places like legislative assemblies and courthouses.  *Id*.  Thus, the Court took it as "settled" that "these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment."  *Id*.

Against that backdrop, Allam cannot and does not argue that the text of the Second Amendment would protect his carrying a firearm in a sensitive place. Instead, he suggests that his base of operations—across the street from a school's gym, fields, and playground—was not a sensitive place. He emphasizes that *Heller* referred to carrying firearms "*in* sensitive places such as schools and government buildings," and that he was not "in" a school building. Mot. 8 (emphasis in original; quotation omitted). But the Court's use of "such as" indicates that a place outside the building may be just as sensitive for Second Amendment purposes.

Post-*Heller* cases illustrate the point. In *United States v. Dorosan*, 350 F. App'x 874 (5th Cir. 2009) (unpublished), the defendant was convicted under 39 C.F.R. § 232.1(*l*) for bringing a handgun to a post office parking lot. The Fifth Circuit affirmed, reasoning in part that the lot was "a place of regular government business" and therefore fit within "the 'sensitive places' exception recognized by *Heller*." 350 F. App'x at 875. The Tenth Circuit reached a similar conclusion in *Bonidy v. USPS*, 790 F.3d 1121, 1125 (10th Cir. 2015). Both cases survive *Bruen*: *Dorosan* did not apply means-end scrutiny, 350 F. App'x at 875-876, and *Bonidy* did so only as an "alternative basis for [its] holding," 790 F.3d at 1125.

Especially instructive is the D.C. Circuit's analysis in *United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019). There, Class parked in a spot that was on the grounds of the United States Capitol but was "approximately 1,000 feet from the entrance to

the Capitol itself." *Id*. at 462; *see id*. at 466.  Class kept firearms in his car and was

convicted under 40 U.S.C. § 5104(e) for possessing a firearm on Capitol grounds.

*Id*. at 462.  The D.C. Circuit affirmed, rejecting Class's Second Amendment claim.

*Id*. at 463-466, 470.  The court held that, although the parking lot was "not a

government building," it was "sufficiently integrated with the Capitol for *Heller*[']s

sensitive places exception to apply."[3]  *Id*. at 464.  "Several facts" led the court to

that result, including the following (*id*.):

- Capitol employees used the parking lot, making the area "a potential stalking ground for anyone wishing to attack congressional staff and disrupt the operations of Congress."

- Those operations depended on the ability of Members and staff "to freely and safely travel to and from work."

- The lot was "close to the Capitol and legislative office buildings."  Class's car was "less than 1,000 feet away from the entrance to the Capitol, and a block away from the Rayburn House Office Building."

The D.C. Circuit was unmoved by Class's point—virtually identical to

Allam's—that *Heller* "refers only to bans on possession *in* sensitive places like

government buildings."  930 F.3d at 463 (emphasis in original; quotation omitted).

---

[3]  Before *Bruen*, the D.C. Circuit ordinarily applied a two-part test to firearms regulations: (1) "whether a particular provision impinges upon a right protected by the Second Amendment," and (2) if so, "whether the provision passes muster under the appropriate level of constitutional scrutiny."  *Class*, 930 F.3d at 463 (quotation omitted). In *Class*, the court held that the restriction did not impinge upon a right protected by the Second Amendment, so it expressly declined to decide whether the restriction would withstand means-end scrutiny.  *Id*.  *Class* therefore remains valid after *Bruen*, which rejected only the second part of the D.C. Circuit's test.  142 S. Ct. at 2127 n.4; *see id*. at 2127 ("Step one of the predominant framework is broadly consistent with *Heller*[.]").

In the court's view, that argument "slices *Heller*[ ] too thin."  *Id*. at 463-464.  The court had "little trouble concluding that the same security interests which permit regulation of firearms 'in' government buildings permit regulation of firearms on the property surrounding those buildings as well."  *Id*. at 464.  It held that, although there was "surely some outer bound on the distance Congress could extend the area of protection around the Capitol without raising Second Amendment concerns," Class's parking spot did not exceed that bound.  *Id*.

*Class*'s reasoning applies with equal or greater force to Allam, who did not merely park near the school but lurked there, with a rifle and 150 rounds, for hours on end.  His spot was much closer to the school than Class's was to the Capitol building.  And his spot was closer to the school's gym, fields, and playground than Class's was to the Rayburn building.  *Class*, 930 F.3d at 464 (Class's car was a "block away" from Rayburn).  Much as in *Class*, then, Allam's spot was a sensitive place because it was "a potential stalking ground for anyone wishing to attack" the children across the street, and it was close enough to school grounds that unrestricted arms bearing there would threaten students' ability "to freely and safely travel to and from" school.  *Id*.

Given all of this, it does not matter that Allam was not *on* school grounds, *contra* Mot. 8.  He was within 40 feet and had a clear view.  The need for protection is no less acute on an exposed school playground than it is inside a school.  Either

place—and any spot with a close vantage of either place—is a sensitive one for purposes of "*Heller*[']s sensitive places exception."  *Class*, 930 F.3d at 464; *see id*. at 465 ("places are 'sensitive' for purposes of the Second Amendment because of the people found there or the activities that take place there") (quotation omitted); *accord United States v. Lewis*, 2008 WL 5412013, at *2 (D.V.I. 2008) (holding, without applying means-end scrutiny, that "*Heller* unambiguously forecloses a Second Amendment challenge" to Section 922(q)(2) because a school zone "is precisely the type of location of which *Heller* spoke").

## II.    Historical Analogues Support Section 922(q)(2).

Because Allam does not show that the Second Amendment reaches his conduct, the government need not "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2126; *see id*. at 2129-2130.   In any event, Section 922(q)(2) is consistent with that tradition, because it is "relevantly similar" to historical precursors in "how" and "why" it burdens "a law-abiding citizen's right to armed self-defense."  *Id*. at 2132-2133.   Part A below discusses the scope of Section 922(q)(2), which is not as sweeping as Allam pretends.   Part B then explains why, properly understood, the statute is "analogous enough" to "historical precursors" to "pass constitutional muster."  *Id*. at 2133.

### A.      Section 922(q)(2)

As relevant here, Section 922(q)(2) makes it "unlawful for any individual knowingly to possess a firearm … at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(2)(A).  A person is in a school zone if he is "in, or on the grounds of, a public, parochial or private school," 18 U.S.C. § 921(a)(26)(A), or if he is "within a distance of 1,000 feet from the grounds of a public, parochial or private school," 18 U.S.C. § 921(a)(26)(B).

Allam challenges the latter aspect of the statute.  He says that the application of Section 922(q)(2)(A) to places within 1,000 feet of every public, parochial, or private school "impedes on the rights of firearm owners to drive in their vehicles with their firearms over a significant amount of geography," Mot. 9, including on many "major highways," Mot. 13.  He provides maps of Beaumont schools and highways.  Mot. 10-13.  He lists other Texas communities in which "schools are located near major thoroughfares."  Mot. 13.  He concludes: "Under this law, as the Government is applying it to Allam, tens of thousands of Texans are violating the law on a daily basis."  Mot. 13.

That sounds startling, but it is wrong.  It ignores Section 922(q)(2)(B), which provides that Section 922(q)(2)(A) "does not apply to the possession of a firearm" in seven different circumstances.  Taken together, two of those carveouts negate Allam's purported concern for law-abiding citizens who travel with firearms.

15

First, there is no violation "if the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license." 18 U.S.C. § 922(q)(2)(B)(ii).  Texas law requires the Department of Public Safety—the law enforcement authority of the State, TEX. GOV'T CODE ANN. § 411.002; *see Westfall v. Miller*, 77 F.3d 868, 872 n.1 (5th Cir. 1996)—to "issue a license to carry a handgun to an applicant *if* the applicant meets all the eligibility requirements and submits all the application materials."  TEX. GOV'T CODE ANN. § 411.177(a) (emphasis added); *see id*. § 411.172(a) (eligibility requirements). Under at least one court's reasoning, Texas law would satisfy Section 922(q)(2)(B)(ii) because it requires DPS to verify that an applicant meets Texas's eligibility requirements.  *Cf. United States v. Tait*, 202 F.3d 1320, 1324 (11th Cir. 2000) (Alabama law).  It should follow that, without violating Section 922(q)(2)(A), a law-abiding Texan can travel through a school zone with a firearm if the State has issued him a license to carry it.

Second, even if a person is not licensed by the State in which the school zone is located, he does not violate Section 922(q)(2)(A) if the firearm he possesses is "not loaded" and is "in a locked container, or a locked firearms rack that is on a

motor vehicle."  18 U.S.C. § 922(q)(2)(B)(iii).  So when an out-of-stater fears that he may be traveling near a school, he can temporarily unload and lock his firearm.

Even apart from those two carveouts—not to mention the other five in subsection (B)—the mens rea element in subsection (A) protects an unwitting but otherwise well-intentioned armed citizen, *contra* Mot. 14-15.  A person does not violate the statute unless he "knows" or "has reasonable cause to believe" that the place of possession is a school zone.[4]  18 U.S.C. § 922(q)(2)(A).  That element has teeth.  At least two courts of appeals have reversed convictions for insufficient evidence where the government's only proof of mens rea was the defendant's proximity to the school.  *United States v. Guzmán-Montañez*, 756 F.3d 1, 10-12 (1st Cir. 2014); *United States v. Haywood*, 363 F.3d 200, 207-209 (3d Cir. 2004).  One of the courts added that, because the defendant "did not live in the neighborhood, his awareness had to be readily proven."  *Guzmán-Montañez*, 756 F.3d at 12.

To be clear, this discussion of the statute's scope is not aimed at satisfying the means-end scrutiny that *Bruen* rejected.  The point is that, for most law-abiding

---

[4]  Allam muddles knowledge of law and knowledge of fact.  Ignorance of the law is no excuse, so a person cannot escape a firearm restriction just because he does not know of it.  *See United States v. Trevino*, 989 F.3d 402, 405 (5th Cir. 2021) (Section 922(g)(1)).  Thus, contrary to Allam's apparent belief, Mot. 14-15, the government need not post signs that it is *illegal* to possess a firearm within 1,000 feet of a school.  What matters is if the person knows or has reasonable cause to believe that he *is* within 1,000 feet of a school.  Here, Allam parked next to a sign indicating that he was near a school.  Exhibit 2.  To top it off, a sign by the playground declared: "Drug Free Gun Free School Zone," "Violators Will Face Federal and State Prosecution."  Exhibit 9 (typeface altered).  Having spent six days near both signs, Allam cannot complain about notice.

citizens most of the time—i.e., when they are in their home State—Section 922(q)(2) is more akin to a licensing requirement than to a ban. *See* 18 U.S.C. § 922(q)(2)(B)(ii). And even when a law-abiding citizen is in a State in which he is not licensed, the statute is more akin to a transitory storage requirement than to a ban. *See* 18 U.S.C. § 922(q)(2)(B)(iii). Understood in that properly cabined way, Section 922(q)(2) is "relevantly similar" to the historical precursors below, both in "how" and "why" it burdens "a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2132-2133. It does not matter that the precursors did not ban everyone, always, from possessing firearms near a school, because Section 922(q)(2) does not do that either.

### B.    Precursors

The non-exhaustive list below cites ten historical analogues falling into two categories: public-university restrictions relating to firearms on campus,[5] and state restrictions relating to firearms in or near schools. Links to the university restrictions are available online at Duke Law School's research repository, under the subject "Sensitive Places and Times." Duke Center for Firearms Law, *Repository*

---

[5] In 1655, Harvard's rules provided that "noe students shall be suffered to have [a g]un in his or theire chambers or studies, or keepeing for theire use any where else in the town." A COPY OF THE LAWS OF HARVARD COLLEGE, 1655, at 10 (1876) (brackets in original). Similarly, in 1745, Yale's rules prescribed punishment for "any Scholar" who "Shall keep a Gun or Pistol, or Fire one in the College-Yard or College." II FRANKLIN BOWDITCH DEXTER, BIOGRAPHICAL SKETCHES OF THE GRADUATES OF YALE COLLEGE: MAY 1745–MAY 1763, at 8 (1896). In an abundance of caution, however, the list below omits those and other private-university restrictions.

*of Historical Gun Laws*, law.duke.edu/gunlaws (last visited Feb. 18, 2023).  The state restrictions, printed as session laws, are attached chronologically in Exhibit 10.

### *University restrictions*:

- **1810.**  The University of Georgia "ordained" that "no student shall be allowed to keep any gun, pistol, … or any other offensive weapon in College or elsewhere," including "out of the college."  THE MINUTES OF THE SENATUS ACADEMICUS OF THE STATE OF GEORGIA, 1799–1842, at 86 (Aug. 1810).

- **1824.**  The University of Virginia Board of Visitors—whose six members included Thomas Jefferson and James Madison—resolved that: "No Student shall, within the precincts of the University, … keep or use weapons or arms of any kind, or gunpowder[.]"  UNIVERSITY OF VIRGINIA BOARD OF VISITORS MINUTES, at 6-7 (Oct. 1824).

- **1838.**  The University of North Carolina established that: "No Student shall keep a dog, or fire arms, or gunpowder.  He shall not carry, keep, or own at the College … any deadly weapon; nor shall he use fire arms without permission from the President."  ACTS OF THE GENERAL ASSEMBLY AND ORDINANCES OF THE TRUSTEES, FOR THE ORGANIZATION AND GOVERNMENT OF THE UNIVERSITY OF NORTH-CAROLINA, at 15 (Sept. 1838).

### *State restrictions relating to schools*:

- **1871.**  Texas prohibited "any person" from carrying "a pistol or other firearm" into (*inter alia*) "any school room, or other place where persons are assembled for amusement or for educational or scientific purposes."  Law of Apr. 12, 1871, ch. 34, § 3, 1871 Tex. Gen. Laws 25-26.

- **1878.**  Mississippi prohibited "any student of any university, college or school" from carrying, concealed or partly concealed, a pistol or other deadly weapon.  Law of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws 175-176.

- **1879.**  Missouri prohibited "any person" from discharging "any gun, pistol or fire-arms of any description, in the immediate vicinity of any court house, church or building used for school or college purposes."  Law of Apr. 30, 1879, § 1, 1879 Mo. Laws 90.  The statute defined "immediate vicinity" to mean "a distance not exceeding two hundred yards."  *Id*. § 3, at 91.

- **1883.**  Missouri also prohibited "any person" from carrying "any kind of fire arms" into (*inter alia*) "any school room or place where people are assembled for educational, literary or social purposes."  Law of Mar. 5, 1883, § 1, 1883 Mo. Laws 76.

- **1889.**  Arizona, then a territory, prohibited "any person" from carrying "a pistol or other firearm" into (*inter alia*) "any school room, or other place where persons are assembled for amusement or for educational or scientific purposes."  Law of Mar. 18, 1889, No. 13, § 3, 1889 Ariz. Sess. Laws 30-31.

- **1890.**  Oklahoma, then a territory, prohibited "any person" from carrying a pistol or revolver into (*inter alia*) "any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes."  The Statutes of Oklahoma, ch. 25, art. 47, § 7, 1890 Okla. Sess. Laws 495-496.

- **1903.**  Montana prohibited "any person" from carrying "a pistol or other firearm," concealed or partly concealed, into (*inter alia*) "any school room or other place where persons are assembled for amusement or for educational or scientific purposes."  Law of Feb. 27, 1903, § 3, 1903 Mont. Laws 49-50.

* * * * *

On average, those precursors were broad.  The university restrictions applied to all students regardless of age; they prohibited possession everywhere on campus (and "elsewhere," in Georgia's case); and they did not confer extensive licensing, storage, and other exceptions of the sort found in Section 922(q)(2)(B).  The school restrictions were broader still.  They made limited exceptions for peace officers and the like, but they otherwise prohibited *any* person—adult or child—from carrying firearms in schools.  And they, too, contained few or no carveouts akin to those in Section 922(q)(2)(B).  *But see* Law of Feb. 27, 1903, § 4, 1903 Mont. Laws 50 (a

20

person who showed that he was "peaceable" and of "good moral character" could get judicial permission to carry a pistol or revolver).

To be sure, most of the precursors did not extend a prescribed distance beyond the campus or school.  But one did: Missouri prohibited discharging a firearm within 600 feet of a school.  Law of Apr. 30, 1879, §§ 1, 3, 1879 Mo. Laws 90-91.  In a similar vein, Mississippi banned any student of any age from carrying any concealed firearm anywhere.  Law of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws 175-176.  And most notably, the more common prohibitions on any person carrying any firearm into any school were not limited to the school itself.  They extended beyond "school room[s]" to unspecified "other place[s]" where children and others assembled for education, science, worship, or amusement.

Perhaps none of the precursors is an "historical *twin*" of Section 922(q)(2). *Bruen*, 142 S. Ct. at 2133 (emphasis in original).  But none needs to be a twin: "analogical reasoning under the Second Amendment," although not a "regulatory blank check," is not a "regulatory straitjacket" either.  *Id*.  That goes double for statutes that regulate sensitive places.  Crucially, *Bruen* held that courts may analogize to historical regulations governing previously-identified sensitive places—e.g., schools and government buildings—to uphold "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places."  *Id*. (emphasis in original).

Even assuming that the statute's 1,000-foot radius around school grounds is a "new" sensitive place, *but see supra* pp. 11-14, it passes muster because it closely parallels the aforementioned "other place[s]" where children congregated in the 19th century. And even assuming that the 1,000-foot radius exceeds the reach of some precursors in terms of distance, the *burden* it puts on "a law-abiding citizen's right to armed self-defense" (*Bruen*, 142 S. Ct. at 2133) is no heavier given all the exceptions in Section 922(q)(2)(B).

Accounting for the passage of two centuries, it would be unrealistic to expect even closer analogues. As *Bruen* cautioned, "cases implicating unprecedented social concerns or dramatic technological changes may require a more nuanced approach" to precursors. 142 S. Ct. at 2132. Plainly, the precursors here were aimed at minimizing the danger that deadly weapons pose when many young and naturally irresponsible people assemble in one place for many hours at a time. Over the years, that danger has only multiplied. *See* Dkt. 22-3 at 19-20, 22, 30-32, 39-44, 51-54, 66-67, 75, 78 (legislative history).[6] Nineteenth-century legislators did not confront mass shootings on the modern scale. Nor did they have to address everyday juvenile

---

[6] According to one source, "[t]here have been 366 school shootings since 1999." www.washingtonpost.com/education/interactive/school-shootings-database (last visited Feb. 18, 2023). Another source indicates that, since 2013, there have been "at least 1047 incidents of gunfire on school grounds, resulting in 342 deaths and 737 injuries nationally." k12ssdb.org/interactive-map (last visited Feb. 18, 2023). The government has not independently verified those statistics. But if they are even close to accurate, they help illustrate the general point.

assaults, gang violence, and drug trafficking.  That conduct is inevitably more dangerous when committed with firearms.  And much of it is committed near but not on school grounds.  *See, e.g.*, Dkt. 22-3 at 66 ("there are large numbers of kids between the ages of 17 and 21 … standing on street corners dealing drugs"); *id*. at 67 (gang members "frequent the area of the schools," "furnish school-age students with weapons," and "send them into the schools"); *id*. at 75 (violence occurs "in the areas around the schools"); *id*. at 91 (a significant percentage of gun violence occurs after school and while students are traveling to and from school).

Taking those present-day problems together with present-day technology—say, a telephoto lens, a semiautomatic rifle, a 30-round magazine, and 150 rounds of ammunition—it is neither surprising nor unconstitutional for Congress to make modest adjustments to traditional restrictions.

## CONCLUSION

Allam's motion to dismiss should be denied.

Respectfully submitted,

BRIT FEATHERSTON
United States Attorney

STEPHAN E. OESTREICHER, JR.
Assistant United States Attorney
Maryland Bar No. 0112120169
101 E. Park Blvd., Suite 500
Plano, Texas 75074
(972) 415-6202
(972) 509-1209 (fax)
stephan.oestreicher@usdoj.gov

  /s/ *John B. Ross*
JOHN B. ROSS
Assistant United States Attorney
Texas Bar No. 00788325
350 Magnolia, Suite 150
Beaumont, Texas 77701-2237
(409) 839-2538
(409) 839-2550 (fax)
john.ross5@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing response was served on Allam's

counsel via electronic filing on this 21st day of February, 2023.

_/s/ John B. Ross_
JOHN B. ROSS